UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| SHERYL SERREZE DESROSIERS,<br><br>Plaintiff,<br><br>v.<br><br>HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY, a Connecticut Corporation,<br><br>Defendant. | : | Civil Action No. 03-018-L |

**MOTION FOR SUMMARY JUDGMENT**

Pursuant to F.R. Civ. P. 56, defendant Hartford Life And Accident Insurance Company hereby moves for summary judgment in this case.

In support of this motion, the Court is respectfully referred to the accompanying memorandum.

HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY,

By Its Attorneys,

Mark A. Pogue (#3441)
EDWARDS & ANGELL, LLP
2800 Financial Plaza
Providence, RI 02903
(401) 274-9200
(401) 276-6611 (telecopy)

**Certificate of Service**

I hereby certify that on this 3rd day of March, 2006 I served a copy of the within Motion For Summary Judgment by first class mail, postage prepaid to:

Christopher M. Lefebvre
Law Offices of Claude Lefebvre & Sons
P.O. Box 479
Pawtucket, RI 02862

Jordan M. Lewis, Esq.
Siegel, Brill, Greupner, Duffy & Foster, P.A.
400 East Wisconsin Avenue
Suite 333, Floor 3A
Milwaukee, WI 53202

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| SHERYL SERREZE DESROSIERS,<br><br>Plaintiff,<br><br>v.<br><br>HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY, a Connecticut Corporation,<br><br>Defendant. | : | Civil Action No. 03-018-L |

**MEMORANDUM IN SUPPORT OF DEFENDANT HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY'S CROSS-MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF ITS OBJECTION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Defendant Hartford Life And Accident Insurance Company ("Hartford") files this memorandum in support of its cross-motion for summary judgment and in support of its objection to plaintiff's motion for summary judgment.

The record reflects that Hartford devoted an extraordinary amount of time and attention to plaintiff's multi-faceted claim for disability benefits. Hartford contacted six of plaintiff's doctors to review her claimed ailments; reviewed hundreds of pages of medical notes and test results; arranged for plaintiff to submit to an independent neuropsychological examination; and asked its medical advisor to review plaintiff's case on four separate occasions. At every step of the way, the same theme emerged: there was no objective medical evidence that plaintiff's was unable to work and, on the contrary, there was substantial evidence indicating that she could. In

view of this evidence, Hartford's decision to deny plaintiff's claim not only was not arbitrary and capricious; it was the only reasonable conclusion that could be reached. Hartford is therefore entitled to summary judgment.

Plaintiff's own motion for summary judgment, on the other hand, is a study in evasion and avoidance. Plaintiff's supporting brief cherry-picks the record, omitting any discussion of unhelpful facts (such as the independent medical examination which pronounced plaintiff fit to work, and the conclusions of numerous doctors who openly questioned whether plaintiff's symptoms were imagined) while trumpeting the comments of a single neurologist who supported her claim. But plaintiff's selective presentation of the record cannot obscure -- and indeed underscores -- the fact that there is substantial evidence supporting Hartford's decision. As a result, plaintiff's motion must be denied.

## Factual Background

### A. The Parties

The plaintiff, Sheryl Serreze DesRosiers, is a Rhode Island resident. In 1992, she became employed by the Untied States Trustee Program, which is a division of the United States Department of Justice. In 1995, she assumed the position of Assistant United States Trustee of the Rhode Island office.

Hartford is a Connecticut corporation engaged, among other things, in underwriting group long-term disability insurance. Hartford is authorized to do business in Rhode Island.

### B. The Insurance

As an employee of the Justice Department, plaintiff participated in a group employee benefit plan known as the Federal Employees Group Long Term Disability Plan (the "Plan"). This Court has previously ruled that the Plan is governed by the provisions of the Employee

Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA"). Desrosiers v. Hartford Life And Acc. Ins., Co., 354 F. Supp. 2d 119 (D.R.I. 2005).

Benefits available under the Plan are paid from an insurance policy (the "Policy") issued by Hartford. Hartford is the administrator of the Plan, and has complete authority to determine eligibility for benefits under the Policy. In particular, the Policy provides:

> The Hartford has full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy.

The Policy defines "total disability" in the following terms:

Total Disability or Totally Disabled means that:

> i. during the Elimination Period; and
> ii. for the next 24 months, you are prevented by:
>
> a. accidental bodily injury;
> b. sickness;
> c. mental illness;
> d. substance abuse; or
> e. pregnancy,
>
> from performing the essential duties of your occupation, and as a result you are earning less than 20% of your Pre-disability earnings, unless engaged in a program of Rehabilitative Employment approved by us.[1]

---

[1] Defendant's Statement Of Undisputed Facts, Exh. A, p. 9. The Policy goes on to provide that, after 24 months, a claimant must establish that she is totally disabled from performing the essential duties of any occupation for which she is reasonably qualified. Id. Hartford's denial of plaintiff's claim related only to the "own occupation" portion of the Policy, and plaintiff does not contend otherwise. Hence, should this Court conclude that Hartford's decision was arbitrary and capricious, the proper remedy is to award benefits for the 24-month "own occupation" period, and remand for consideration under the "any occupation" standard.

**C. The Three Reported Injuries**

According to plaintiff, she sustained three separate injuries during 1999. On April 16, 1999, she was struck by a car door. A. 496.[2] On May 18, 1999, she broke her nose when she fell off a swing. Id. In December 7, 1999, she fell down a flight of stairs. Id.

**D. Plaintiff's Claim For Disability Benefits**

Following her accidents, plaintiff submitted a claim for disability benefits under the Policy. Hartford received the claim on February 15, 2000. A. 495.[3] On the claim form, plaintiff listed three conditions which in her view prevented her from working: "right leg paralysis"; "vision loss in left eye"; and cognitive deficits, including dizziness, headaches, and loss of memory. A. 496.

Plaintiff's treating physician, Diane I. Dubois-Hall, M.D., submitted an Attending Physician's Statement in connection with plaintiff's disability claim. Dr. Dubois-Hall, like plaintiff, indicated that plaintiff had three subjective symptoms at the time her claim was submitted: "R [right] leg partial paralysis s/c [spinal cord] injury"; "L [left] vision deficit"; and cognitive deficits, including headaches and "post-concussive syndrome." A. 500.

**E. Hartford's Investigation of Plaintiff's Claim**

After submitting her claim, plaintiff sent Hartford medical records reflecting her treatment during the previous 11 months. A. 403. Hartford thereupon contacted plaintiff's treatment providers in order to gather their records and evaluate plaintiff's claim. In particular, Hartford requested treatment records from Dr. Dubois-Hall; Dr. Thomas Johnson; Dr. Thomas

[2] References to "A." in this memorandum refer to the administrative record generated by Hartford in the course of processing plaintiff's claim. The administrative record is attached as Exhibit 2 to the Affidavit of Jordan Lewis, which was filed in connection with plaintiff's motion for summary judgment.

[3] Plaintiff states that she submitted the claim on January 27, 2000. A. 403.

Hedges; Dr. Ann Murriello; Dr. Michele Sammaritano; Dr. Thomas Sokol; Dr. Samuel Greenblatt; and Landmark Hospital. A. 14, 26, 27.

The medical records obtained by Hartford reflected the following treatment chronology:

On May 28, 1999, after she injured herself falling off a swing, plaintiff's brain was scanned by a Magnetic Resonance Imaging (MRI) device. A. 467. The results were negative. Id. On the same day, plaintiff underwent a CT scan of the brain. A. 469. These results were also negative. Id.

On December 8, 1999, the day after she fell down stairs, plaintiff was admitted to Rhode Island Hospital ("RIH"). A. 142. Her complaint upon admission was "right lower extremity monoplegia" – paralysis of the right leg. To investigate this complaint, an MRI scan of plaintiff's lumbar spine was conducted at RIH on December 8, 1999. It was "unremarkable," and revealed "no evidence of disc herniation or acute bony abnormality." A. 142, 437. On the same day, multiple X-rays of plaintiff's cervical, thoracic and lumbar spine were performed. These tests revealed "some marginal spur formation at various levels suggesting early or mild degenerative disc disease," A. 424, but overall were read as normal. A. 424, 217.

Because the MRI scan, X-rays and other tests performed on plaintiff's leg did not reveal anything abnormal, the physicians at RIH were unable to account for plaintiff's complaints of paralysis or weakness in that leg. For example, a physician's note dated December 10, 1999 states:

> Exam – she can lift entire [right] leg off mattress versus resistance but not with knee bent -- this makes no neurological sense.

A. 220-21. The doctors concluded that plaintiff's complaints were likely due to a psychological condition:

> Isolated "weakness" [at] right knee extensors entirely non-physiologic...Therefore, etiology is probably conversion hysteria or (less likely) malingering.

A. 217-18. Further, the doctors ruled out back conditions (radiculopathy or myelopathy) as a cause of plaintiff's leg complaints:

> Strength exam is inconsistent. Sensory exam non-physiological. No objective evidence of radiculopathy, myelopathy.

A.223.

Two days after her admission to RIH, plaintiff was walking again. A. 142. She was discharged from RIH on December 11, 1999 with a diagnosis of "Neck and back sprain." Id.

In January 2000, plaintiff consulted with Thomas Hedges III, M.D., a neuro-opthamologist in Boston, with regard to her complaints of a problem with the vision in her left eye. A. 384. Dr. Hedges performed another MRI scan. As with the MRI scan performed on May 28, 1999, the results were normal. A. 434.

On January 14, 2000, plaintiff was examined by Gary D. Johnson, M.D., a neurologist at The Miriam Hospital. A. 433-436. Her complaints centered on the same three items listed on the disability claim form she had submitted to Hartford: right leg weakness; vision deficits in her left eye; and cognitive symptoms including headaches and dizziness. A. 434-35. Like the doctors at RIH, Dr. Johnson was unable to explain plaintiff's complaints about weakness in her right leg. He strongly suspected that these complaints were exaggerated:

> Additionally, the right leg weakness does not seem to be a consistent abnormality, and seems clearly to be elaborated upon.

A. 435. Similarly, Dr. Johnson could not explain plaintiff's complaints about a vision deficit in her left eye:

> [T]he left eye problem seems to defy neurologic explanation. The pattern of field loss that she describes is one that is usually not associated with ocular pathology. However, there is no evidence

> of hemispheric abnormality or an optic tract lesion which could explain this. In fact, Dr. Hedges was not able to arrive at a specific cause for her symptoms, which also creates some confusion regarding this particular problem.

A. 435. Finally, Dr. Johnson could not confirm plaintiff's cognitive complaints, and recommended that plaintiff undergo neuropsychological testing to investigate her symptoms:

> [Plaintiff] describes cognitive symptoms, which could be related to a postconcussive state ... I do not have evidence to confirm or deny this. It would seem that neuropsychological testing would be helpful in documenting the degree to which these symptoms are present, since other aspects of her examination are difficult to define.

Id.

On January 21, 2000, plaintiff returned for a follow-up visit to Dr. Hedges. On this occasion Dr. Hedges noted that plaintiff "continues to have excellent visual acuity of 20/20," and that "we do not have any evidence of degeneration of the optic nerve." A. 384. Dr. Hedges noted, however, that plaintiff had "an irregular left hemianopic defect[4], although this was not associated with any objective findings, because plaintiff had nearly perfect (20/20) vision. Id. Because there were no physical problems with plaintiff's left eye, Dr. Hedges stated that plaintiff's vision problem "could improve spontaneously." Id.

On March 30, 2000, plaintiff underwent an EEG test. A. 63, 87. The results were normal. Id.

On May 5, 2000, Hartford decided to submit plaintiff's claim to Todd J. Lyon, M.D., for an assessment of plaintiff's functional capacity. A. 19-20. Dr. Lyon worked for Medical Advisory Group LLC, an independent medical consultant based in Plaistow, New Hampshire. A. 358. After reviewing the claim file, Dr. Lyon personally contacted three of plaintiff's treating

---

[4] Hemianopia is defined as "defective vision or blindness in half of the visual field of one or both eyes." Dorland's Illustrated Medical Dictionary (28th ed. 1994) at 744.

physicians -- Dr. Dubois-Hall, Dr. Johnson and Dr. Hedges -- in order to obtain their perspective on plaintiff's complaints. Dr. Dubois-Hall, who had treated plaintiff for a period of years, reported to Dr. Lyon that plaintiff seemed "slower both cognitively and physically," yet her intellectual capacities seemed unimpaired, and there was no objective explanation for her reported complaints. A. 356. Dr. Hedges reported that plaintiff had a "mild lateral left eye visual field deficit," but that this deficit did "not have significant visual impairment impact" and that, overall, plaintiff's visual acuity "was quite close to normal." A. 359. Dr. Johnson reported that his evaluation had "failed to find any consistent objective findings and that [he] was unable to attribute her symptoms to a specific neurologic diagnosis." A. 358.

On the basis of his review of the records and interviews with plaintiff's doctors, on May 19, 2000 Dr. Lyon issued a detailed report evaluating whether plaintiff's reported symptoms rendered her incapable of performing her occupation as an attorney. A. 361-65. Dr. Lyon concluded that the medical evidence failed to demonstrate any deficits that would preclude plaintiff from performing as an attorney. A. 365. Dr. Lyon further opined that, although there was no objective evidence of plaintiff's reported cognitive deficits, neuropsychological testing would be useful in clarifying whatever such deficits might exist. Id.

On May 18, 2000, Hartford informed plaintiff that it had arranged for her to undergo an independent neuropsychiatric examination to investigate her reported cognitive deficits. A. 17, 18.

On May 31, 2000, Dr. Dubois-Hall cleared plaintiff to return to work on a part-time basis, subject to certain restrictions. A. 345. Plaintiff in fact returned to work the next day. Affidavit of Sheryl Serreze Desrosiers ("Desrosiers Aff.") (submitted in connection with plaintiff's motion for summary judgment) ¶ 12.

By letter dated June 7, 2000, plaintiff's lawyer informed Hartford that plaintiff would not attend the independent neuropsychological examination arranged by Hartford. A. 336. Plaintiff's lawyer disputed the relevance of a neuropsychological examination since, according to the lawyer, "Ms Serreze's doctors all agree that her cognitive functioning has gradually and steadily improved since her accident six months ago." A. 336.

On June 14, 2000, plaintiff was examined by Michele Sammaritano, M.D., a neurologist. 118-121. According to Dr. Sammaritano:

> My clinical impression is that Ms. Serreze has suffered a series of three mild closed head injuries, and now has a residual neurological deficit including a visual field loss and neurological findings in the right lower extremity [leg]… She has suffered a post-concussion syndrome and headache, post-concussive exacerbation of her migraine headaches, a sleep disorder of hypersomnia probable [sic] trauma related…

A. 120-21. Dr. Sammaritano pronounced plaintiff totally disabled and instructed her to stop working – reversing the clearance to return to work given by plaintiff's family physician, Dr. Dubois-Hall, only two weeks earlier. A. 121, 345. Plaintiff followed Dr. Sammaritano's advice and stopped working. Desrosiers Aff., ¶ 13.

Despite the fact that her lawyer had previously announced that plaintiff would not attend the independent neuropsychological examination arranged by Hartford, plaintiff in fact attended that examination (accompanied by her husband) on June 15, 2000. The examination was conducted by Synthia I. Brooks, Ph.D. and Ronald A. Cohen, Ph.D., who are members of PsyBar, L.L.C., a provider of independent neuropsychological examinations based in St. Louis Park, Minnesota. A. 254-65. The examination, conducted at The Miriam Hospital in Providence, A. 285, consisted of a detailed interview with plaintiff and the administration of an extensive series of tests. A. 254.

Drs. Brooks and Cohen released a lengthy report with respect to their examination on July 10, 2000. A. 254-65. They concluded that plaintiff is a woman of "superior intelligence with intact neurocognitive functioning." A. 264. There was no evidence of amnesia or memory dysfunction. Id. There was no evidence of post-concussive syndrome. Id. Plaintiff scored in the above average or superior ranges on the most of the tests administered. Id. She scored in the low average range on only one test measuring visual tracking, and "her weaker performance in this area cannot be explained by particular deficits in these areas." Id.

Drs. Brooks and Cohen concluded that, from a neurocognitive standpoint, plaintiff was not disabled:

> Ms. Serreze appears to be a woman who is accustomed to very high levels of cognitive functioning, and in the face of even the slightest reduction in performance level, whether due to anxiety or stress, mild attentional difficulties, the effect of migraines, or possibly, if not likely, all of these conditions combined, she is likely to experience any change or reduction in her performance as major and significantly impaired. However, the results of the current neurocognitive evaluation, even when taken within the context of her outstanding achievements and education, do not reflect a pattern of disabling neurocognitive deficits.

A. 265.

At the time that plaintiff had initially refused to submit to an independent neuropsychological examination, Hartford had asked Dr. Lyon (who had recommended that such an examination be performed) to issue his "final" opinion on whether plaintiff was capable of performing her own occupation as an attorney. Dr. Lyon -- unaware that plaintiff had in fact been examined by Drs. Brooks and Cohen on June 15, 2000 -- released this report on June 20, 2000. A. 307. He concluded as follows:

> It is my opinion, based on the data in the medical report dated May 19, 2000, and the above information, that there is no compelling evidence to suggest that Sheryl Serreze's subjective complaints of

> cognitive deficits is limiting her ability to function at her sedentary capacity level occupation...Therefore, it is my opinion that Sheryl Serreze has the functional capacity to perform her own sedentary occupation and has had the capacity to do so from December 8, 1999 through March 9, 2000 and beyond.

A. 307.

After Hartford received the results of the independent neuropsychological examination, it asked Dr. Lyon to comment on them. In an addendum dated July 27, 2000, Dr. Lyon stated that the independent report confirmed his own view that plaintiff had the functional capacity, from a cognitive standpoint, to perform as an attorney:

> After reviewing this neuropsychological evaluation, I continue to feel that Sheryl Serreze has had and has currently the functional capacity to perform her own sedentary occupation. This new documentation verifies normal cognitive functioning.

A. 286.

On July 27, 2000, Hartford sent the report of Drs. Brooks and Cohen to Dr. Sammaritano and invited her to submit any comments in response to the report.

On August 11, 2000, having failed to receive any comments from Dr. Sammaritano, Hartford denied plaintiff's claim for disability benefits. A. 67-72. Hartford set out the reasons for its decision in a detailed letter. After summarizing the medical evidence, the letter stated that the reason for Hartford's decision was that the medical evidence "does not support that you were physically unable to perform the essential duties of your occupation ... [or] that you were unable to perform the essential duties of your occupation by any neurocognitive impairments." A. 71-2. Hartford invited plaintiff to submit any additional evidence in her possession, and explained that she had the right to appeal the decision. A. 72.

**F. Plaintiff's Appeal**

By letter dated August 18, 2000, plaintiff advised Hartford that she would submit additional information for consideration by Hartford. A. 251. On October 2, 2000, plaintiff requested an extension of time in which to submit additional documentation. A. 245. Hartford approved this request. A. 243. On November 6, 2000, plaintiff requested another extension of time, until November 23, 2000, to submit additional documentation. Id. Hartford approved this request as well. Id. On November 8, 2000, Hartford received a letter from plaintiff appealing Hartford's decision to deny benefits. A. 59. Although this appeal was received well outside the 60-day appeal period specified in Hartford's denial letter of August 11, 2000, Hartford considered the appeal as if it had been timely filed.

Plaintiff submitted several types of additional information to Hartford in connection with her appeal. First, she submitted a description of her job in the United States Trustees Program, including a document indicating how many hours of each day were devoted to performing particular tasks. A. 227-30.

Plaintiff also submitted a report generated by Samuel Sokol, Ph.D., a neuropsychologist at New England Medical Center. A. 125-28. Dr. Sokol examined plaintiff on July 21, 2000, but his report was not submitted to Hartford until November 21, 2000. A. 125. Dr. Sokol's report reflects that he conducted an interview and administered several tests. Dr. Sokol concluded that, in most areas of cognitive functioning, plaintiff's performance was normal or above normal. A. 127, 128. Her higher order visual processing skills were normal. A. 127. Dr. Sokol found, however, that plaintiff's VEP amplitudes in her left eye were "moderately abnormal." A. 128.[5] As a result of these moderately abnormal VEP amplitudes in her left eye, Dr. Sokol felt that the

[5] "VEP" stands for "visual evoked potential." Visual evoked potential tests measure electrical activity in the brain in response to visual stimulation.

conclusion of Drs. Brooks and Cohen -- that plaintiff had no disabling neurocognitive deficit -- should be viewed with "caution." A. 128. Although Dr. Sokol did not state that plaintiff was disabled, he opined that plaintiff's moderately abnormal VEP amplitudes "could interfere" with the performance of her job. Id.

On January 16, 2001, Dr. Lyon interviewed Dr. Sokol regarding his examination of plaintiff. A. 88. In that conversation, Dr. Sokol agreed that, despite plaintiff's moderately abnormal VEP results, her visual processing and visual test performance were in the average to high average range. Moreover, Dr. Sokol agreed that his examination had not revealed any significant organically based cognitive dysfunction. Id.

During the pendency of her appeal, plaintiff also submitted a letter from Dr. Hedges, the neuro-opthamologist, dated October 5, 2000. In that letter, Dr. Hedges reported that plaintiff's vision had improved, and that "her temporal visual field defect in the left eye is better." A. 140. Dr. Hedges stated that he "remain[s] very optimistic that she could improve spontaneously in the future." Id.

Plaintiff also submitted additional materials generated by Dr. Sammaritano. These included a letter from Dr. Sammaritano dated September 28, 2000. A. 131. In that letter Dr. Sammaritano reversed her earlier directive, see A. 121, and cleared plaintiff to return to work on a part-time basis, subject to certain limitations. A. 131.

Plaintiff also submitted a letter from Dr. Sammaritano dated October 31, 2000. A. 116-17. In that letter Dr. Sammaritano opined that, conditionally, plaintiff was totally disabled from working -- "unless the specific requirements of my letter dated September 28, 2000 are met." A. 116. According to Dr. Sammaritano, plaintiff suffered from a host of conditions, including "postconcussive syndrome and headache," "visual defect," "hypersomnia," "Sleep disorder called

Restless Legs Syndrome and Periodic Limb Movement Disorder," and "Lumbar-Sacral Radiculopathy on the right." Id.[6]

On January 31, 2001, Dr. Lyon interviewed Dr. Sammaritano concerning her findings regarding plaintiff. A. 88. He sent her a follow-up letter on the same day summarizing their conversation. A. 82. On February 14, 2001, Dr. Sammaritano responded to Dr. Lyon's letter. A. 82. She made two points in her letter. First, Dr. Sammaritano agreed with Dr. Lyon that plaintiff's "overall cognitive functioning was in the general normal range." A. 83. Second, Dr. Sammaritano disputed Dr. Lyon's characterization of plaintiff's occupation as "sedentary." Id.

On January 31, 2001, Dr. Lyon issued an additional addendum to his report in which he reviewed his conversations with Dr. Sokol and Dr. Sammaritano. A. 85-89. Dr. Lyon noted that Dr. Sokol agreed that none of the testing plaintiff had undergone demonstrated a significant organically based cognitive defect. A. 88 With respect to Dr. Sammaritano, Dr. Lyon noted her agreement that plaintiff's cognitive functioning was in the normal range. A. 88. He also noted that Dr. Sammaritano apparently believed that plaintiff suffered from a herniated disk. Dr. Lyon disputed this conclusion on grounds that (i) plaintiff's MRI results did not show any neural impingement; (ii) her reported symptoms were non-physiologic; and (iii) the RIH records from December 1999 "provide evidence suggesting non-physiologic neurologic findings and the possibility of a conversion disorder or malingering." A. 89. In sum, after communicating with Dr. Sokol and Dr. Sammaritano, Dr. Lyon maintained his opinion that plaintiff had both the physical and cognitive capabilities to meet the demands of her job. Id.

On February 15, 2001, plaintiff's lawyer wrote to Hartford to emphasize that she had not received federal disability retirement benefits. A. 81.

---

[6] Dr. Sammaritano's letter does not make clear whether, in her opinion, plaintiff was disabled because of each of these conditions individually, or as a result of their combined effect.

On May 17, 2001, Hartford denied plaintiff's appeal. A. 62-6. In its denial letter, Hartford reviewed all of the additional medical documentation provided by plaintiff. It then addressed each of the ailments that plaintiff (and Dr. Dubois-Hall) had raised in the original claim: cognitive deficits, right leg weakness, and visual problems with her left eye. Hartford summarized its discussion as follows:

> In summary, the new medical information submitted provides more evidence that Ms. Serreze retains excellent cognitive functioning. There is no documented neurologic deficit to explain complaints of pain or right extremity weakness. Moreover, the mild lateral visual field impairment Ms. Serreze had appears to be improving according to Dr. Hedges and neuropsychological testing demonstrates overall normal visual functioning. Although Ms. Serreze may have experienced a decrease in overall cognitive functioning as stated in the opinion of Dr. Sammaritano, she has retained sufficient cognitive capabilities to meet the essential duties of her occupation. Therefore, our position remains unchanged and no benefits are payable to Ms. Serreze.

A. 66.

On July 16, 2001, plaintiff wrote to Hartford to express her disagreement with its decision. A. 52. Hartford treated plaintiff's letter as a request for a further review of its position, and responded with a detailed letter, dated October 31, 2001, which again summarized the evidence it had relied on in denying her claim. A. 44-7. That letter stated:

> The Hartford does acknowledge that you did suffer a degree of injury on 12/8/99, and such may have compounded a previous level of similar injury suffered just prior to that time. Furthermore, The Hartford realizes that prior to the occurrence of accidental bodily injury on 12/8/99, your cognitive ability may have exceeded that which was measured subsequent to the same. However, based upon all of the medical findings produced upon the evaluation of your condition, as well as the professional opinions thereof, the extent of your injury is not shown to have rendered you "Totally Disabled," as defined by the policy…

A. 46.

Thirteen months later, in November 2002, plaintiff filed this lawsuit.

## Argument

### I. Hartford Is Entitled To Summary Judgment Upholding Its Decision

Hartford's cross-motion for summary judgment is asserted pursuant to F. R. Civ. P. 56. The Court may grant the motion upon a showing that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." F. R. Civ. P. 56. As shown below, there are no genuine issues of fact in this case, and Hartford is entitled to judgment as a matter of law.

#### A. The Deferential Standard Of Review

"When an insurance plan subject to ERISA grants discretion to the insurer to determine eligibility for benefits, the insurer's decisions will be generally reviewed only for an abuse of discretion." Plaintiff's Memorandum In Support Of Motion For Summary Judgment On Liability ("Pl. Mem.") at 6. Here, the parties agree that the Policy grants Hartford discretion to determine eligibility for benefits, with the result that Hartford's decision to deny plaintiff benefits should be reviewed by this Court under the deferential "arbitrary and capricious" standard of review. Id.[7]

> Under this standard, as the First Circuit stated last year, a decision to deny benefits to a beneficiary will be upheld if the Administrator's decision was reasoned and supported by substantial evidence. Evidence is substantial when it is reasonably sufficient to support a conclusion. Evidence contrary to an administrator's decision does not make the decision unreasonable, provided substantial evidence supports the decision.

Wright v. Donnelley & Sons Co. Group Benefits Plan, 402 F.3d 67, 74 (1st Cir. 2005) (citations and quotation marks omitted). Accord, Boardman v. Prudential Ins. Co. of Am., 337 F.3d 9, 15

[7] The Policy provides: "The Hartford has full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy." Defendant's Statement Of Undisputed Facts, Exh. A, p. 9.

(1st Cir. 2003) (holding that a district court can "overturn [an administrator's] termination decision only if 'the insurer's eligibility determination was unreasonable in light of the information available to it'" (citation omitted); Doyle v. Paul Revere Life Ins. Co., 144 F.3d 181, 184 (1st Cir. 1998) ("Sufficiency, of course, does not disappear merely by reason of contradictory evidence."); Gannon v. Metropolitan Life Ins. Co., 360 F.2d 211, 213 (1st Cir. 2004) ("the existence of contrary evidence does not, in itself, make the administrator's decision arbitrary.").[8]

**B. Rules Regarding Medical Evidence Under the Arbitrary And Capricious Standard**

Disability claims governed by ERISA always involve medical evidence. As a consequence, the First Circuit has developed several principles for use in reviewing claim decisions involving medical evidence pursuant to the deferential arbitrary and capricious standard.

First, where the medical evidence is conflicting, the court's role is not to resolve the conflict, but instead to determine merely whether the insurer's conclusion was supported by the record. "[W]e must determine not which side we believe is right, but whether the insurer had substantial evidentiary grounds for a reasonable decision in its favor." Matias-Correa v. Pfizer, Inc., 345 F.3d 7, 12 (1st Cir. 2003) (citation omitted).

Second, it is perfectly permissible for a doctor to render an opinion about a claimant's ability to work without physically examining the claimant. Gannon v. Metropolitan Life Ins. Co., 360 F.3d at 214 ("That Dr. Greenwood did not physically examine Gannon does not decrease the credibility of his medical opinion... On the contrary, we have treated a

[8] Plaintiff's discussion of the applicable standard of review relies on decisions from the Seventh Circuit, the Tenth Circuit, the Third Circuit, the Eighth Circuit and the District of Maryland. Pl. Mem. at 6-7. These cases are not relevant.

nonexamining physician's review of a claimant's file as reliable medical evidence on several occasions.").

Third, where an insurer has received conflicting medical opinions from both the claimant's treating physician and an independent medical consultant, "it is not the court's role to evaluate how much weight an insurer should have accorded the opinion of an independent medical consultant relative to the opinions of a claimant's own physicians." Wright v. R.R. Donnelley & Sons Co. Group Benefits Plan, 402 F.3d at 67 (citation omitted). In particular, as the United States Supreme Court has stated, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834, 123 S.Ct 1965, 155 L.Ed.3d 1034 (2003); accord, Gannon v. Metropolitan Life Ins. Co., 360 F.3d at 215 ("ERISA does not require plan administrators or reviewing courts to accord special deference to the opinions of treating physicians.").

Fourth, an opinion that a claimant is totally disabled, in order to be probative, must be based on objective findings which illustrate the limitations on the claimant's work capacity. Denmark v. Liberty Life Assurance Company of Boston, 2005 WL 3008684 (D.Mass. Nov. 10, 2005) * 23. This is true even where the claimed illness is itself incapable of objective measurement, because while such illnesses "do not lend themselves to objective clinical findings, the physical limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis." Boardman v. Prudential Ins. Co. of Am., 337 F.3d at 17 n.5.

Finally, "the existence of medical evidence pointing in two directions does not render arbitrary or capricious a plan administrator's decision to credit one viewpoint or the other." Buffonge v. Prudential Ins. Co. of America, 426 F.3d 20, 28 (1st Cir. 2005). Again, the court's

role is not to resolve such conflicts; rather, the court's function is merely to confirm that there is evidence "reasonably sufficient to support a conclusion" in the administrator's favor. Wright v. R.R. Donnelly & Sons, Co. Group Benefits Plan, 462 F.3d at 74.

### C. Hartford's Decision To Deny Benefits Must Be Upheld Because It is Reasoned And Supported By Substantial Evidence

Application of the foregoing authority makes clear that Hartford is entitled to summary judgment. Hartford's decision to deny plaintiff's claim was both reasoned and supported by substantial evidence. While there is a small amount of evidence in the record supporting plaintiff's disability claim, there is substantial evidence supporting Hartford's conclusion that the plaintiff is not disabled. That is sufficient to show that Hartford's decision was not arbitrary and capricious.

The following discussion is organized in accordance with the three ailments reported by plaintiff: weakness in her right leg; problems with the vision in her left eye; and cognitive deficits. As to each of these complaints, there is substantial evidence supporting Hartford's conclusion that plaintiff was not totally disabled.

#### 1. Plaintiff's Reported Right Leg Problem

There are three references in the administrative record to difficulties plaintiff reported with her right leg. First, on the claim form she submitted in February 2000, plaintiff alleged that her right leg was paralyzed. A. 303. Second, her treating physician at the time, Dr. Dubois-Hall, described this problem as "R [right] leg partial paralysis s/c [spinal cord] injury." A. 500. Finally, on June 14, 2000, Dr. Sammaritano submitted a report which referred to unspecified "neurological findings in the right lower extremity," A. 120, which she ascribed to "evidence for spinal cord injury vs. lumbar-sacral right radiculopathy." A. 121.

There are two reasons why Hartford's decision to deny plaintiff's disability claim with respect to her right leg was proper. First, there is no evidence at all that plaintiff's leg problems impaired her ability to work. Neither Dr. Dubois-Hall nor Dr. Sammaritano ever stated that plaintiff was disabled because of her leg condition. The strongest comment made by either of these physicians is Dr. Sammaritano's vague statement that there were unspecified "neurological findings" in plaintiff's leg which signaled "evidence for spinal cord injury vs. lumbar-sacral radiculopathy." A. 121.

Assuming arguendo that there was evidence that plaintiff was totally disabled because of her reported leg problems, Hartford's decision to deny this aspect of plaintiff's disability claim was not arbitrary or capricious. That is because there is substantial evidence -- that is, evidence reasonably sufficient to support a conclusion -- that plaintiff's leg problem was not disabling. For example: The MRI scan taken of plaintiff's lumbar spine on December 8, 1999 was unremarkable, and revealed no evidence of disc herniation. A. 142, 437. X-rays of her lumbar spine taken on the same day were also read as normal. A. 424, 217. These tests revealed "no objective evidence of radiculophathy, myleopathy." A. 223. The doctors at RIH could not explain plaintiff's leg complaints, and speculated that the cause was "hysteria or (less likely) malingering." A. 63-64. In any event, plaintiff's "leg paralysis" apparently abated quickly, because plaintiff was walking again on December 11, 1999, two days after her admission to RIH. A. 220-21.[9] Dr. Johnson, like the RIH doctors, could find nothing wrong with plaintiff's right leg, and speculated that plaintiff's complaints were exaggerated: "the right leg weakness does not seem to be a consistent abnormality, and seems clearly to be elaborated upon." A. 435.

[9] Between that date and December 2002, when plaintiff filed this action, there is no evidence in the administrative record that plaintiff's leg problems ever again prevented her from walking or, indeed, caused her any trouble at all.

Finally, Dr. Lyon interviewed Dr. Sammaritano specifically to learn why she believed that plaintiff suffered from a disabling leg problem, or a related back condition. A. 89. Dr. Lyon concluded that Dr. Sammaritano's speculation that plaintiff may have sustained a herniated disk was wrong, and he set forth a list of objective test results supporting his conclusion. A. 89.

In sum, there is no evidence that plaintiff's leg problem impaired her ability to work. There is substantial medical evidence that she had no disabling leg problem at all. As a result, Hartford's decision to deny benefits with respect to plaintiff's reported leg problem must be affirmed.

2. **<u>Plaintiff's Reported Vision Problem</u>**

Hartford is also entitled to summary judgment on plaintiff's disability claim with respect to her reported vision problem. That is because there is substantial evidence supporting Hartford's conclusion on this score, and no evidence establishing that this ailment was disabling.

The precise nature of plaintiff's reported vision problem is not clear from the record. Dr. Hedges noted that plaintiff had "an irregular left hemianopic defect." A. 384. Dr. Sokol commented that the "VEP amplitudes" in plaintiff's left eye were "moderately abnormal." A. 128. And Dr. Sammaritano commented more generally that plaintiff had a "visual defect." A. 116.

Regardless of the exact nature of plaintiff's eye problem, there is no evidence that it was disabling. No physician ever stated that plaintiff's eye problem rendered her unable to work. The strongest comment in the entire record is Dr. Sokol's notation that plaintiff's moderately abnormal VEP amplitudes "could interfere" with plaintiff's work as an attorney. A. 128. Of course, this speculation is too vague to establish that plaintiff was disabled. Moreover, Dr. Sokol's comment has little probative value because it is not based on objective findings. Even if

plaintiff's eye problem itself was not capable of objective measurement, any limitations created by the problem certainly were. See Boardman v. Prudential Ins. Co. of Am., 337 F.3d at 17 n. 5. But Dr. Sokol made no effort to measure or report those limitations.

In fact, the evidence was overwhelming that plaintiff's eye problem was not disabling. Dr. Hedges noted that plaintiff had "excellent visual acuity of 20/20." A. 384. Dr. Johnson noted that there was "no evidence of hemispheric abnormality or optic tract lesion which could explain" plaintiff's complaint, and that the problem "seems to defy neurologic explanation." A. 435. Dr. Lyon's review of the eye problem -- including interviews with Drs. Hedges, Johnson and Sokol -- confirmed that the eye problem was not disabling. Dr. Hedges stated that the problem did "not have significant visual impairment impact." A. 359. Dr. Johnson reported that his examination had failed to find any objective evidence of a problem. A. 358. And Dr. Sokol agreed that, despite the reported problem, objective measurements of plaintiff's performance on visual processing and visual performance tests showed that plaintiff's vision was in the average to above average range. A. 88.[10]

In sum, Hartford's conclusion that plaintiff's eye problem was not disabling is supported by substantial evidence. Hartford is therefore entitled to summary judgment as to plaintiff's eye problem.

### 3. **Plaintiff's Reported Cognitive Deficits**

Hartford is also entitled to summary judgment on plaintiff's claim that she incurred disabling cognitive deficits, including headaches and post-concussive syndrome. As shown below, the evidence on this point is to some degree conflicting. But Hartford is entitled to

[10] The fact that plaintiff's eye problem was not disabling is also shown by the fact that, in her summary judgment memorandum, plaintiff nowhere mentions the eye problem. Thus, it appears that plaintiff no longer contends that this problem was disabling.

summary judgment because its position is reasoned, and there is substantial evidence in support of its conclusion.

### a. <u>The Evidence Bearing On Plaintiff's Cognitive Functioning</u>

Dr. Dubois-Hall, plaintiff's family physician, noted that plaintiff seemed "slower" cognitively, although her intellectual capacities seemed undiminished. A. 356. One month later, plaintiff's lawyer reported to Hartford that plaintiff's doctors "all agree" that "her cognitive functioning has gradually and steadily improved since her accident six months ago." A. 336. In June 2000, Dr. Sammaritano pronounced plaintiff totally disabled because of, <u>inter</u> <u>alia</u>, post-concussive syndrome. A. 120-21. On June 15, 2000, plaintiff underwent an extensive neuropsychological examination by Drs. Brooks and Cohen, two independent medical consultants. Their report concluded that plaintiff was a woman of superior intelligence and was not disabled. A. 265. Dr. Sokol examined plaintiff in July 2000. He opined that the conclusion of Drs. Brooks and Cohen should be viewed with "caution," A. 123, although his testing had not revealed any significant organically based cognitive dysfunction. A. 88. In October 2000, Dr. Sammaritano pronounced plaintiff fit to return to work, from a cognitive standpoint, provided the physical limitations she recommended were observed. A. 116. In July 2001, Dr. Sammaritano opined that plaintiff's "overall cognitive functioning was in the general normal range." A. 83.

Finally, Dr. Lyons consistently opined that plaintiff's reported cognitive deficits did not prevent her from performing as an attorney. Dr. Lyons stated this on two occasions before he received the results of the independent medical examination. A. 365, 307. He repeated this conclusion after reviewing the independent report. A. 286. And on a fourth occasion, in January 2001, after interviewing both Drs. Sokol and Dr. Sammaritano, Dr. Lyon repeated his position: "Although Ms. Serreze may have experienced a decrease in overall cognitive functioning as

stated in the opinion of Dr. Sammaritano, she has retained sufficient cognitive capabilities to meet the essential duties of her occupation." A. 66.

### b. Hartford's Position Is Supported By Substantial Evidence

It is not the court's task to decide which doctor is right. Rather, the court's only mission is to determine "whether the insurer had substantial evidentiary grounds for a reasonable decision in its favor." Matias-Correa v. Pfizer, Inc., 345 F.3d at 12. Here, there was clearly substantial evidence supporting Hartford's position. The independent neuropsychiatric examination concluded that plaintiff's cognitive complaints were not disabling. Dr. Lyon said the same thing -- on four different occasions. Dr. Dubois-Hall opined that plaintiff's cognitive capacities were undiminished and Dr. Sammaritano herself agreed that plaintiff's cognitive functioning was normal. This evidence is more than sufficient to support Hartford's decision.

Because Hartford's conclusion was reasoned and supported by substantial evidence, Hartford is entitled to summary judgment.[11]

## II. Plaintiff's Motion For Summary Judgment Should Be Denied

Plaintiff has moved for summary judgment in support of her claim that she is entitled to disability benefits. Instead of presenting a balanced discussion of the record in support of her motion, plaintiff avoids discussing virtually any fact which undermines her claim, and instead places great emphasis on the statements of a single physician, Dr. Sammaritano. For example, plaintiff's brief does not contain a single reference to: (i) the independent neuropsychological

[11] In fact, Hartford's conclusion that plaintiff was not totally disabled from her own occupation is supported by Dr. Sammaritano, who cleared plaintiff to return to work (with certain conditions) on a part-time basis as of September 14, 200. A. 131. The First Circuit has on two occasions implied that total disability means inability to work either part-time or full-time, Doyle v. Paul Revere Life Insurance Company, 144 F.3d 181, 186 (1st Cir. 1998); August v. Offices Unlimited, Inc., 981 F.2d 576, 582 (1st Cir. 1992), and has cited with approval decision holding explicitly that part-time work capacity precludes total disability status. See Doyle, 144 F.3d at 186 (citing Marecek v. BellSouth Communications, Inc., 49 F.3d 702, 705 (11th Fir. 1995) and Simari's Case, 11 Mass. App. Ct. 904, 414 N.E. 2d 629 (1981). Thus, the fact that plaintiff's own doctor approved part-time work for plaintiff defeats her claim.

examination conducted by Drs. Brooks and Cohen (which found that plaintiff was fit to work); (ii) the report of Dr. Johnson (who could find no basis for plaintiff's complaints, and questioned whether plaintiff was exaggerating her symptoms); (iii) the opinions of the RIH doctors (who questioned whether plaintiff was imagining her symptoms); (iv) the report of Dr. Hedges (who noted that plaintiff had nearly perfect vision); or (v) plaintiff's CAT-scan and MRI test results (which showed that plaintiff had no disc herniation or other back problem). The mere fact that plaintiff's discussion of the evidence is so egregiously one-sided dooms her motion.

Because the medical evidence does not support her motion, plaintiff devotes the bulk of her brief to criticizing Hartford's handling of her claim on procedural grounds. As shown below, none of these criticisms is valid.

**1. Hartford's Consideration of Plaintiff's Cognitive Abilities Was Appropriate**

Plaintiff's first complaint is that Hartford, through Dr. Lyons, erroneously focused on plaintiff's cognitive abilities in evaluating her disability claim. Plaintiff says it is "unclear" why Hartford focused on her cognitive abilities, and asserts that they "were never at issue." Pl. Mem. at 12.

This assertion is puzzling, to say the least. On the claim form she submitted, plaintiff asserted that she was totally disabled because of "cognitive deficits." A. 496. So did her family physician, Dr. Dubois-Hall. A. 500. Moreover, the record contains many documents -- submitted by plaintiff -- intended to demonstrate that she was unable to work because of a diminution in her cognitive abilities.

If plaintiff now maintains that she was not disabled because of cognitive deficits, then her claim must be based on the reported vision problem in her left eye, because this is the only physical ailment that receives more than passing mention in plaintiff's supporting memorandum.

See Pl. Mem. at 21-22. As shown above, however, there is no basis for disturbing Hartford's conclusion that plaintiff's claimed vision problem was not disabling.

Plaintiff goes on to argue that "the point of [plaintiff's] disability claim is that she did not maintain her intellectual and physical strength to the level and for the time necessary to perform her occupation." Pl. Mem. at 12. Plaintiff offers no citation to the record in support of this assertion. That is not surprising because -- contrary to what plaintiff says now -- she never argued to Hartford that she lacked the stamina to perform her job. On the contrary, plaintiff argued that her leg problem, her eye problem and her cognitive deficits prevented her from working at all. Plaintiff's subsidiary argument -- that Hartford's "apparent position" is that plaintiff could perform "some of her job duties some of [the] time," Pl. Mem. at 12 -- is equally nonsensical. There is no support in the record for this statement. As shown above, the evidence supports Hartford's conclusion that plaintiff was not disabled from working on a full-time basis. See A. 67, 72, 62-6, 44-7.[12]

**2. Hartford Appropriately Reviewed Objective Evidence Of Plaintiff's Claimed Disability**

Plaintiff complains that it was unfair for Hartford (through Dr. Lyon) to expect plaintiff to submit objective evidence in support of her claim, "given the nature of [her] injuries." Pl. Mem. at 14. She further contends that Hartford ignored objective evidence that was submitted. Id. at 13-14.

The premise of this argument is wrong. Hartford did not require objective proof of the ailments plaintiff claimed -- for example, headaches -- which cannot be measured. Such ailments "do not lend themselves to objective clinical findings." Boardman v. Prudential Ins. Co. of Am., 337 F.3d at 17 n.5. Instead, as to these claimed ailments, Hartford looked for objective

[12] In any event, even part-time work capacity precludes total disability status. See note 11, supra.

evidence that they impaired plaintiff's ability to work. That is because "the physical limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis." Id. (emphasis added).

It was for this reason that Hartford commissioned the independent neuropsychological examination. The results of this examination showed -- objectively -- that while plaintiff had numerous cognitive complaints, they did not render her unable to perform her work as an attorney. To the contrary, plaintiff ranked far above average range on the majority of the tests given.

Nor did Hartford "ignore" objective evidence that supported plaintiff's claims. Dr. Lyon noted that plaintiff performed below average on one test module given during the independent examination. [cite]. He also noted that, based on her personal examinations, Dr. Sammaritano believed that plaintiff was disabled. In view of the diversity and abundance of countervailing evidence, however, Hartford's conclusion not to accept Dr. Sammaritano's conclusion cannot be faulted.

### 3. The Determination Of The Social Security Administration Was Not Relevant To Plaintiff's Disability Claim

Plaintiff asserts that she qualified for disability benefits from the Social Security Administration ("SSA"), and flays Hartford for "ignoring" that determination. Pl. Mem. at 14-16.

There are two problems with this argument. First, "the SSA's determination of a claimant's entitlement to social security benefits is not binding on disability insurers . . ." Gannon v. Metropolitan Life Ins. Co., 360 F.3d 211, 215 (1st Cir. 2004). The most that can be said is that such determinations "can be relevant" for an insurer's evaluation. Id.

Second, where a determination by the SSA is made after an ERISA insurer has already evaluated a disability claim, the insurer has no obligation to re-open its investigation in order to weigh the SSA's determination. See Denmark v. Liberty Life Assurance Company of Boston, 2005 WL**15, 16 (rejecting argument that insurer abused its discretion by declining to reconsider its denial in light of subsequent SSA determination; whether insurer abused its discretion is determined "in light of the information available to it when it made its decision.") (quotation marks omitted).

That is the situation here. Hartford denied plaintiff's claim on August 11, 2000, and denied her appeal (after granting plaintiff several extensions of time) on May 17, 2001. A. 62-6. On October 25, 2001, five months after her appeal was denied, plaintiff informed Hartford -- for the first time -- that the SSA had "recently commenced disability payments." A. 49.[13] But since Hartford had already completed its investigation and denied plaintiff's appeal, it had no obligation to reopen the appeal in light of the new information.[14]

Finally, benefits are available under the Policy only if plaintiff became disabled while she was working. The record contains no indication as of what date the SSA concluded that plaintiff was disabled. Without that information, the SSA determination is of no probative value at all.

For the foregoing reasons, the SSA's determination regarding plaintiff's disability application was neither binding nor relevant to the claim plaintiff submitted to Hartford.

---

[13] Plaintiff says that she "applied for SSA disability benefits and received them, and kept Hartford apprised at every step along the way." Pl. Mem. at 14-15. This is a huge overstatement. The voluminous administrative record contains only two references to plaintiff's application to the SSA. One document (A. 403 ) indicates that plaintiff had applied for benefits. The other (A. 49 ) – which plaintiff sent to Hartford after her appeal had already been denied – indicates that plaintiff was receiving SSA benefits.

[14] The regulations adopted pursuant to ERISA's "full and fair review" provision, 29 U.S.C. § 1133(2), only require administrators to establish procedures providing claimants with a reasonable opportunity to appeal a denied claim. 29 C.F.R. § 2560.503-1(g)(l)(1977). No further review is required. Here, Hartford afforded plaintiff the opportunity to appeal its initial decision, and that appeal was denied on May 17, 2001. A. 62-6. Although Hartford in effect permitted plaintiff to file a second appeal, See A. 66, this was not required under the regulations.

4. **Hartford Did Not Ignore The FERS Disability Finding**

Next, plaintiff criticizes Hartford because its analysis "makes no mention at all of the decision by the Federal Employees' Retirement [sic] that [plaintiff] was disabled." Pl. Mem. at 16. Plaintiff asserts that Hartford "knew" of this decision. Id. at 17.

This argument is incorrect. There is no evidence in the administrative record that Hartford "knew" that the Federal Employees Retirement system ("FERS") had deemed plaintiff disabled. To the contrary, plaintiff informed Hartford that FERS had denied her application for benefits. A. 81. Later -- after Hartford had denied her appeal -- plaintiff told Hartford that her FERS payments "were not finalized." A. 49.

It is the plaintiff's burden to submit evidence in support of her disability claim. Denmark v. Liberty Life Assurance Company Of Boston, 2005 WL 3008684 *19. Here, plaintiff did not inform Hartford that the FERS had awarded benefits while her claim was under consideration at Hartford.

Even if plaintiff had brought the FERS decision (assuming there was one) to Hartford's attention, it would have had no probative value. That is because the standards the FERS uses for awarding benefits (set forth at 5 U.S.C. § 8451(a)(l)(B)) are completely different from those contained in the Policy. Plaintiff cites to no reported decision -- and Hartford has not found one -- in which any court has concluded that an award from the FERS is relevant to a disability determination under ERISA.

5. **There Were No "Procedural Irregularities" In The Processing Of Plaintiff's Claim**

Plaintiff complains that Hartford committed a variety of "procedural errors and miscues" which "bear directly on the arbitrariness and capriciousness of its denial." Pl. Mem. at 17. This

is not so. As shown below, the "errors and miscues" identified by plaintiff are substantially exaggerated, and in any event do not bear on the propriety of Hartford's decision.

### A. Alleged Delays In Rendering A Decision

Plaintiff complains that Hartford took "about nine months" to render its initial decision on plaintiff's claim. Pl. Mem. at 17. This is not true. Plaintiff's disability claim was received by Hartford on February 15, 2000. A. 495. Hartford rendered its initial decision on August 11, 2000 – less than six months later. A. 67-72. The reason the claim took nearly six months to process was because of its complexity, and the unusually large number of health care providers involved. Hartford gathered information from no fewer than six physicians in order to process this claim. It reviewed hundreds of pages of treatment notes and other documents related to the claim. Its medical consultant, Dr. Lyon, issued three separate reports during the claim processing period. In addition, Hartford scheduled, and plaintiff attended, an independent neuropsychological examination.

There is no allegation in plaintiff's motion that Hartford's careful consideration of her multi-faceted claim prejudiced her interests in any way. Nor is there any complaint that Hartford's processing of her appeal was dilatory. To the contrary, plaintiff herself asked for extensions of time, on two different occasions, to submit information supporting her appeal. A. 243, 245.

### B. Alleged Delays In Processing Plaintiff's Appeal

Plaintiff complains that she appealed Hartford's decision on July 16, 2001, and that Hartford did not resolve the appeal until October 31, 2001. Pl. Mem. at 17-18.

The period of three and one-half months needed to process plaintiff's appeal is explained by the complexity of her claim and the need to review the "numerous letters" submitted by

plaintiff and her lawyers during this period. A. 44. In any event, plaintiff does not allege that she was prejudiced by any delay.

### C. Plaintiff's Job Description

Next, plaintiff alleges that "Hartford had no information that described [her] job function when it denied her disability claim." Pl. Mem. at 18. This is not so. On November 21, 2000, plaintiff's counsel submitted a very detailed description of plaintiff's job duties. A. 227-230. It included the number of hours in a representative week that plaintiff spent performing each of her various job duties – travel, document preparation, court appearances, legal research, attendance at seminars, and so forth. A. 230. Hartford received this information and considered it in the course of processing plaintiff's appeal. See A. 62.[15]

### D. Plaintiff's Complaints About Dr. Lyon

Plaintiff advances a number of complaints about Dr. Lyon. She questions his expertise; complains that Hartford gave his opinions undue weight; asserts that he discounted objective evidence and certain of plaintiff's symptoms; and that he "manufactured" the record ultimately relied upon by Hartford to deny her claim. Pl. Mem. at 19-22.

With respect to Dr. Lyon's expertise, there are several problems with plaintiff's argument. First, the significance plaintiff attaches to Dr. Lyon's credentials is overblown, because he was just one of numerous physicians who either pronounced plaintiff fit to work or were unable to confirm her reported physical problems. Dr. Hedges, Dr. Johnson, Drs. Brooks and Cohen, and the doctors at RIH all fall into this category. Second, plaintiff made no effort to request information about Dr. Lyon's credentials during the lengthy processing of her claim or the long pendency of this lawsuit, with the result that her complaint now rings hollow. Finally, there is

[15] Plaintiff boldly alleges that "there is no evidence in the file" that the job description submitted by her attorney "was even considered in [her] appeal." Pl. Mem. at 19. The record belies this statement. See A. 62 (item 7).

simply no requirement under ERISA that the insurer provide to a claimant information concerning the doctors upon whom the insurer relies.

Plaintiff also complains that Hartford placed undue weight on the opinions of Dr. Lyon[16], and that this reliance was error because Dr. Lyon "discounted" certain medical evidence and "manufactured" other evidence to support his conclusions. Pl. Mem. at 19, 20. Plaintiff insinuates that Dr. Lyon's opinions amount to nothing more than a "hunch." Id. at 20.

This argument runs afoul of the basic principle that it is not the Court's function to question the weight Hartford gave to Dr. Lyon. "[I]t is not the court's role to evaluate how much weight an insurer should have accorded the opinion of an independent medical consultant relative to the opinions of a claimant's own physician." Wright v. R.R. Donnelley & Sons Co. Group Benefits Plan, 402 F.3d at 67. Moreover, plaintiff's charges -- once again -- are unfounded. Dr. Lyon did not discount or ignore unfavorable evidence. To the contrary, he contacted plaintiff's strongest advocate -- Dr. Sammaritano -- by telephone and by mail to discuss her views, and forthrightly discussed her opinions at considerable length in his own report. A. 86-87.[17] The fact that Dr. Lyon concluded that plaintiff was not disabled does not mean that he "discounted" or "ignored" Dr. Sammaritano's opinions; it simply means that he disagreed with them. Under the arbitrary and capricious standard of review, this is precisely the sort of disagreement which this Court should not attempt to resolve.

Finally, plaintiff's charge that Dr. Lyon "manufactured" the record he relied on. Pl. Mem. at 19. This is another distortion. The great bulk of Dr. Lyon's reports are based on the written

[16] According to plaintiff, "Virtually all roads in this case lead back to Dr. Todd J. Lyon...[His] coverage memos are repeated, nearly verbatim, by every Hartford claims processor after they were written. And they were essentially unchanged throughout the entire claims process." Pl. Mem. at 11.

[17] Plaintiff also complains that Dr. Lyon discounted certain test scores attained by plaintiff in one area of the testing administered by Dr. Sokol. Pl. Mem. at 20. This is a misrepresentation. Dr. Sokol himself agreed that the isolated low test scores in question could have been due to inattention – especially since plaintiff had scored well in these area during the testing conducted one month earlier by Drs. Brooks and Cohen. A. 88.

material which comprises the administrative record in this case. In those cases where Dr. Lyon interviewed a treating physician, he was careful to document the conversation, and then give the physician an opportunity to correct his summary. The fact that, on one occasion,[18] Dr. Sammaritano wrote back to clarify her position on one issue does not mean that Dr. Lyon fabricated information. Instead, it reflects that his procedure for ensuring the accuracy of his interview notes worked as intended.

**Conclusion**

For the foregoing reasons, Hartford's motion for summary judgment should be granted, and plaintiff's motion for summary judgment should be denied.

HARTFORD LIFE INSURANCE COMPANY,

By its Attorneys,

Mark A. Pogue (#3441)
EDWARDS ANGELL PALMER & DODGE, LLP
2800 Financial Plaza
Providence, RI 02903
(401) 274-9200
(401) 276-6611 (telecopy)

[18] A. 82.



PRV_787806_1/MPOGUE

**Certificate of Service**

I hereby certify that on this 3rd day of March, 2006 I served a copy of the foregoing by first class mail, postage prepaid to:

Christopher M. Lefebvre, Esq.
Law Offices of Claude Lefebvre & Sons
P.O. Box 479
Pawtucket, RI 02862

Jordan M. Lewis, Esq.
Siegel, Brill, Greupner, Duffy & Foster, P.A.
1845 Walnut Street, 24th Floor
Philadelphia, PA 19103

[signature]