UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| SHERYL SERREZE DESROSIERS,<br><br>Plaintiff,<br><br>v.<br><br>HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY, a Connecticut Corporation,<br><br>Defendant. | : | Civil Action No. 03-018-L |

**DEFENDANT'S STATEMENT OF UNDISPUTED FACTS**

Pursuant to Local Rule 12.1, Defendant Hartford Life and Accident Insurance Company ("Hartford") submits the following statement of undisputed facts.

1. Plaintiff, Sheryl Serreze DesRosiers, began working for the United States Trustee Program, a division of the United States Department of Justice, in 1992. In 1995, plaintiff assumed the position of Assistant United States Trustee of the Rhode Island office.

2. As an employee of the Justice Department, plaintiff participated in a group employee benefit plan known as the Federal Employees Group Long Term Disability Plan (the "Plan"). Benefits available under the plan are paid from an insurance policy (the "Policy") issued by Hartford.

3. The Policy defines "total disability" as follows:

Total Disability or Totally Disabled means that:

i. during the Elimination Period; and
ii. for the next 24 months, you are prevented by:

a. accidental bodily injury;
b. sickness;
c. mental illness;
d. substance abuse; or

e. pregnancy,

from performing the essential duties of your occupation, and as a result you are earning less than 20% of your Pre-disability earnings, unless engaged in a program of Rehabilitative Employment approved by us.

See Exh. A hereto, p. 9.

4. Hartford is the administrator of the Plan and "has full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions" of the Policy. Id.

5. Plaintiff states that she sustained three injuries during 1999. On April 16, 1999, she was struck by a car door. A. 496.[1] On May 18, 1999, she fell off a swing. Id. On December 7, 1999, she fell down a flight of stairs. Id.

6. Plaintiff submitted a claim for disability benefits following these accidents. Hartford received the claim on February 15, 2005. A. 495. Plaintiff listed three conditions on the claim form which, in her view, prevented her from working: "right leg paralysis"; "vision loss in left eye"; and cognitive defects, including dizziness, headaches, and loss of memory. A. 496.

7. After submitting her claim, plaintiff sent Hartford medical records reflecting her treatment during the previous 11 months. Hartford then contacted plaintiff's treatment providers to evaluate plaintiff's claim. Hartford requested treatment records from Dr. Dubois-Hall, Dr. Thomas Johnson, Dr. Thomas Hedges, Dr. Ann Murriello, Dr. Michele Sammartino, Dr. Thomas Sokol, Dr. Samuel Greenblatt, and Landmark Hospital. A. 14, 26, 27.

[1] References to "A." herein refer to the administrative record generated by Hartford in the course of processing plaintiff's claim. The administrative record is attached as Exhibit 2 to the Affidavit of Jordan Lewis, which was filed in connection with plaintiff's motion for summary judgment.

8. On May 28, 1999, after plaintiff fell off a swing, plaintiff's brain was scanned by a Magnetic Resonance Imaging ("MRI") device, and she underwent a CT scan of the brain. The results of both tests were negative. A. 467, 469.

9. On December 8, 1999, the day after she fell down stairs, plaintiff was admitted to Rhode Island Hospital ("RIH"), complaining of "right lower extremity monoplegia," i.e., paralysis of the right leg. A. 142. An MRI scan of plaintiff's spine was "unremarkable," and revealed "no evidence of disc herniation or acute bony abnormality." A. 142, 437. In addition, multiple X-rays of plaintiff's cervical, thoracic and lumbar spine were performed; overall, these tests were read as normal. A. 217, 424.

10. Because the tests performed revealed no abnormalities, physicians at RIH were unable to account for plaintiff's complaints, noting that the weakness in her right leg was "entirely non-physiologic" and "probably conversion hysteria or (less likely) malingering." A. 217-18.

11. Plaintiff was walking again two days after her admission to RIH, and she was discharged on December 11, 1999. A. 142.

12. In January 2000, plaintiff consulted with Thomas Hedges III, M.D., a neuro-opthamologist, complaining of vision problems in her left eye. Dr. Hedges performed an MRI scan, the results of which were negative. A. 434.

13. On January 14, 2000, plaintiff was examined by Gary D. Johnson, M.D., a neurologist at The Miriam Hospital. A. 433-36. Her complaints centered on the three items listed on the disability claim submitted to Hartford: right leg weakness, vision deficits in her left eye; and cognitive symptoms. A. 434-35.

14. Dr. Johnson was unable to explain plaintiff's complaints about weakness in her right leg, noting that "the right leg weakness does not seem to be a consistent abnormality, and seems clearly to be elaborated upon." A. 435. With respect to plaintiff's complaints regarding a vision deficit in her left eye, Dr. Johnson stated, "the left eye problem seems to defy neurologic explanation." Id. Dr. Johnson could not confirm plaintiff's cognitive complaints, and recommended neuropsychological testing to investigate her symptoms. Id.

15. On January 21, 2000, plaintiff saw Dr. Hedges again. He noted that plaintiff "continues to have excellent visual acuity of 20/20," and that there was no evidence of degeneration of the optic nerve. A. 384. He further noted that plaintiff had an irregular left hemianopic defect, but that this defect was not associated with any objective findings and that plaintiff's vision problem "could improve spontaneously." Id.

16. On March 30, 2000, plaintiff underwent an EEG test. A. 63, 87. The results were normal.

17. On May 5, 2000, Hartford submitted plaintiff's claim to Todd J. Lyon, M.D., for an assessment of her functional capacity. A. 19-20. After reviewing the claim file, Dr. Lyon personally contacted three of plaintiff's treating physicians – Dr. Dubois-Hall, Dr. Johnson and Dr. Hedges.

18. Dr. Dubois-Hall, who had treated plaintiff for a period of years, reported to Dr. Lyon that plaintiff seemed "slower both cognitively and physically," but that her intellectual capacities appeared to be unimpaired and that there was no objective explanation for her reported complaints. A. 356. Dr. Hedges reported that plaintiff had a "mild lateral left eye visual field deficit," but that this deficit did "not have significant visual impairment impact" and that, overall, plaintiff's visual acuity "was quite close to normal." A. 359. Dr. Johnson reported that

his evaluation had "failed to find any consistent objective findings and that [he] was unable to attribute her symptoms to a specific neurologic diagnosis." A. 358.

19. On May 19, 2000, Dr. Lyon issued a detailed report concluding that the medical evidence failed to demonstrate any deficits that would preclude plaintiff from performing her job as an attorney. A. 361-65. Dr. Lyon further opined that, although there was no objective evidence of plaintiff's reported cognitive deficits, neuropsychological testing would be useful in clarifying whether such deficits might exist. A. 365.

20. On May 18, 2000, Hartford informed plaintiff that it had arranged for her to undergo an independent neuropsychological examination. A. 17, 18.

21. On May 31, 2000, Dr. Dubois-Hall cleared plaintiff to return to work on a part-time basis, subject to certain restrictions. A. 345. Plaintiff returned to work the next day. Affidavit of Sheryl Serreze Desrosiers (submitted in connection with plaintiff's motion for summary judgment), ¶ 12.

22. By letter dated June 7, 2000, plaintiff's lawyer informed Hartford that plaintiff would not attend the independent neuropsychological examination arranged by Hartford. Plaintiff's lawyer disputed the relevance of such an examination, stating that plaintiff's doctors "all agree that her cognitive functioning has gradually and steadily improved since her accident six months ago." A. 336.

23. On June 14, 2000, plaintiff was examined by Michele Sammartino, M.D., a neurologist. A. 118-21. Dr. Sammartino opined that plaintiff had suffered a series of "three mild closed head injuries," and, as a result, had "a residual neurological deficit including a visual field loss and neurological findings in the right lower extremity [leg]," as well as "post-

concussion syndrome and headache, post-concussive exacerbation of her migraine headaches, a sleep disorder of hypersomnia probable [sic] trauma related . . . ." A. 120-21.

24. Dr. Sammartino pronounced plaintiff totally disabled and instructed her to stop working – reversing the clearance given by Dr. Dubois-Hall only two weeks earlier. A. 121, 345. Plaintiff stopped working. Affidavit of Sheryl Serreze Desrosiers, ¶ 13.

25. Contrary to her attorney's earlier statement that she would not do so, on June 15, 2000, plaintiff attended the neuropsychological examination arranged by Hartford. The examination was conducted by Synthia I. Brooks, Ph.D., and Ronald A. Cohen, Ph.D., who are members of PsyBar, L.L.C., a provider of independent neuropsychological examinations. A. 254-65. The examination consisted of a detailed interview with plaintiff and the administration of an extensive series of tests. A. 254.

26. On July 10, 2000, Drs. Brooks and Cohen issued a lengthy report; in that report, Drs. Brooks and Cohen concluded that, from a neurocognitive standpoint, plaintiff was not disabled. A. 265.

27. Unaware that plaintiff had decided to submit to an independent neuropsychological examination (as he had recommended), Dr. Lyon issued a final opinion on whether plaintiff was capable for performing her occupation as an attorney on June 20, 2000. A. 307. Dr. Lyon concluded that "there is no compelling evidence to suggest that Sheryl Serreze's subjective complaints of cognitive deficits is limiting her ability to function at her sedentary capacity level occupation." Id.

28. After Hartford received the results of the independent neuropsychological examination, it asked Dr. Lyon to comment on them. On July 27, 2000, Dr. Lyon issued an addendum to his final report, in which he stated that the independent report confirmed his own

view that plaintiff had the functional capacity, from a cognitive standpoint, to perform as an attorney. A. 286.

29. Hartford also sent the report of Drs. Brooks and Cohen to Dr. Sammartino and invited her to submit comments in response to the report. A. 12.

30. On August 11, 2000, not having received any comments from Dr. Sammartino, Hartford denied plaintiff's claim for disability benefits. A. 67-72. In its detailed letter setting forth the reasons for its decision, Hartford explained that the medical evidence did not support that plaintiff was physically unable to perform the essential duties of her occupation or that she was unable to perform those essential duties by reason of any neurocognitive impairments." A. 72. Hartford invited plaintiff to submit any additional evidence in her possession, and notified her of her right to appeal the decision. A. 72.

31. By letter dated August 18, 2000, plaintiff advised Hartford that she would submit additional information for consideration by Hartford. A. 251. She then requested, and Hartford granted, two extensions of time to do so. A. 243, 245.

32. On November 8, 2000, Plaintiff appealed Hartford's denial of benefits. A. 59. In support of her appeal, plaintiff submitted a description of her job duties, A. 227-30; a report by Samuel Sokol, Ph.D., a neuropsychologist at New England Medical Center, A. 125-28; and additional materials generated by Dr. Sammartino, A. 116-17, 131.

33. In his report, Dr. Sokol concluded that, in most areas of cognitive function, plaintiff's performance was normal or above normal. A. 127-28. Dr. Sokol further concluded that plaintiff's higher order visual processing skills were normal, but that the VEP amplitudes in her left eye were "moderately abnormal." A. 128. He opined that the moderately abnormal VEP

amplitudes "could interfere" with plaintiff's performance of her law practice and, therefore, that the conclusion of Drs. Brooks and Cohen should be viewed with "caution." A. 128.

34. On January 16, 2001, Dr. Lyon interviewed Dr. Sokol regarding his examination of plaintiff. A. 88. Dr. Sokol acknowledged in that interview that, despite the moderately abnormal VEP results, plaintiff's visual processing and performance test results were in the average to high average range. Id.

35. The additional materials generated by Dr. Sammartino included (i) a letter dated September 28, 2000, in which Dr. Sammartino cleared plaintiff to return to work on a part-time basis, with certain limitations, A. 131; and (ii) a letter dated October 31, 2000, in which Dr. Sammartino opined that, conditionally, plaintiff was totally disabled from working unless the specific requirements outlined in her letter of September 28, 2000 were met, A. 116-17.

36. On January 31, 2001, Dr. Lyon interviewed Dr. Sammartino regarding her findings. A. 88. He then sent her a letter summarizing their conversation, A. 82, and on February 14, 2001, Dr. Sammartino responded to that letter. A. 83. In her response, Dr. Sammartino agreed that plaintiff's overall cognitive functioning was in the "general normal range," but disputed Dr. Lyon's characterization of plaintiff's occupation as sedentary. Id.

37. On January 31, 2001, Dr. Lyon issued a second addendum to his report, maintaining his opinion that plaintiff had both the physical and cognitive abilities to perform her job. A. 85-89. Dr. Lyon reviewed his discussions with Dr. Sokol and Dr. Sammartino, noting that Dr. Sokol agreed that none of the testing plaintiff had undergone demonstrated a significant organically based cognitive defect and that Dr. Sammartino had agreed that plaintiff's cognitive functioning was in the normal range. A. 88. Dr. Lyon further noted that Dr. Sammartino apparently believed that plaintiff suffered from a herniated disk. Dr. Lyon disputed this

conclusion based on (i) plaintiff's normal MRI results; (ii) the fact that plaintiff's reported symptoms were non-physiologic; and (iii) the RIH records from December 1999. A. 89.

38. During the pendency of her appeal, plaintiff also submitted a letter from Dr. Hedges stating that plaintiff's vision had improved and that Dr. Hedges remained optimistic that the condition could "improve spontaneously in the future." A. 140.

39. On May 17, 2001, Hartford denied plaintiff's appeal. A. 62-66. In its denial letter, Hartford reviewed all the additional medical documentation provided by plaintiff and addressed each of the three ailments that plaintiff had raised in the original claim, noting that (i) the new medical information provided more evidence that plaintiff retains sufficient cognitive capabilities to meet the essential duties of her occupation; (ii) that there is no documented neurologic deficit to explain her complaints regarding her right leg; and (iii) that plaintiff's mild lateral visual field impairment appeared to be improving and that the neuropsychological testing demonstrated overall normal visual functioning. A. 66.

40. On July 16, 2001, plaintiff wrote to Hartford to express her disagreement with its decision. A. 44. Hartford responded with another letter summarizing the evidence it relied on in denying her claim. A. 44-47.

41. Fourteen months later, in December 2002, plaintiff filed this suit.

March 3, 2006

HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY,

By Its Attorneys,

Mark A. Pogue (#3441)
EDWARDS ANGELL PALMER & DODGE, LLP

2800 Financial Plaza
Providence, RI 02903
(401) 274-9200
(401) 276-6611 (telecopy)

**Certificate of Service**

I hereby certify that on this 3rd day of March, 2006 I served a copy of the foregoing by first class mail, postage prepaid to:

Christopher M. Lefebvre
Law Offices of Claude Lefebvre & Sons
P.O. Box 479
Pawtucket, RI 02862

Jordan M. Lewis, Esq.
Siegel, Brill, Greupner, Duffy & Foster, P.A.
1845 Walnut Street, 24th Floor
Philadelphia, PA 19103

**HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY**
**Hartford, Connecticut**
(Herein called The Hartford)

**CERTIFICATE OF INSURANCE**
under
**The Group Insurance Policy**
**as of the Effective Date**
Issued by
**The Hartford**
to
**The Policyholder**

This is to certify that The Hartford has issued and delivered the Group Insurance Policy to the Policyholder.

The Group Insurance Policy insures the employees of the Employer who:

- are eligible for the insurance;
- become insured; and
- continue to be insured;

according to the terms of the Policy.

The terms of the Group Insurance Policy which affect your insurance are contained in the following pages.

This Certificate of Insurance and the following pages will become your Booklet-certificate. This Booklet-certificate is a part of the Group Insurance Policy.

This Booklet-certificate replaces any other that The Hartford may have issued to the Policyholder to give to you under the Group Insurance Policy specified herein.

**HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY**

Lynda Godkin, *Secretary* Lawndes A. Smith, *President*



**SCHEDULE OF INSURANCE**

| | |
|---|---|
| The Policyholder: | DEPARTMENT OF JUSTICE RECREATION ASSOCIATION |
| The Group Insurance Policy: | GLT-695001 |
| Employer: | DEPARTMENT OF JUSTICE |
| The Plan Effective Date: | March 1, 1995 |

This plan of Long Term Disability Insurance provides you with income protection if you become disabled from a covered accidental bodily injury, sickness or pregnancy.

You must contribute towards the plan's cost.

| | |
|---|---|
| Eligible Class(es): | All Active Permanent Full-time Employees, including employees working in job share positions where each share of the total job calls for a minimum of 20 hours per week |
| Full-time Employment: | 40 hours weekly |
| Maximum Monthly Benefit: | Option 1 - $3,500<br>Option 2 - $8,000 |
| Minimum Monthly Benefit: | $100 |
| Benefit Percentage: | Option 1 - 50%<br>Option 2 - 65% |

The Option you elect must be indicated on your Group Insurance Enrollment Materials.

[redacted]

**The Eligibility Waiting Period** is the number of continuous days of service during which you must be an Active Full-time Employee in a class eligible for insurance before you become eligible for coverage. It is as follows:

(1) If you are working for the Employer on the Plan Effective Date - None

(2) If you start working for the Employer after the Plan Effective Date - None

**The Elimination Period** is the period of time you must be Totally Disabled before benefits become payable. It is:

Option 1 - the first 60 consecutive days of any one period of Total Disability; or

Option 2 - the first 90 consecutive days of any one period of Total Disability.

The Option you elect must be indicated on your Group Insurance Enrollment Materials.

**MAXIMUM DURATION OF BENEFITS TABLE**

| **Age When Totally Disabled** | **Benefits Payable** |
|---|---|
| Prior to Age 62 | To Age 65, or for 48 months, if greater |
| Age 62 | 48 months |
| Age 63 | 42 months |
| Age 64 | 36 months |
| Age 65 | 30 months |
| Age 66 | 27 months |
| Age 67 | 24 months |
| Age 68 | 21 months |
| Age 69 and over | 18 months |

The above table shows the maximum duration for which benefits may be paid. All other limitations of the plan will apply.



## DEFINITIONS

The terms listed, if used, will have these meanings.

**Actively at Work**
You will be considered to be actively at work with your Employer on a day which is one of your Employer's scheduled work days if you are performing, in the usual way, all of the regular duties of your job on a full time basis on that day. You will be deemed to be actively at work on a day which is not one of your Employer's scheduled work days only if you were actively at work on the preceding scheduled work day.

**Active Full-time Employee** means an employee, including an employee who works in a job share position, who works for the Employer on a regular basis in the usual course of the Employer's business. The employee must work the number of hours in the Employer's normal work week. This must be at least the number of hours indicated in the Schedule of Insurance.

**Current Monthly Earnings** means the monthly earnings you receive from any employer or for any work, while Disabled and eligible for Partial Disability benefits under this plan.

**Disabled** or **Disability** means either Totally or Partially Disabled or Total or Partial Disability.

**Monthly Benefit** means a monthly sum payable to you while you are Disabled, subject to the terms of the Group Insurance Policy.

**Monthly Rate of Basic Earnings** means your regular monthly pay, from the Employer, including:

(1) cost of living adjustments;

(2) scheduled overtime;

(3) availability pay (law enforcement officers only); and

(4) Administratively Uncontrollable Overtime;

as defined in the most recent edition of the Federal Employees Almanac.

Monthly Rate of Basic Earnings excludes commissions, awards, bonuses, hazard pay, danger pay, overtime pay (except scheduled overtime referenced above); or any other fringe benefit or extra compensation.

If you become Disabled, your Monthly Rate of Basic Earnings will be the rate in effect on your last day as an Active Full-time Employee before becoming Totally Disabled.



NS

**Other Income Benefits** mean the amount of any benefit for loss of income, provided to you or to your family, as a result of the period of Disability for which you are claiming benefits under this plan. This includes any such benefits for which you or your family are eligible or that are paid to you, to your family, or to a third party on your behalf, pursuant to any:

(1) temporary or permanent disability benefits under a Workers' Compensation Law, the Jones Act, occupational disease law, or similar law;

(2) governmental law or program that provides disability or unemployment benefits as a result of your job with the Employer;

(3) plan or arrangement of coverage, whether insured or not, as a result of employment by or association with the Employer or as a result of membership in or association with any group, association, union or other organization;

(4) individual insurance policy where the premium is wholly or partially paid by the Employer;

(5) disability benefits under the United States Social Security Act, the Railroad Retirement Act, the Canada Pension Plan, the Quebec Pension Plan, or similar plan or act that you, your spouse and children, are eligible to receive because of your Disability.

Other Income Benefits also mean any such payments that are made to you, your family, or to a third party on your behalf, pursuant to any:

(1) disability benefit under the Employer's Retirement Plan;

(2) portion of a settlement or judgment, minus associated costs, of a lawsuit that represents or compensates for your loss of earnings;

(3) retirement benefit, other than military retirement, from a Retirement Plan that is wholly or partially funded by employer contributions, unless:

(a) you were receiving it prior to becoming Disabled; or

(b) you immediately transfer the payment to another plan qualified by the United States Internal Revenue Service for the funding of a future retirement.

Other Income Benefits will not include the portion, if any, of such retirement benefit that was funded by your after-tax contributions;



(4) retirement benefits under the United States Social Security Act, the Railroad Retirement Act, the Canada Pension Plan, the Quebec Pension Plan, or similar plan or act that you, your spouse and children, receive because of your retirement, unless you were receiving them prior to becoming Disabled.

If you are paid Other Income Benefits in a lump sum, we will pro-rate the lump sum:

(1) over the period of time it would have been paid if not paid in a lump sum; or

(2) if such period of time cannot be determined, over a period of 60 months.

**Additional Requirement for Application of Other Income Benefits**

You will be required to apply for Disability Retirement Benefits under the Federal Employment Retirement System (FERS) and the Civil Service Retirement System (CSRS). Additionally, if it is determined that you have not applied for such benefits, The Hartford will estimate benefits for which you would have been eligible and apply that amount as Other Income Benefits. If you are denied benefits under FERS or CSRS, you will be required to follow all appropriate procedures to appeal the denial, if there is a reasonable basis for appeal.

The Hartford may make a retroactive allocation of any retroactive Other Income Benefit payments.

The amount of any increase in benefits paid under any federal or state law will not be included as Other Income Benefits if such increase:

(1) takes effect after the date benefits become payable under this plan; and

(2) is a general increase which:

(a) is required by law; and

(b) applies to all persons who are entitled to such benefits.

**Partial Disability or Partially Disabled** means:

(1) you were Totally Disabled throughout the Elimination Period, and became entitled to receive benefits for Total Disability; and

(2) are still prevented by the same disabling condition from performing essential duties of your occupation; but

(3) you have recovered to the extent that you are:

   (a) able to perform some, but not all, of the essential duties of your or any occupation; and

   (b) as a result, your Current Monthly Earnings are at least 20%, but no more than 80% of your Pre-disability Earnings.

**Physician** means a practitioner of a healing art, which we are required by law to recognize, who is properly licensed, and practicing within the scope of that license.

**Pre-disability Earnings** means your Monthly Rate of Basic Earnings in effect on the day before you became Disabled.

**Regular Care of a Physician** means appropriate care and attendance by a Physician other than yourself, your spouse, father, mother, brother, sister, son or daughter.

**Retirement Plan** means a defined benefit or defined contribution plan that provides benefits for your retirement and which is not funded wholly by your contributions. It does not include:

(1) a profit sharing plan;

(2) thrift, savings or stock ownership plans;

(3) a non-qualified deferred compensation plan; or

(4) an individual retirement account (IRA), a tax sheltered annuity (TSA), Keogh Plan, 401(k) plan or 403(b) plan.



**Total Disability or Totally Disabled** means that:

(1) during the Elimination Period; and

(2) for the next 24 months, you are prevented by:

   (a) accidental bodily injury;

   (b) sickness;

   (c) mental illness;

   (d) substance abuse; or

   (e) pregnancy,

from performing the essential duties of your occupation, and as a result you are earning less than 20% of your Pre-disability Earnings, unless engaged in a program of Rehabilitative Employment approved by us.

After that, you must be so prevented from performing the essential duties of any occupation for which you are qualified by education, training, or experience.

Your failure to pass a physical examination required to maintain a license to perform the duties of your occupation does not alone mean that you are Totally Disabled.

**We** or **Us** means the Hartford Life and Accident Insurance Company.

**You** means the Insured Person to whom this Booklet-certificate is issued.

## ELIGIBILITY AND ENROLLMENT

**Who are Eligible Persons?**
All persons in the class or classes shown in the Schedule of Insurance will be considered Eligible Persons.

**When will you become eligible?**
You will become eligible for coverage on either:

(1) the Plan Effective Date, if you have completed the Eligibility Waiting Period; or if not

(2) the date on which you complete the Eligibility Waiting Period.

See the Schedule of Insurance for the Eligibility Waiting Period.

**How do you enroll?**
To enroll for this plan, you must:

(1) complete and sign a group insurance enrollment form which is satisfactory to us; and

(2) deliver it to the administrator along with your Direct Deposit Sign-up Form 1199A; and

(3) deliver your completed Direct Deposit Sign-up Form 1199A to your payroll deduction authority for appropriate implementation.

If you do not enroll within 31 days after becoming eligible, you must submit Evidence of Insurability satisfactory to us.

**What is Evidence of Insurability?**
If you are required to submit Evidence of Insurability, you must:

(1) complete and sign a health and medical history form provided by us;

(2) submit to a medical examination, if requested;

(3) provide any additional information and attending physicians' statements that we may require; and

(4) furnish all such evidence at your own expense. We will then determine if you are insurable under the plan.



## WHEN COVERAGE STARTS

**When does your coverage start?**
If you must contribute towards the plan's cost, your coverage will start on the date determined below, but in no event prior to the first day of the pay period for which you have a payroll deduction made for this plan:

(1) the date you become eligible, if you enroll or have enrolled by then;

(2) the date on which you enroll, if you do so within 31 days after the date you are eligible; or

(3) the date The Hartford approves your Evidence of Insurability, if you are required to submit Evidence of Insurability.

## DEFERRED EFFECTIVE DATE

**When will coverage become effective if a disabling condition causes you to be absent from work on the date it is to start?**
If you are absent from work due to:

(1) accidental bodily injury;

(2) sickness;

(3) pregnancy;

(4) mental illness; or

(5) substance abuse,

on the date your insurance or increase in coverage would otherwise have become effective, your effective date will be deferred. Your insurance, or increase in coverage will not become effective until you are Actively at Work for one full day.

## CHANGES IN COVERAGE

**Do coverage amounts change if there is a change in your class or your rate of pay?**
Your coverage may increase or decrease on the date there is a change in your class or Monthly Rate of Basic Earnings. However, no increase in coverage will be effective unless on that date you:

(1) are an Active Full-time Employee; and

(2) are not absent from work due to being Disabled.

If you were so absent from work, the effective date of such increase will be deferred until you are Actively at Work for one full day.

No change in your Rate of Basic Earnings will become effective until the date The Hartford receives notice of the change.

**What happens if the Policyholder changes the Plan?**
Any increase or decrease in coverage because of a change in the Schedule of Insurance will become effective on the date of the change, subject to the following limitations on an increase:

(1) the Deferred Effective Date provision; and

(2) Pre-existing Conditions Limitations.

**Can you change your benefit Option?**
You may elect to increase your benefit Option only if you provide Evidence of Insurability which is satisfactory to The Hartford at your own expense. Your coverage will be effective on the date The Hartford approves your Evidence of Insurability, but in no event prior to the first day of the pay period for which you have a payroll deduction made for this plan.

You may decrease your benefit Option at any time. The decrease will be effective on the first day of the pay period for which a payroll deduction is made reflecting the decreased benefit Option.

## EXCLUSIONS

**What disabilities are not covered?**
The Plan does not cover, and no benefit shall be paid for any Disability:

(1) unless you are under the Regular Care of a Physician;

(2) that is caused or contributed to by war or act of war (declared or not);

(3) caused by your commission of or attempt to commit a felony, or to which a contributing cause was your being engaged in an illegal occupation; or

(4) caused or contributed to by an intentionally self-inflicted injury.



NS

If you are receiving or are eligible for benefits for a Disability under a prior disability plan that:

(1) was sponsored by the Employer; and

(2) was terminated before the Effective Date of this plan,

no benefits will be payable for that Disability under this plan.

## PRE-EXISTING CONDITIONS LIMITATIONS

**Are there any other limitations on coverage?**
No benefit will be payable under the Plan for any Disability that is due to, contributed to, by, or results from a Pre-existing Condition, unless such Disability begins:

(1) after the last day of 365 consecutive days while insured during which you receive no medical care for the Pre-existing Condition; or

(2) after the last day of 730 consecutive days during which you have been continuously insured under this Plan.

**Pre-existing Condition** means:

(1) any accidental bodily injury, sickness, mental illness, pregnancy, or episode of substance abuse; or

(2) any manifestations, symptoms, findings, or aggravations related to or resulting from such accidental bodily injury, sickness, mental illness, pregnancy, or substance abuse;

for which you received Medical Care during the 365 day period that ends the day before:

(1) your effective date of coverage; or

(2) the effective date of a Change in Coverage.

**Medical Care** is received when:

(1) a Physician is consulted or medical advice is given; or

(2) treatment is recommended, prescribed by, or received from a Physician.

Treatment includes but is not limited to:

(1) Medical examinations, tests, attendance or observation;

(2) use of drugs, medicines, medical services, supplies or equipment.

**Is there continuity of coverage if a change in your employment status results in your eligibility for coverage under this plan.**

If you:

(1) were covered by an "Other Plan" on the day before your effective date of coverage under this plan; and

(2) become covered under this plan due to a change in your employment status,

then, if your coverage was limited by a pre-existing condition restriction under the "Other Plan", the Pre-existing Conditions Limitations will cease to apply on the date the restriction would have ceased to apply had you remained insured under such plan.

The amount of the Monthly Benefit payable for a Pre-existing Condition in accordance with the previous paragraph will be the lesser of:

(1) the Monthly Benefit which was paid by the "Other Plan"; or

(2) the Monthly Benefit provided by this plan.

No payment will be made after the earlier to occur of:

(1) the date payments would have ceased under the "Other Plan"; or

(2) the date payments cease under this plan.

"Other Plan" means a Group Long Term Disability Insurance Plan in the 695000 policy number series, which is sponsored by the Policyholder and insured by The Hartford.



TERMINATION

**When does your coverage terminate?**

You will cease to be covered on the earliest to occur of the following dates:

(1) the date the Group Insurance Policy terminates;

(2) the date the Group Insurance Policy no longer insures your class;

(3) the last day of the period for which you make any required premium contribution, if you fail to make any further required contribution;

(4) the first day on which you receive benefits from a pension plan provided or sponsored by the Employer;

(5) the date you cease to be an Active Full-time Employee in an eligible class including:

(a) temporary layoff;

(b) leave of absence; or

(c) a general work stoppage (including a strike or lockout).

**Does your coverage continue if your employment terminates because you are Disabled?**

If you are Disabled and you cease to be an Active Full-time Employee, your insurance will be continued:

(1) during the Elimination Period while you remain Disabled by the same Disability; and

(2) after the Elimination Period for as long as you are entitled to benefits under the Policy.

**Must premiums be paid during a Disability?**

No premium will be due for you:

(1) after the Elimination Period; and

(2) for as long as benefits are payable.

**Do benefits continue if the plan terminates?**
If you are entitled to benefits while Disabled and the Group Insurance Policy terminates, benefits:

(1) will continue as long as you remain Disabled by the same Disability; but

(2) will not be provided beyond the date we would have ceased to pay benefits had the insurance remained in force.

Termination of the Group Insurance Policy for any reason will have no effect on The Hartford's liability under this provision.

**May coverage be continued during a family or medical leave?**
If you are granted a leave of absence by your Employer according to the Family and Medical Leave Act of 1993, the Policyholder may continue your insurance for up to 12 weeks, or longer if required by state law, following the date your coverage would have terminated, subject to the following:

(1) the leave authorization must be in writing;

(2) the required premium for you must be paid;

(3) your benefit level, or the amount of earnings upon which your benefit may be based, will be that in effect on the day before said leave commenced; and

(4) such continuation will cease immediately if one of the following events should occur:

(a) the leave terminates prior to the agreed upon date;

(b) the termination of the Group Insurance Policy;

(c) non-payment of premium when due; or

(d) the Group Insurance Policy no longer insures your class.



## CONVERSION PRIVILEGE

**Under what conditions can your Long Term Disability Coverage be converted to another plan?**
If your insurance terminates because:

(1) your employment ends for reason other than your retirement; or

(2) you are no longer in an eligible class:

and if:

(1) you have been continuously insured for at least 12 consecutive months under this plan or under this plan and the Prior Plan; and

(2) a Disability is not preventing you from performing duties of your occupation; and

(3) the insurance for your class, or the plan has not terminated; and

(4) you are not eligible for coverage under the plan under another class;

then you are eligible to enroll for personal insurance under another group policy called the Group Long Term Disability Conversion Policy.

Prior Plan, as used above, means the plan of group long term disability insurance that was provided or sponsored by the Employer and terminated on the day before the Plan Effective Date.

**How to convert**
To obtain coverage under the Group Long Term Disability Conversion Policy, the following must be done within 31 days of the termination of group insurance:

(1) a written enrollment request must be made to The Hartford; and

(2) the required premium and enrollment fee for the conversion policy must be paid.

If the preceding conditions are met, The Hartford will issue to you a certificate of insurance under the Group Long Term Disability Conversion Policy. Such coverage will:

(1) be issued without medical evidence of insurability; and

(2) be on one of the forms then being issued by The Hartford for conversion purposes; and

(3) be effective on the day following the date your insurance under this plan terminates.

The coverage available under the conversion policy may differ from this plan. The terms of the Group Long Term Disability Conversion Policy, including:

(1) the type and amount of coverage provided; and

(2) the premium payable,

will be determined by the kinds of insurance being provided by the Group Long Term Disability Conversion Policy at the time such enrollment request is made.



## DISABILITY BENEFITS

**When do benefits become payable?**

You will be paid a monthly benefit if:

(1) you become Totally Disabled while insured under this plan;

(2) you are Totally Disabled throughout the Elimination Period;

(3) you remain Totally Disabled beyond the Elimination Period;

(4) you are, and have been during the Elimination Period, under the Regular Care of a Physician; and

(5) you submit proof of loss satisfactory to The Hartford.

Benefits accrue as of the first day after the Elimination Period and are paid monthly.

**When will benefit payments cease?**

We will cease benefit payment on the first to occur of:

(1) the date you are no longer Disabled;

(2) the date you fail to furnish proof, when requested by us, that you continue to be Disabled;

(3) the date you are no longer under the Regular Care of a Physician, or refuse to be examined by a Physician, if we require such an examination;

(4) the date you die;

(5) the date determined from the Maximum Duration of Benefits Table shown in the Schedule of Insurance; or

(6) the date your Current Monthly Earnings exceed 80% of your Pre-disability Earnings.

## MENTAL ILLNESS AND SUBSTANCE ABUSE BENEFITS

**Are benefits limited for Mental Illness or substance abuse?**
If you are Disabled because of:

(1) Mental Illness that results from any cause;

(2) any condition that may result from Mental Illness;

(3) alcoholism; or

(4) the non-medical use of narcotics, sedatives, stimulants, hallucinogens, or any other such substance,

then, subject to all other Policy provisions, benefits will be payable:

(1) only for so long as you are confined in a hospital or other place licensed to provide medical care for the disabling condition; or

(2) when you are not so confined, a total of 24 months for all such Disabilities during your lifetime.

**Mental Illness** means any psychological, behavioral or emotional disorder or ailment of the mind, including physical manifestations of psychological, behavioral or emotional disorders, but excluding demonstrable, structural brain damage.

## RECURRENT DISABILITY

**What happens if you return to work but become Disabled again?**
Attempts to return to work as an Active Full-time Employee during the Elimination Period will not interrupt the Elimination Period, subject to the following limitations:

(1) for an Elimination Period of 180 or more days, up to 30 such return-days are allowed;

(2) for an Elimination Period of less than 180 days, up to 5 such return-days are allowed for each 30 days of Elimination Period.

Any day you were working will not count towards the Elimination Period.



After the Elimination Period, when a return to work as an Active Full-time Employee is followed by a recurrent Disability, and such Disability is:

(1) due to the same cause; or

(2) due to a related cause; and

(3) within 6 month(s) of the return to work,

the Period of Disability prior to your return to work and the recurrent Disability will be considered one Period of Disability, provided the Group Insurance Policy remains in force.

If you return to work as an Active Full-time Employee for 6 month(s) or more, any recurrence of a Disability will be treated as a new Disability. A new Disability is subject to a new Elimination Period and a new Maximum Duration of Benefits.

The term "Period of Disability" as used in this provision means a continuous length of time during which you are Disabled under this plan.

The Elimination Period and Maximum Duration of Benefits Table are in the Schedule of Insurance.

## CALCULATION OF MONTHLY BENEFIT

**How are benefits calculated for Total Disability?**
If you are Disabled after the Elimination Period, your Monthly Benefits will be calculated as follows:

(1) Multiply your Monthly Rate of Basic Earnings by the Benefit Percentage shown in the Schedule of Insurance;

(2) Identify the Maximum Benefit shown in the Schedule of Insurance;

(3) Compare the amounts determined in items (1) and (2) above and from the lesser amount subtract all Other Income Benefits.

The result is your Monthly Benefit. Your Monthly Benefit, however, will not be less than the Minimum Monthly Benefit shown in the Schedule of Insurance.

**How is the benefit calculated for a period of less than a month?**
If a Monthly Benefit is payable for less than a month, The Hartford will pay 1/30 of the Monthly Benefit for each day you were Disabled.

**Does the benefit calculation change if you return to limited duties after receiving benefits for Total Disability?**

For Partial Disability, your Monthly Benefit for the 12 month period following the end of the Elimination Period will be calculated as follows:

(1) determine the Monthly Benefit that would be paid if Totally Disabled and add to it the amount of any Current Monthly Earnings;

(2) if the sum from above exceeds your level of Pre-disability Earnings, determine the amount of the excess by subtracting your Pre-disability Earnings from the sum;

(3) your Monthly Benefit will be the Monthly Benefit that would be paid if Totally Disabled minus the amount of the excess determined in item (2) above.

During this 12 month period, the sum of your Monthly Benefit and your Current Monthly Earnings may provide an amount up to 100% of your Pre-disability Earnings.

**How are benefits calculated after the 12th Monthly Benefit has been paid?**

After you have received a Monthly Benefit for a 12 month period, and you continue to be Partially Disabled, the following calculation is used to determine your Monthly Benefit:

Monthly Benefit = **((A - B) / A) x C**

Where

**A** = Your Pre-disability Earnings.
**B** = Your Current Monthly Earnings.
**C** = The Monthly Benefit payable if you were Totally Disabled.

Your Monthly Benefit, however, will not be less than the Minimum Monthly Benefit shown in the Schedule of Insurance.



## VOCATIONAL REHABILITATION/ REHABILITATIVE EMPLOYMENT

**What Vocational Rehabilitative services are available?**

**Vocational Rehabilitation** means employment or services that prepare you, if Disabled, to resume gainful work. If you are Disabled, our Vocational Rehabilitative Services may help prepare you to resume gainful work.

Our Vocational Rehabilitative Services include, when appropriate, any necessary and feasible:

(1) vocational testing;

(2) vocational training;

(3) work-place modification, to the extent not otherwise provided;

(4) prosthesis; or

(5) job placement.

**Rehabilitative Employment** means employment that is part of a program of Vocational Rehabilitation. Any program of Rehabilitative Employment must be approved, in writing, by us.

**Do earnings from Rehabilitative Employment affect the Monthly Benefit?**

If you are Disabled and are engaged in an approved program of Rehabilitative Employment, your Monthly Benefit will be:

(1) the amount calculated for Total Disability; but

(2) reduced by 50% of the income received from each month of such Rehabilitative Employment.

The sum of the resulting net Monthly Benefit and your total income received under Rehabilitative Employment may not exceed 100% of your Pre-disability Earnings. If it does, the Monthly Benefit will be reduced by the amount of excess.

## COST-OF-LIVING ADJUSTMENT
### (Only Available to employees who choose Option 2)

**How do benefits keep abreast of inflation?**
Your Monthly Benefit for Total Disability may increase in accordance with the Cost-of-Living formula described below. The Cost-of-Living Adjustment is made each year on January 1st. Your Monthly Benefit may increase under this formula provided you:

(1) have been Totally Disabled for 12 consecutive months; and

(2) are receiving benefits when the Cost-of-Living Adjustment is made.

**What is the Cost-of-Living Formula?**
To apply the Cost-of-Living Formula:

(1) determine the lesser of:

(a) 3%; or

(b) 1/2 the percentage change in the Consumer Price Index;

(2) multiply the resulting percentage (%) times the Monthly Benefit for Total Disability being received; and

(3) add the resulting amount to your Monthly Benefit.

**How long will Cost-of-Living Adjustments continue?**
No Cost-of-Living Adjustment will be made after you cease to be Totally Disabled or you have received 5 adjustments.

The term Consumer Price Index (CPI-W) means the index for Urban Wage Earners and Clerical Workers published by the United States Department of Labor. It measures on a periodic (usually monthly) basis the change in the cost of typical urban wage earners' and clerical workers' purchase of certain goods and services. If the index is discontinued or changed, we may use another nationally published index that is comparable to the CPI-W.

For the purposes of this benefit, the percentage change in the CPI-W means the difference between the current year's CPI-W as of July 31, and the prior year's CPI-W as of July 31, divided by the prior year's CPI-W.





## SURVIVOR INCOME BENEFIT

**Will your survivors receive a benefit if you should die while receiving Disability Benefits?**
If you die while receiving benefits under this Plan, a Survivor Benefit will be payable to:

(1) your surviving Spouse; or

(2) your surviving Child(ren), in equal shares, if there is no surviving Spouse; or

(3) your estate, if there is no surviving Spouse or Child.

If a minor Child is entitled to benefits, it is The Hartford's option to make benefit payments to the person caring for and supporting the Child until a legal guardian is appointed.

The Benefit is one payment of an amount that is 3 times the lesser of:

(1) your Monthly Rate of Basic Earnings multiplied by the Benefit Percentage; or

(2) the Maximum Monthly Benefit shown in the Schedule of Insurance.

The following terms apply to this Benefit:

(1) "Spouse" means your wife or husband who:

(a) is mentally competent; and

(b) was not legally separated from you at the time of your death.

(2) "Child" means your son or daughter under age 19 who is dependent on you for financial support.

## GENERAL PROVISIONS

**What happens if facts are misstated?**
If material facts about you were not stated accurately:

(1) your premium may be adjusted; and

(2) the true facts will be used to determine if, and for what amount, coverage should have been in force.

No statement made by you relating to your insurability will be used to contest the insurance for which the statement was made after the insurance has been in force for two years during your lifetime. In order to be used, the statement must be in writing and signed by you.

**When should we be notified of a claim?**
You must give The Hartford written notice of a claim within 30 days after Disability starts. If notice cannot be given within that time, it must be given as soon as possible. Such notice must include your name, your address and the Group Insurance Policy number.

**Are special forms required to file a claim?**
When The Hartford receives a Notice of Claim, you will be sent forms for providing us with Proof of Loss. We will send these forms within 15 days after receiving a Notice of Claim. If we do not send the forms within 15 days, you may submit any other written proof which fully describes the nature and extent of your claim.

**When must proof of a Disability be given?**
Written proof of loss must be sent to The Hartford within 90 days after the start of the period for which The Hartford owes payment. After that, we may require further written proof that you are still Disabled. If proof is not given by the time it is due, it will not affect the claim if:

(1) it was not possible to give proof within the required time; and

(2) proof is given as soon as possible; but

(3) not later than 1 year after it is due, unless you are not legally competent.

The Hartford has the right to require, as part of the proof of loss:

(1) your signed statement identifying all Other Income Benefits; and

(2) proof satisfactory to The Hartford that you and your dependents have duly applied for all Other Income Benefits which are available.

After submitting proof of loss, you will be required to apply for Social Security disability benefits. If the Social Security Administration denies your eligibility for any such benefits, you will be required to follow the process established by the Social Security Administration to reconsider the denial and, if denied again, to request a hearing before an Administrative Law Judge of the Office of Hearing and Appeals.

The Hartford reserves the right to determine if your proof of loss is satisfactory.



You will not be required to claim any retirement benefits which you may only get on a reduced basis.

**What additional proof of Disability is The Hartford entitled to?**
The Hartford may have you examined to determine if you are Disabled. Any such examination will be:

(1) at The Hartford's expense; and

(2) as reasonably required by The Hartford.

**Who gets the benefit payments?**
All payments are payable to you. Any payments owed at your death may be paid to your estate. If any payment is owed to your estate, a person who is a minor or a person who is not legally competent, then The Hartford may pay up to $1,000 to any of your relatives who is entitled to it in the opinion of The Hartford. Any such payment shall fulfill The Hartford's responsibility for the amount paid.

**When are payment checks issued?**
If written Proof of Loss is furnished, accrued benefits will be paid at the end of each month that you are Disabled. If payment for a part of a month is due at the end of the claim, it will be paid as soon as written Proof of Loss is received.

**What notification will you receive if your claim is denied?**
If a claim for benefits is wholly or partly denied, you will be furnished with written notification of the decision. This written decision will:

(1) give the specific reason(s) for the denial;

(2) make specific reference to the Policy provisions on which the denial is based;

(3) provide a description of any additional information necessary to prepare a claim and an explanation of why it is necessary; and

(4) provide an explanation of the review procedure.

**What recourse do you have if your claim is denied?**
*On any denied claim, you or your representative may appeal to The Hartford for a full and fair review. You may:*

(1) request a review upon written application within 60 days of the claim denial;

(2) review pertinent documents; and

(3) submit issues and documents in writing.

A decision will be made by The Hartford no more than 60 days after the receipt of the request, except in special circumstances (such as the need to hold a hearing), but in no case more than 120 days after the request for review is received. The written decision will include specific references to the Policy provisions on which the decision is based.

**When can legal action be started?**
Legal action cannot be taken against The Hartford:

(1) sooner than 60 days after due Proof of Loss has been furnished; or

(2) 3 years after the time written Proof of Loss is required to be furnished according to the terms of the Policy (5 years in Kansas; 6 years in South Carolina).

**What are The Hartford's subrogation rights?**
If an Insured Person:

(1) suffers a Disability because of the act or omission of a Third Party; and

(2) becomes entitled to and is paid benefits under the Group Insurance Policy in compensation for lost wages; and

(3) does not initiate legal action for the recovery of such benefits from the Third Party in a reasonable period of time;

then The Hartford will be subrogated to any rights the Insured Person may have against the Third Party and may, at its option, bring legal action to recover any payments made by it in connection with the Disability.

**Who interprets policy terms and conditions?**
The Hartford has full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy.



**What happens if benefits are overpaid?**
We have the right to recover from you any amount that is determined to be an overpayment of benefits under this plan. Repayment to us must be made within 60 days of your receipt of our notice of the amount of the overpayment. If you do not repay the overpayment within the 60 day period, we may, without forfeiting our right to collect an overpayment through any means legally available to us, recover all or any portion of the overpayment by reducing or withholding future benefit payments, including, if applicable, the Minimum Monthly Benefit.