UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

SHERYL SERREZE DESROSIERS,           :
                                     :
          Plaintiff,                 :
                                     :
     v.                              :    C.A. No. 03-018-L
                                     :
HARTFORD LIFE AND ACCIDENT           :
INSURANCE COMPANY, a Connecticut     :
Corporation.                         :
                                     :
          Defendant.                 :


## DECISION AND ORDER

Ronald R. Lagueux, Senior United States District Judge.

     This case is before the Court on both Defendant's Motion for
Summary Judgment on Plaintiff's Complaint, and Plaintiff's Cross
Motion for Summary Judgment on the issue of liability only.
Plaintiff's Complaint originally alleged two violations of the
law of the State of Rhode Island:  (1) that Defendant's failure
to pay her long-term disability insurance claim represented a
breach of its contract with her; and (2) that the breach is a
violation of Rhode Island General Laws § 9-1-33, which provides a
cause of action against an insurer who wrongfully and in bad
faith refuses to settle or pay a claim.  In 2005, this Court
granted Defendant's motion for summary judgment on the Complaint
on the ground that the insurance plan in question was governed by
federal law, the  Employee Retirement Income Security Act
("ERISA"), 29 U.S.C. §§ 1001 et seq., which preempted Plaintiff's

state law claims.  *See* <u>Desrosiers v. Hartford Life and Accident Ins. Co.</u>, 354 F. Supp.2d 119 (D.R.I. 2005).   In that decision, the Court also granted Plaintiff's motion to amend her Complaint so that the case could proceed under ERISA law.  Subsequently, the parties moved for summary judgment on Plaintiff's underlying claim for benefits, which motions the Court now addresses.

The parties to this litigation are Plaintiff Sheryl Serreze Desrosiers (hereinafter "Desrosiers" or Plaintiff), a former employee of the United States Trustee Program in the Department of Justice; and Hartford Life and Accident Insurance Company (hereinafter "Hartford" or Defendant), a Connecticut insurance company which underwrote the long term disability insurance policy offered through Desrosier's employer.

For the reasons that follow, the Court determines that Hartford's denial of benefits was reasoned and based on substantial evidence, and so grants its motion for summary judgment.

## Background

In 1992, Plaintiff began working for the United States Trustee Program of the United States Bankruptcy Court, as the Attorney-in-Charge of the Rhode Island office.  In 1995, she was promoted to Assistant United States Trustee.  As a result of her employment status, she was able to enroll in the Federal Employees Long Term Disability Plan, which was covered by an

-2-

insurance policy issued by Defendant.

In 1999, at the age of thirty-nine, Plaintiff suffered a series of three accidents. First, in April 1999, Plaintiff was hit on the left side of her head when a car door was suddenly opened in her path. She visited an Urgent Care facility, and received a diagnosis of corneal abrasion. She received an eye patch and was advised to use Tylenol. She reported that this accident was followed by headaches, dizziness and some difficulty with her vision in her left eye.

A month later, Plaintiff fell off a swing at a playground, breaking her nose. Plaintiff stopped working and the following day she underwent the first of several plastic surgeries. A maxillofacial CT scan performed at the time was normal. However, a month later Plaintiff consulted Dr. Vlad Zyas, a neurologist, for her persistent headaches, nausea and dizziness. Dr. Zyas diagnosed post-traumatic migraines. At some point prior to her third accident, Plaintiff returned to work full time.

In December 1999, Plaintiff fell down the stairs at her home. She was taken to the hospital by ambulance, where she was admitted for five days. Plaintiff had cut her forehead, which required seventeen stitches. In addition, she was experiencing urinary incontinence, partial loss of vision in her left eye, and a weakness or paralysis in her right leg. An MRI and a CT scan of her spine yielded normal results, while a brain MRI showed

-3-

"slight hyperintensity of the left optic nerve." Four days later, when sensation had returned to her legs and her urination was normal, Plaintiff was diagnosed with a sprained back and neck and was discharged with a walker. Thereafter, Plaintiff continued to have headaches, dizziness and a sensation of weakness in her right leg. In addition, she reported cognitive problems such as forgetfulness, sleepiness, sleeplessness, inability to concentrate, anxiety, bothersome background noise, and a tendency to "zone out." Following the third accident, Plaintiff did not return to work.

The date of her disability, for purposes of the insurance policy's definitions, is, therefore, December 8, 1999. As a threshold for benefits, the insurance policy requires that a person be totally disabled for ninety consecutive days after the initial date of disability. In Plaintiff's case, this so-called "Elimination Period" lasted from December 8, 1999, until March 7, 2000.[1] This dispute concerns Plaintiff's symptoms during this time period.

During the several months following the December 1999 fall, Plaintiff visited several doctors and specialists in an effort to

---

[1] The policy states, "Total Disability or Totally Disabled means that: 1) during the Elimination Period; and 2) for the next 24 months, you are prevented by: (a) accidental bodily injury; (b) sickness; (c) mental illness; (d) substance abuse; or (e) pregnancy, from performing the essential duties of your occupation, and as a result you are earning less than 20% of your Pre-disability earnings..."

get a diagnosis and secure relief from her symptoms.  She was
tested for Lyme disease, diabetes, multiple sclerosis, ischemic
stroke and cardiovascular disease.  All tests were negative.
Because of her vision problems, she visited an ophthalmologist
and then a neuro-ophthalmologist who determined that there was a
partial loss of vision in Plaintiff's left eye.  Dr. Thomas
Hedges, the neuro-ophthalmologist, conducted another MRI, as well
as other testing; however no objective cause for the vision loss
could be discovered.  Plaintiff was prescribed a course of
prednisone, with the hope that the problem would clear up.  After
a follow-up appointment on January 21, 2000, Dr. Hedges wrote to
Plaintiff's family doctor, Diane Dubois-Hall, D.O., explaining
that the treatment had been unsuccessful but that, "She continues
to have excellent visual acuity of 20/20, but she also continues
to have an irregular left hemianopic defect."  He further
suggested that Plaintiff should see an optometrist if her problem
did not improve spontaneously.

Several neurologists were also consulted.  Dr. Gary Johnson
examined Plaintiff on January 14, 2000.  He observed that, while
Plaintiff arrived with a cane, she did not need it when she got
up from the chair and got on the examining table.  Furthermore,
he stated that "the right leg weakness does not seem to be a
consistent abnormality and seems clearly to be elaborated upon.
There are no reflex changes or other abnormalities to correspond

-5-

with this."  On the subject of the vision problem, he recorded
that, "...the left eye problem seems to defy neurologic
explanation.  The pattern of field loss that she describes is one
that is usually not associated with ocular pathology."

There is a dispute as to when Plaintiff submitted her claim
to Defendant, but it was around this same time.  The differing
dates provided by the parties include December 31, 1999, January
27, 2000, and February 15, 2000.

On March 9, 2000, Plaintiff saw another neurologist, Dr.
Mary Anne Muriello.  The medical history recorded by Dr. Muriello
includes an additional hospitalization – Plaintiff fainted and
was hospitalized, possibly with an allergic reaction to
ibuprofen.  While noting the vision deficit in the left eye, Dr.
Muriello found no neurological problems.  She cited Plaintiff's
three falls, and suggested, "It is likely that she has post-
concussive syndrome accounting for her headaches and cognitive
impairments."

In the ordinary course of its business, Hartford submitted
the claim and the accompanying medical records to its Associate
Medical Director, Dr. Todd Lyon, on May 5, 2000.  Dr. Lyon's
internal report, dated May 19, 2000, summarized Plaintiff's
medical history, suggested that there was no evidence of total
disability, and recommended that Plaintiff be evaluated by a
neuropsychologist.

In the meantime, Dr. Dubois-Hall, Plaintiff's family doctor, cleared her to return to work on a part-time basis, which Plaintiff did on June 1, 2000.    Plaintiff found that she was unable to complete her duties on a part-time basis.  She tried working additional hours but was hampered by headaches and increased back and neck pain.

On June 14, 2000, Plaintiff was examined by another neurologist, Dr. Michele Sammaritano, who deemed her totally disabled and instructed her to stop working again.  In her report, Dr. Sammaritano wrote,

> She has today what I feel is a post concussive syndrome and headache including the following symptoms: constant vertigo, retrograde amnesia, lability of emotions, decrease in concentration and decrease in memory, severe headaches, including an exacerbation of her migraine headaches, excessive sleepiness so that she sleeps 12 to 14 hours per night which is unusual for her. At times, she has nausea and vomiting with the severe headaches.
>
> Most significantly, associated with this postconcussive syndrome and headache is the presence of a neurological deficit, that is, the left visual field hemianopsia, and the findings in the right leg (will be included in the section on the neurological examination) the coincidence of this syndrome with a neurological deficit makes the closed head injury more significant.

Dr. Sammaritano concluded that Plaintiff was "completely disabled to perform her normal work activities."

On June 15, 2000, Plaintiff was examined by the

-7-

neuropsychologists to whom she had been referred by Defendant, following the recommendation of Dr. Lyon.  Synthia Brooks, Ph.D., and Ronald Cohen, Ph.D., administered a battery of approximately seventeen tests.  The results were extensive, and Plaintiff did not excel in every area.  For example, Plaintiff scored in the low average range on a test that measured complex psychomotor skill.  However, overall, her performance was excellent.  The psychologists wrote,

> Results of this neurocognitive evaluation reveal a 42-year-old woman of superior intelligence with intact neurocognitive functioning (ranging from low average to very superior levels), and no current evidence of a primary amnestic disorder, significant memory dysfunction, or cognitive sequelae of post concussive syndrome on formal testing.....In summary, from a neurocognitive performance standpoint, Ms. Serreze appears to be functioning well enough to perform her professional duties perhaps even on a full time basis, if the migraines and her reported fatigue can be properly managed.

The psychologists also noted "a significant clinical profile on the MMPI-2, strongly suggesting a somatization disorder and/or conversion symptoms."

On August 11, 2000, Hartford denied Plaintiff's claim, based on its conclusion that she was not totally disabled "throughout and beyond the Elimination Period."  The text of the denial letter outlined the medical documentation reviewed by Defendant, and quoted from Dr. Lyon's report on Plaintiff:

-8-

> Her primary subjective complaints at this
> time appear to be weakness of the lower
> extremities, especially the right leg, as
> well as reported cognitive deficits including
> forgetfulness.  The visual field loss appears
> to be relatively insignificant and not to the
> degree of conferring significant visual
> impairment.  There are essentially no other
> objective findings present in Ms. Serreze's
> evaluations through x-rays, MRI scanning, EEG
> studies, and physical exam findings other
> than her visual loss.  It appears that her
> major troubling complaints at this time are
> those of cognitive deficits.

Dr. Lyon's report had been prepared prior to his receipt of the neuropsychological testing.  An addendum to his first report, prepared July 27, 2000, after he had reviewed those test results, reiterated his conclusion that Plaintiff had the functional capacity to perform her sedentary occupation as a lawyer.

Plaintiff appealed Defendant's decision, and, on November 21, 2000, she submitted additional medical documentation to support her appeal.  This included results from a second neuropsychological evaluation which had taken place on July 21, 2000, and was performed by clinical neuropsychologist Samuel Sokol, Ph.D., to whom she had been referred by Dr. Sammaritano. Dr. Sokol wrote in his summary as follows:

> • Mrs. Serreze's overall cognitive skills
> are in the high average to superior range.
> Her verbal skills are moderately stronger
> than her nonverbal skills but a difference of
> this magnitude occurred in 20% of the
> unimpaired normative population.

> • Mrs. Serreze's immediate auditory attention

-9-

is weak, a difficulty seen during her
evaluation in June.  Her performance on
visual tasks that required rapid scanning
(letter cancellation, symbol search) was
impaired as it was in June.  Her visual
attention on untimed tasks was intact.  Her
executive processing skills are intact.

• Mrs. Serreze's working memory is normal.
Her visual memory is intact.  Her verbal
memory is impaired.  Given that her verbal
memory was normal in June, her current
performance is likely due to inattention.

• Mrs. Serreze's language skills are strong.

• Mrs. Serreze's higher order visual
processing skills are normal for her age and
level of education.  In contrast, her sensory
visual skills are impaired. Visually evoked
potentials are abnormal in her left eye and
consistent with her visual field defect.  In
addition to a field defect, it is also likely
that she has poor depth perception.

...In my opinion her VEPs are moderately
abnormal and in conjunction with her field
defects could interfere with her ability to
carry out the duties and responsibilities of
her law practice and may have contributed to
her subsequent accidents.

There was also additional data from Dr. Sammaritano.  Dr.
Sammaritano had followed up with Plaintiff on August 14, 2000,
and September 14, 2000, and wrote to Plaintiff's regional
supervisor on September 28, 2000, stating that Plaintiff might
return to work if certain conditions were met.  These conditions
included a four-hour workday, a restriction on sitting or
standing in one position for more than one hour, a requirement
that another attorney assist her with all hearings and that

-10-

someone assist her with typing, legal research, scheduling and other organizational tasks, and a prohibition on driving.  The new material was reviewed by Dr. Lyon, who contacted both Drs. Sokol and Sammaritano to discuss their findings.  Dr. Lyon determined that his initial assessment was correct, and Defendant denied Plaintiff's appeal on May 17, 2001.

In an exchange of letters, the two sides continued to debate the decision until Plaintiff filed this lawsuit in Rhode Island Superior Court in November 2002.  It was removed by Defendant to this Court on January 10, 2003, based on the diversity of citizenship of the parties, pursuant to 28 U.S.C. § 1332.  As noted earlier, the Court then granted Defendant's motion to summarily dismiss the Complaint based on federal preemption. Although Plaintiff never redrafted her claim to conform to the ERISA statute, the Court will treat her claim as one to recover benefits due under the ERISA plan, pursuant to 29 U.S.C. § 1132 (a).

## Legal Analysis

### Summary Judgment Standard of Review

Generally speaking, when ruling on a motion for summary judgment, the court must look to the record and view all the facts and inferences therefrom in the light most favorable to the nonmoving party.  <u>Continental Casualty Co. v. Canadian Universal Ins. Co.</u>, 924 F.2d 370, 373 (1st Cir. 1991).  However, for ERISA

-11-

cases, the First Circuit has determined that a slightly different procedure is appropriate:

> ...in an ERISA case where review is based only on the administrative record before the plan administrator and is an ultimate conclusion as to disability to be drawn from the facts, summary judgment is simply a vehicle for deciding the issue. This means the non-moving party is not entitled to the usual inferences in its favor. When there is no dispute over plan interpretation, the use of summary judgment in this way is proper regardless of whether our review of the ERISA decision maker's decision is de novo or deferential.

Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 517 (1st Cir. 2005) (cites omitted). The case before the Court consists of a review of the administrative record, and does not involve a dispute over the plan's interpretation. Consequently, the Court will follow the Orndorf methodology.

### ERISA Standard of Review

It is well established that where the ERISA plan administrator has discretion to determine eligibility for benefits, then those determinations will be reviewed by the court only for an abuse of discretion. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989). It is undisputed that in the case before the Court, Hartford made the determination to deny benefits. The First Circuit uses the 'abuse of discretion' standard interchangeably with the 'arbitrary and capricious' standard. Wright v. R. R. Donnelley & Sons Co. Group Benefits

-12-

Plan, 402 F.3d 67, 74 (1st Cir. 2005).  Elaborating on the

standard, the Wright Court wrote,

> A decision to deny benefits to a beneficiary
> will be upheld if the administrator's
> decision 'was reasoned and supported by
> substantial evidence.'... Evidence is
> substantial when it is 'reasonably sufficient
> to support a conclusion.'  Evidence contrary
> to an administrator's decision does not make
> the decision unreasonable, provided
> substantial evidence supports the decision.

402 F.3d at 74 (quoting Gannon v. Metro. Life Ins. Co., 360 F.3d

211, 213 (1st Cir. 2004)).  Consequently, the task of this Court

is not to determine whether Plaintiff is disabled, totally or

otherwise, or to state whether Defendant's decision was the

correct one.  Instead, the Court's function is to make sure that

Defendant's decision was reasoned and based on substantial

evidence.  See Buffonge v. Prudential Ins. Co. of America, 426

F.3d 20, 31 n. 13 (1st Cir. 2005).

### A less deferential standard of review?

Plaintiff urges the Court to consider employing a less

deferential standard of review.  In support of this argument, she

cites several cases from other circuit courts of appeal.  For

example, in Fought v. Unum Life Ins. Co. of America, 379 F.3d 997

(10th Cir. 2004), the Tenth Circuit set forth guidelines for a

"sliding scale" standard of review for cases in which the plan

administrator is operating with a conflict of interest because it

is charged with the dual responsibilities of determining benefits

-13-

as well as paying out those benefits.  While recognizing that a
legitimate conflict of interest must trigger a less deferential
standard of review, and mindful of other circuits' rulings, the
First Circuit has rejected the notion that a plan administrator's
financial stake in making benefit decisions creates improper
self-interest:

> In <u>Pari-Fasano</u>, the Court acknowledged that
> an insurer 'does have a conflict of sorts
> when a finding of eligibility means that the
> insurer will have to pay benefits out of its
> own pocket,' but determined that the market
> presents competing incentives that
> substantially minimize the apparent conflict
> of interest.  In <u>Doyle</u>, the Court identified
> the competing incentives, explaining that
> employers have benefit plans to please
> employees and, consequently, will not want to
> keep an overly tight-fisted insurer.  Thus,
> according to the Court, an insurer could
> 'hardly sell policies if it is too severe in
> administering them.'

<u>Wright</u>, 402 F.3d at 75, (citing <u>Pari-Fasano v. ITT Hartford Life
& Acc. Ins. Co.</u>, 230 F.3d 415, 418 (1st Cir. 2000) and <u>Doyle v.
Paul Revere Life Ins. Co.</u>, 144 F.3d 181, 184 (1st Cir. 1998)).
The <u>Wright</u> Court concluded that the trial court, "[B]ound by
well-established precedent," was correct when it "declined to
apply a less deferential standard due to the alleged structural
conflict."  402 F.3d at 75.

Plaintiff also points out that several courts have applied a
less deferential standard of review in instances where there was
evidence of serious procedural irregularities committed by the

-14-

plan administrator in the course of evaluating a claim for
benefits.   The Tenth Circuit's decision in <u>Fought v. UNUM</u> is a
good example.   In that case, the plan administrator denied
plaintiff's claim based on complex medical evidence without
seeking any independent review.   "Thus," the <u>Fought</u> Court wrote,
"when an inherent conflict of interest, or a serious procedural
irregularity exists, such as here, and the plan administrator has
denied coverage, the district court is required to slide along
the scale considerably and an additional reduction in deference
is appropriate."   379 F.3d at 1007.

In <u>Kosiba v. Merck & Co.</u>, 384 F.3d 58, 66 (3d Cir. 2004),
the Third Circuit also recommended the sliding scale approach in
cases where there is "demonstrated procedural irregularity, bias,
or unfairness in the review of the claimant's application for
benefits."   In <u>Kosiba</u>, the employer/plan administrator Merck
interfered with the third-party claim administrator's appeal
procedures by requesting an independent medical exam with a
specified doctor.   "We conclude," the Court wrote, "that the
procedural bias we have described in Epps-Malloy's appeals
process warrants a moderately heightened arbitrary and capricious
standard of review."   384 F.3d at 68.

Plaintiff herein is hard pressed to find support in First
Circuit precedent for her argument that procedural irregularities
compel a less deferential standard of review.   Plaintiff cites

Orndorf, wherein the Court stated that "personal bias by a plan administrator or prejudicial procedural irregularity in the ERISA administrative review procedure" might justify the admission of evidence outside the administrative record.  404 F.3d 510, 520. However, this really has no bearing on the issue of the standard of review.

In Beauvais v. Citizens Financial Group, Inc., 418 F. Supp. 2d 22, 31 (D.R.I. 2006), Chief Judge Ernest Torres of this Court held that a procedural irregularity (i.e., the plan administrator's failure to obtain x-rays and MRI results when evaluating the claim) constituted an abuse of discretion.  The Court then awarded the benefits retroactively.

This writer endorses the reasoning articulated in Beauvais. A plan administrator's failure to follow its rules and internal policies in a neutral and consistent manner is the essence of arbitrariness and capriciousness.  A demonstration of serious procedural irregularities does not mandate the application of a different standard of review; it mandates a finding that the plan administrator abused its discretion.  With the appropriate standard in mind, this Court must now evaluate the seriousness of the procedural irregularities claimed by Plaintiff.

### Procedural irregularities alleged by Plaintiff

Plaintiff alleges that Defendant abused its discretion in handling her claim because of several procedural irregularities

-16-

that revealed its methods to be arbitrary and capricious.  The
Court addresses each of these irregularities below, and
determines that none is arbitrary or capricious or in any other
way sufficiently significant to compel a remand of this case to
the plan administrator.

1.  *Defendant ignored the Social Security Administration's
    finding of disability*

On March 21, 2000, Plaintiff sent Defendant a copy of her
completed application for Social Security benefits (SSI).  On
October 25, 2001, in a letter to Defendant's Appeal Unit,
Plaintiff mentions that the Social Security Administration has
"recently commenced disability payments of $1669 a month."   In
her memorandum of law to the Court, she argues that it was error
that Defendant did "not credit or reconcile that finding with its
own..."  In support of her argument, Plaintiff cites cases
wherein federal courts have indicated that a benefits
determination made by the Social Security Administration is
relevant evidence.  See <u>Lopes v. Metropolitan Life Ins. Co.</u>, 332
F.3d 1, 6 n.9 (1st Cir. 2003).

In response to this argument, Defendant has several
persuasive arguments.  One focuses on the timeline: Defendant
denied Plaintiff's claim in August 2000; and denied her appeal in
May of 2001.  Several months later, on October 25, 2001,
Plaintiff mentioned in a letter, almost parenthetically, that she
had just started receiving Social Security benefits.  A Social

-17-

Security Administration determination on disability is relevant but not binding on a plan administrator.  Gannon v. Metropolitan Life Ins. Co., 360 F.3d 211, 215 (1st Cir. 2004), Pari-Fasano v. ITT Hartford Life & Acc. Ins. Co., 230 F.3d 415, 420 (1st Cir. 2000).  Consequently, a plan administrator is not required to reopen its file and reconsider its decision several months after the fact.

Defendant's second argument reinforces the logic of the first.  What Plaintiff refers to as "a finding" consists only of a mere mention in a letter drafted by Plaintiff herself.  There is no information in the record to explain the nature of the Social Security Administration's determination, or the standard used to assess the disability.  More importantly, no information is provided to indicate what time period of Plaintiff's life was evaluated when the agency's determination of total disability was made.  To be eligible for benefits under the ERISA plan, Plaintiff had to become totally disabled while she was still working.  The record does not reflect that the Social Security determination focused on this time period.  Consequently, there was no error in Defendant's procedures with regard to the Social Security determination.

## 2. *Defendant ignored the findings of the Federal Employees' Retirement board*

Plaintiff argues that Defendant committed error by failing

to address the decision made by the Federal Employees' Retirement
board ("FERS") that she was disabled.  The record includes three
references to these disability retirement benefits.  The first is
a letter from Plaintiff's attorney to Defendant, dated February
15, 2001, which stated that Plaintiff had "not been granted
disability benefits from the Federal government."  The second
reference is dated March 30, 2001, and is found in Defendant's
activity log.  The entry states that Plaintiff's attorney phoned
and explained that Plaintiff had applied for disability
retirement.  The third reference can be found in the above-cited
October 25, 2001, letter from Plaintiff to Defendant's Appeal
Unit where she writes, "My disability retirement payments from
the United States Department of Justice have not yet been
finalized..."  Plaintiff's characterization of this record as a
'decision of disability by the Federal Employees' Retirement
board' is inaccurate.  There is nothing in the record that
definitively establishes that the Federal Employees' Retirement
board found Plaintiff disabled, or that Defendant knew anything
about it beyond a few inconclusive references.  Plaintiff's
argument does not support a finding of procedural irregularity by
this Court.

3.   *Defendant was tardy in making its initial benefits
     determination*

      Plaintiff cites 29 C.F.R. § 2560.503-1(f)(3) to demonstrate

-19-

that Defendant violated ERISA regulations when it took nine

months to make its benefits determination, rather than the 45

days specified in the code.  The precise time period between

Plaintiff's claim and Defendant's denial is in dispute as the

parties differ as to the date Plaintiff submitted her claim.

However, there is no dispute that Defendant took longer than 45

days.

In <u>Terry v. Bayer Corp.</u>, 145 F.3d 28, 39 (1st Cir. 1998),

the First Circuit addressed the notice requirements set forth in

the same regulation, stating, "...ERISA's notice requirements are

not meant to create a system of strict liability for formal

notice failures."  The <u>Terry</u> Court goes on to quote approvingly

from a Seventh Circuit decision, "Not all procedural defects ...

will upset a fiduciary's decision. Substantial compliance with

the regulations is sufficient."  145 F.3d at 39 (quoting from

<u>Donato v. Metropolitan Life Ins. Co.</u>, 19 F.3d 375, 382 (7th Cir.

1994)).

In the present case, as Defendant points out, there is no

showing that Defendant was dilatory in its review of Plaintiff's

claim.  In fact, the record shows that Defendant's associate

medical director, Dr. Todd Lyon, engaged in an extensive review

of the reports gleaned from several different specialists.  In

addition, he followed up with many of the doctors by phone and

letter, recommended a series of additional tests, and drafted

-20-

three reports summarizing the medical documentation.
Furthermore, there is no showing that the length of time involved
prejudiced Plaintiff in any way.   Consequently, the Court
concludes that the extended time taken by Defendant to evaluate
Plaintiff's claim does not represent a significant procedural
irregularity.

### 4. *Defendant violated its own rule when it delayed deciding Plaintiff's appeal*

Defendant's policy states that the outcome of claims'
appeals should be determined no more than sixty days from their
receipt, and no more than 120 days in special cases, such as when
a hearing is necessary.   Plaintiff argues that the ninety days
that Defendant took to process her appeal represents a serious
procedural irregularity.   Because Plaintiff submitted additional
medical documentation with her appeal, which was reviewed and
evaluated by Defendant, the Court determines that the ninety-day
time period was a reasonable one.

### 5. *Defendant rejected claim without reviewing Plaintiff's job description*

Through discovery, Plaintiff obtained written internal
procedures from Defendant that stated that a job description
should be obtained when processing a claim.   Defendant's failure
to do so was a serious breach of protocol, according to
Plaintiff.   Plaintiff's attorney sent Defendant a detailed job
description, via fax, on November 21, 2000.   However, Plaintiff

-21-

alleges that there is no evidence that it was considered during the review of her appeal.

However, in its denial letter dated May 17, 2001, Defendant lists the job description as one of the thirteen pieces of additional information that was considered in the appeal. Nothing in the record supports Plaintiff's allegation that her job duties were disregarded in the evaluation of her claim.

**6.   *The role of Dr. Lyon***

Plaintiff has several arguments concerning the role of Dr. Todd Lyon, Defendant's associate medical director.   These contentions include that Dr. Lyon 'manufactured' the record by including paraphrased summaries of doctors' notes in his report; that he disregarded certain medical evidence and certain of Plaintiff's conditions; and that his professional expertise was never disclosed.

Plaintiff's charges are belied by the record.   Dr. Lyon's reports quote extensively from the records of the various treating physicians and reflect a thorough analysis of the medical documentation.   Even so, Dr. Lyon's clarity of thinking, his opinion and his professional background are not the focus of the Court's review.   Defendant retained Dr. Lyon to help digest the medical documentation, and to make a recommendation about Plaintiff's disability based on that documentation.   He is a medical doctor, and it does not appear to the Court that

-22-

Defendant's reliance on his advice was arbitrary or capricious,
or represents a serious procedural irregularity.  The Court's
responsibility is to review the medical evidence in its entirety
and determine whether Defendant's reliance on the conclusions and
recommendations of its employee, Dr. Lyon, was reasoned and based
on substantial evidence.  It is to this task that the Court will
now turn.

**'Reasoned and supported by substantial evidence'**

As cited earlier, the First Circuit has held that a plan
administrator's decision will be upheld if it is "reasoned and
supported by substantial evidence." <u>Wright v. R. R. Donnelley &
Sons Co. Group Benefits Plan</u>, 402 F.3d 67, 74.  Because doctors
may differ in their assessment of a patient, the existence of
medical evidence that does not support the plan administrator's
decision does not make the decision unreasonable, as long as
there is substantial medical evidence that supports the decision.
<u>Id</u>. at 74.  "...[T]he existence of medical evidence pointing in
two directions does not render arbitrary or capricious a plan
administrator's decision to credit one viewpoint or the other."
<u>Buffonge v. Prudential Ins. Co. of America</u>, 426 F.3d 20, 28 (1st
Cir. 2005).  Moreover, the plan administrator is not required to
give special deference to the evaluations provided by a
claimant's treating physician.  <u>Black & Decker Disability Plan v.
Nord</u>, 538 U.S. 822, 831 (2003), <u>Gannon v. Metropolitan Life Ins.</u>

-23-

Co., 360 F.3d 211, 215 (1st Cir. 2004).

In the present case, the Court concludes that there is ample and reasonable evidence to support the plan administrator's decision that Plaintiff was not totally disabled during the Elimination Period, as well as the following weeks during which time her appeal was being evaluated.  While Dr. Sammaritano did conclude that Plaintiff was unable to work during this time period, the weight of all the other medical evidence goes in the opposite direction.  Clearly, her weak leg and defect in peripheral vision are not sufficient to render Plaintiff unable to work as an attorney.  Therefore, Plaintiff's central complaint is her array of neurocognitive symptoms, including headaches, dizziness, difficulty concentrating, forgetfulness and sleepiness.  Though these symptoms are no doubt distressing and unpleasant, the results of two rounds of neuropsychological assessments did not demonstrate that these symptoms were sufficiently disabling to justify an award of benefits.

Drs. Brooks and Cohen, who examined Plaintiff on June 15, 2000, on the recommendation of Dr. Lyon, found that she was "of superior intelligence with intact neurocognitive functioning..." and that she appeared to be functioning well enough to work full time if her headaches and fatigue could be managed.  Dr. Sokol, to whom Plaintiff was referred by Dr. Sammaritano, examined her five weeks later.  He classified Plaintiff's overall cognitive

skills in "the high average to superior range."  Moreover, he stated that her working memory was normal, her language skills were strong and her higher order visual processing skills were normal.  He concluded that it was possible that her left-eye vision problem, coupled with "her field defects" could interfere with her ability to work.

The Brooks/Cohen evaluation provides no support for Plaintiff's claim, and the Sokol evaluation is weak and ambiguous at best.  Dr. Sokol's opinion does not reflect the requisite degree of certainty to support a finding that Plaintiff was totally disabled from working.  As this Court has previously observed, an opinion of an expert that is based on "possibilities" instead of "probabilities" is entitled to little or no weight.  See <u>Hall v. Eklof Marine</u>, 339 F. Supp.2d 369, 377 (D.R.I. 2004).

Clearly, Defendant correctly determined that neither assessment was sufficient to support a finding that Plaintiff was totally disabled from performing in her work setting.  This is a reasonable conclusion.  It is not only reasonable, but it is also supported by substantial evidence.

### Conclusion

For the reasons stated above, the Court grants Defendant's Motion for Summary Judgment on Plaintiff's ERISA claim, and denies Plaintiff's cross motion for partial summary judgment.

-25-

The Clerk shall enter judgment for Defendant on Plaintiff's

Complaint forthwith.

It is so ordered.

Ronald R. Lagueux
Senior United States District Judge
October, *17* , 2006