**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

SHERYL SERREZE DESROSIERS
Plaintiff

v. C.A. 03-018-L

HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY,
A Connecticut Corporation

Defendant

---

**Joint Motion To Correct District Court Docket**

The parties, by and through their undersigned counsel, jointly move this Court to correct the docket and, if necessary, to supplement the appellate record as described below:

**1.** On or about April 2, 2006, defendant/appellee Hartford Life and Accident Insurance Company served and filed a brief titled **Reply to Plaintiff's Opposition to Hartford's Motion for Summary Judgment.** Attached to that brief was: **Supplemental Affidavit of Arthur C. Smith III** (with an attachment); and **Appendix of Department of Labor Opinion Letters Cited in Plaintiff's Reply Brief** (a document that is mistitled, as it refers to defendant's reply brief).

**2.** There is no doubt but that the pleading referred to above (and attached in full below) was properly served on plaintiff and received by the Court. It was, in fact, referred to by the Court in its subsequent decision.

**3.** The pleading, however, does not appear to be referenced in the Trial Court's docket, which has been transferred to the First Circuit as part of the appellate proceedings. It appears that the referenced pleading should be recorded after docket entry number 61 but there is no mention of the pleading on the publicly available docket record.

**4.** The parties do not know whether the referenced pleading is actually contained in the docket record and simply not separately numbered.

**5.** Accordingly, to clear up the confusion, the parties hereby jointly move this Court to correct the Trial Court record to reflect the April 2, 2006 filing and service of the pleading referenced above and attached.

Respectfully submitted:

Dated: February 14, 2007

/s/Christopher M. Lefebvre( # 4019)
P.O. Box 479
Pawtucket R.I. 02862
401-728-6060
401-728-6534 FAX
Lefeblaw@aol.com
Attorney for Sheryl Serreze Desrosiers

/s/Mark A. Pogue, Esq. (#3441)
**EDWARDS AND ANGELL, LLP**
2800 Financial Plaza
Providence, RI 02903
(401) 274-9200
**Attorneys for Hartford Life and Accident Insurance Company**

**CERTIFICATION OF SERVICE**

I hereby certify that I filed the attached **Joint Motion To Correct District Court Docket** with the Clerk of the District Court of Rhode Island using the CM/ECF System. The following participants have received a copy and notice electronically: Mark A. Pogue, Esq. on February 14, 2007.

/s/Christopher M. Lefebvre

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

SHERYL SERREZE DESROSIERS,

Plaintiff,

v.

HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY, a Connecticut Corporation,

Defendant.

Civil Action No. 03-018-L

**REPLY TO PLAINTIFF'S OPPOSITION**
**TO HARTFORD'S MOTION FOR SUMMARY JUDGMENT**

In her opposition to Hartford's summary judgment motion, Plaintiff abandons her earlier position that ERISA's governmental plan exemption applies to the disability plan in question. Plaintiff instead offers several new arguments in an effort to stave off ERISA preemption. First, she contends that the DJRA, which sponsors the plan, is not an "employee organization" within the meaning of ERISA. Second, she asserts that ERISA coverage is precluded by the "safe harbor" regulation, 29 U.S.C. § 2244(b)(2)(A), promulgated by the United States Department of Labor. Finally, she contends that, even if ERISA applies, it does not preempt her state law claim under R. I. Gen. Laws §9-1-33.

As shown below, all of these arguments are groundless. As a result, Hartford's motion for summary judgment should be granted.

**Background**

At a settlement conference conducted in this matter on November 19, 2003, Plaintiff took the position that the group long-term disability plan under which she is claiming benefits (the

"Plan") was covered by ERISA's governmental plan exception. See 29 U.S.C. §1003(b)(1). Following the settlement conference, Hartford moved for summary judgment on grounds that the governmental plan exception did not apply and that Plaintiff's claims were therefore preempted by ERISA. Hartford supported its motion with an affidavit from Arthur C. Smith III, the president of the DJRA, which addressed issues relevant to the governmental plan exception.

In her opposition brief, Plaintiff now states that she "does not contend that the Hartford insurance at issue fits within the governmental plan exception."[1] Instead, plaintiff asserts that ERISA does not apply because the DJRA does not meet the definition of an "employee organization" set forth in ERISA. See 29 U.S.C. §1002(4). She further contends that the Plan is covered by the regulatory safe harbor set forth at 29 C.F.R. §25103-1(j), with the result that ERISA cannot preempt her state law claims.

In response to these contentions, Hartford has obtained a supplemental affidavit from Arthur C. Smith III (attached as Exhibit A). The supplemental affidavit establishes facts relevant to the "employee organization" and "safe harbor" issues. In particular, the affidavit establishes the following:

1. The Plan became effective on March 1, 1995. "Before that date, for the better part of a year, the DJRA was heavily involved in designing the structural components of the Plan and its subsidiary terms and conditions." Supplemental Affidavit of Arthur C. Smith III ("Supp. Smith Aff."), ¶ 3 The DJRA's heavy involvement in designing the plan took two forms. First, the DJRA was directly involved in selecting and negotiating the basic terms of the Plan. After specifying many of the basic terms it wanted, id. at 5, the DJRA negotiated directly with Hartford over other terms and conditions. Id. at 3, 4. For example, the Supplemental Smith

[1] Plaintiff's Memorandum In Opposition To Defendant's Motion For Summary Judgment ("Pl. Mem."), p. 3.

Affidavit establishes that the DJRA negotiated directly with Hartford over (i) whether law enforcement officers who were employees of the Department of Justice (the "DOJ") would be eligible to participate in the Plan, and at what premium rate; (ii) whether employees of the Federal Bureau of Investigation would be eligible to participate in the Plan or would be counted toward the minimum number of participants necessary to activate the Plan; (iii) whether pregnancy would be recognized as a disability within the meaning of the Plan; and (iv) the definition of "elimination period" within the meaning of the Plan. Id.

2. In the course of its very active role in setting up the components and terms of the Plan in 1995, the DJRA reviewed and edited numerous drafts of the Plan. Supp. Smith Aff., ¶ 3.

3. "Since the Plan went into effect, the DJRA has continued to play an active role in establishing the Plan's terms, conditions, and basic structure." Supp. Smith Aff., ¶ 6. For example, in April 2000 the DJRA requested that the Plan's definition of "Cost Of Living Allowance" be changed, and that a definition of "Monthly Rate Of Basic Earnings" be added to the Plan. Hartford agreed to make these amendments. Id.

4. In addition to plan design, the DJRA has also played a very active role in marketing the Plan and promoting it to DOJ employees. Supp. Smith Aff., ¶ 7. In 1995, the DJRA won the right from Hartford to review, edit and approve all marketing materials developed for the Plan. Id. When the Plan first became effective, the DJRA distributed a memo on DJRA letterhead to all DOJ employees which touted the Plan as "a great plan that every DOJ employee should take advantage of." Id., Exh. A. The memo further exhorted DOJ employees to "act quickly" to enroll. Id. Since that time, the DJRA has made "strong efforts" to encourage DOJ employees to enroll in the Plan. These efforts have included numerous briefings encouraging DOJ employees to participate. Id.

5. One of the purposes for which the DJRA exists is to deal with the DOJ on particular matters related to the Plan. Supp. Smith Aff., ¶ 8. There are two types of matters on which the DJRA deals with the DOJ. One concerns problems arising from particular employees' participation in the Plan. Id. A second relates to the system used by the DOJ to deduct Plan premiums from DOJ employees' paychecks. Id. Apart from these issues, however, the DJRA does not generally deal with the DOJ. Id.

6. The DJRA receives 13 cents per Plan enrollee per pay period as compensation for the services it provides under the Plan. Supp. Smith Aff., ¶ 9. Because the DJRA incurs very few costs in connection with the Plan, this income produces a small profit for the DJRA. Id.

7. The DJRA has a board of directors and two officers. Supp. Smith Aff., ¶ 10. The officers are elected from the membership. Id. DJRA members have participated in a wide variety of DJRA activities over the years, including participation in activity groups and sports teams, sponsorship of Little League teams, and donations to worthy causes. Id.

8. One of the most important reasons why the DJRA is organized and exists today is for the purpose of offering a disability income plan to DOJ employees. Supp. Smith Aff., ¶ 12. Indeed, making the Plan available to DOJ employees is central to the very mission of the DJRA. Id.

## Argument

The DJRA is an "employee organization" within the meaning of ERISA. As a consequence, the Plan is governed by ERISA. The regulatory "safe harbor" does not preclude ERISA preemption, moreover, because the DJRA endorsed the Plan and earns a profit from its operations. Finally, Plaintiff's claim for bad faith under R.I. Gen. Laws §9-1-33 is not saved from preemption by ERISA's savings clause.

## I. ERISA Applies Because The DJRA Is An "Employee Organization"

ERISA defines the term "Employee Organization" as follows:

> [A]ny organization of any kind . . . in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning an employee benefit plan, or other matters incidental to employment relationships; or any employees' beneficiary association organized for the purpose in whole or in part, of establishing such a plan.

29 U.S.C. §1002(4). Plaintiff does not recite this critical definition accurately in her opposition brief.[2] The plain and complete language of the statute, however, makes clear that there are two separate classes that fall under the definition of "Employee Organization."

### A. The DJRA Is An "Employee Organization" Since It Is An "organization of any kind . . . in which employees participate and which exist for the purpose, in whole or in part, of dealing with employers concerning an employee benefit plan, or other matters incidental to employment relationships"

Plaintiff offers three arguments why, in her view, the DJRA is not an "employee organization." As more fully set forth below, her arguments are without merit.

#### 1. DOJ Employees Participate In The DJRA

To qualify as an Employee Organization under ERISA, employees must participate in the organization. 29 U.S.C. § 1002(4). Plaintiff asserts that "[n]either [Plaintiff] nor any other insured participates. At best, then, employee "participation" is unproved." Pl. Mem. at 6.

---

[2] Plaintiff states that an "Employee Organization" is an organization "which exists for the purpose, in whole or in part, of dealing with <u>employees</u> concerning an employee benefit plan…" Pl. Mem. at 5 (emphasis added). Plaintiff's reference to "employees" should be to "employers." In addition, Plaintiff completely omits the clause "or other matters incidental to employment relationships" following the ellipsis in her quote. Further, at page 6 of her brief, Plaintiff misquotes <u>Fiero v. Commercial Life Ins. Co.</u>, 2000 WL 1808502 (E.D. La. 2000) for the proposition that an employee organization exists "for the purpose of dealing with employees about employee benefit plans." Pl. Mem. at 6. Again, Plaintiff has incorrectly substituted "employees" for "employers," then incorrectly attributes the substitution to the <u>Fiero</u> court.

As an initial matter, it is unclear how Plaintiff's lawyers[3] are in a position to make the blanket statement that no DOJ employee participates in any DJRA activity. But that point is academic, because the Supplemental Smith Affidavit makes clear that DJRA members – all of whom are DOJ employees – in fact participate in a wide variety of DJRA activities. Supp. Smith Aff., ¶ 10. The DJRA therefore meets the "employee participation" element of the definition of "employee organization."

2. <u>The DJRA Exists In Part For The Purpose Of Dealing With The DOJ</u>

To qualify as an Employee Organization under ERISA, the organization must exist, at least in part, for the purpose of dealing with an employer concerning a plan or matters incidental to the employment relationship. 29 U.S.C. § 1002(4). Plaintiff contends that the DJRA does not meet this part of the definition because it is not an entity "whose <u>primary</u> function concerns [Plaintiff's] disability insurance." Pl. Mem. at 6 (emphasis in original).

Again, however, Plaintiff has mischaracterized the language in the statute. Under ERISA, the question is not whether the DJRA's "primary function" is Plaintiff's "disability insurance." Instead, the question is whether the DJRA exists, at least <u>in part</u>, for the purpose of <u>dealing with an employer</u> about a <u>plan or other incidental matters</u>. <u>See</u> 29 U.S.C. § 1002(4). The Supplemental Smith Affidavit shows that the DJRA meets this part of the definition. Smith avers that one of the purposes for which the DJRA exists is to deal with the DOJ on two discrete issues: payroll deductions used to pay employee premiums for the Plan, and problems involving particular employees' participation in the Plan. Supp. Smith Aff., ¶ 8. This evidence amply fulfills this element of the statutory definition.

[3] Plaintiff did not submit an affidavit or any other evidence in support of this argument.

3. Participation In The Plan Is Limited To DOJ Employees

Plaintiff's third contention is hard to understand. She argues that the DJRA "cannot be an employee association" because participation is not limited to DJRA members. Pl. Mem. at 7. According to Plaintiff, "that fact alone destroys Hartford's claim that this is an ERISA plan." Id. Plaintiff further argues that "Hartford cannot rely on the employee prong [of the statutory definition], because it specifically disclaims any involvement by the employer, the Department of Justice." Id.

To begin with, Plaintiff's use of the term "employee association" is confusing. That term does not appear in ERISA, and it is not used in the decision by Magistrate Judge Lovegreen[4] cited by Plaintiff to support her use of that term. Pl. Mem. at 6. More importantly, Fiero v. Commercial Life Ins. Co. – a case relied on by Plaintiff – makes clear that Plaintiff's position is wrong. In Fiero, the court confronted an argument very similar to the argument Plaintiff appears to advance here: that because plan participation was open to DOJ employees who were not members of the organization that sponsored the plan, the organization could not be an "employee organization" within the meaning of ERISA. The Fiero court rejected that argument because mandatory employee membership in the organization is simply not a part of ERISA's definition of "employee organization":

> With respect, mandatory membership is irrelevant to either method of qualifying as an employee organization under Section 1002(4).

Fiero, 2000 WL 1808502 * 3.

Ultimately, Plaintiff's argument goes awry because it relies on an incorrect predicate. Plaintiff's statement that "Hartford cannot rely on the employee prong, because it specifically disclaims any involvement by the employer," Pl. Mem. at 6, confuses the governmental plan

---

[4] Caranci v. Blue Cross & Blue Shield of Rhode Island, 1999 WL 766974 (D.R.I. 1999).

exemption to ERISA and participant eligibility for an ERISA plan. It is true that Hartford disclaims that the DOJ sponsors or holds the Plan. (That is one reason why the governmental plan exemption in ERISA does not apply.) But Hartford certainly does rely on "the employee prong" to support its contention that the Plan is governed by ERISA. As the two Smith affidavits establish, participation in the Plan is limited to DOJ employees (whether or not they are also members of the DJRA). That is enough to establish that they are participants in an ERISA plan. See Caranci, 1999 WL 766874 *9 ("[I]n order to qualify as a plan participant, [plaintiffs] must be either "employees" or "members of an employee organization.").

**B. The DJRA Is An "Employee Organization" Since It Qualifies As An "employees' beneficiary association"**

Plaintiff's opposition also completely overlooks the fact that there is an entirely separate basis on which an organization like the DJRA can qualify as an "Employee Organization" under ERISA. The statute's definition of "Employee Organization" also includes any "employees' beneficiary association." 29 U.S.C. § 1002(4). Consequently, even if this Court rejects the argument that the DJRA is an Employee Organization of the type discussed above, it should nevertheless find that the DJRA is an employees' beneficiary association under ERISA.

In a series of opinion letters, the United States Department of Labor has developed four criteria for identifying an "employees' beneficiary association." Department of Labor Opinion Letter, No. 89-20A, 1989 WL 206424 (August 8, 1989);[5] see also Department of Labor Opinion Letter, No. 95-25A, 1995 WL 582729 (Oct. 3, 1995). Although Department of Labor opinion letters lack the force of law, they are "entitled to respect" to the extent they have the power to persuade. Christensen v. Harris County, 529 U.S. 576, 587, 120 S.Ct. 1655, 1662-63 (2000)

[5] Copies of all Department Of Labor Opinion Letters cited in this memorandum have been provided to the Court in a separate appendix.

(citing Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164 (1944)). At least one court has found the definition of employees' beneficiary association developed by the Department of Labor to be "informative and persuasive." Fiero v. Commercial Life Ins. Co., 2000 WL 1808502 * 3.

Under the criteria developed by the Department of Labor, to qualify as an employees' beneficiary association the following factors must be met:

1) membership in the association is conditioned on employment status – for example, membership is limited to employees of a certain employer or union;
2) the association has a formal organization, with officers, by-laws or other indications of formality;
3) the association is organized for the purpose, in whole or in part, of establishing a welfare or pension plan; and
4) the association generally does not deal with employers.

Department of Labor Opinion Letter 89-20 A at 2.

The DJRA clearly meets these criteria. First, membership in the DJRA is conditioned on employment status. All DJRA members must be DOJ employees. Smith Aff., ¶ 2. Second, the DJRA has a formal organization, with officers, elections and other indications of formality. Supp. Smith Aff., ¶ 10. Third, one of the most important purposes for which the DJRA is organized and exists is for the purpose of establishing and offering the Plan to DOJ employees. Id., ¶ 11. Finally, although the DJRA interacts with the DOJ on particular issues such as payroll deductions and participation issues, as a general matter the DJRA does not deal with the DOJ. Id., ¶ 8.

The fact that the DJRA qualifies as an employees' beneficiary association confirms that it is an "employee organization" within the meaning of 29 U.S.C. § 1004(2). And because the DJRA is an Employee Organization, the Plan is an "employee welfare benefit plan" within the meaning of 29 U.S.C. § 1002(1). ERISA therefore applies.

### III. The "Safe Harbor" Regulation Does Not Apply

As a fall-back, Plaintiff argues that "even if the Court concludes that Hartford's insurance coverage is preempted by ERISA, 29 C.F.R. § 25103-1(j) pulls the coverage back outside ERISA preemption." Pl. Mem. at 7. As shown below, this argument is incorrect.

To be covered by ERISA, an employee welfare benefit plan must be "established or maintained" by an employer or employee organization. 29 U.S.C. § 1002(1). In 1975, the Department of Labor promulgated "safe harbor" regulations describing when an organization may be involved with such a plan without being deemed to have "established or maintained" it. 40 Fed.Reg. 34, 527 (1975); see 29 C.F.R. § 25103-1(j). Under the regulation, a plan that meets all of the following criteria will be deemed not to have been "established or maintained" by the employer or employee organization, and will therefore be beyond the reach of ERISA:

> 1. No contributions are made by an employer or employee organization;
> 2. Participation [in] the program is completely voluntary for employees or members;
> 3. The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and
> 4. The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

29 C.F.R. § 25103-1(j) (emphasis added).

Hartford concedes that criteria 1 and 2 are met with respect to the DJRA plan. But criteria 3 and 4 are not.

A. The DJRA Endorsed The Plan

Plaintiff contends that the applicable test for "endorsement" under the safe harbor regulation is set forth in Johnson v. Watts Regulator Co., 63 F.3d 1129 (1st Cir. 1995). That is not entirely clear. Johnson dealt with a situation in which an employer obtained disability insurance for its employees. The test for endorsement fashioned by the Johnson court therefore focused on how an employer – as opposed to an employee organization – endorses a plan under the safe harbor regulation:

> [A]n employer will be said to have endorsed a program... if, in light of all the surrounding facts and circumstances, an objectively reasonable employee would conclude ... that the employer had not merely facilitated the program's availability but had exercised control over it or made it appear to be part and parcel of the company's own benefit package.

63 F.3d at 1135.[6] It is obvious that certain parts of this test, such as the reference to "the company's own benefit package," would have no application where, as here, an employee organization is the sponsor of the plan.

To the extent that Johnson is applicable to the present case, however, it actually confirms that the DJRA endorsed the Plan within the meaning of the safe harbor regulation. This is apparent from the sharply different roles played by the employer in Johnson and the DJRA here. In Johnson, the employer exercised no control at all over the plan in question; its role was passive and neutral. "It had no hand in drafting the plan [or] working out its structural components..." 63 F.3d at 1136. It performed "only ministerial activities." Id. It announced the plan to its employees with a four-sentence cover letter that did not "state[] that the employer endorsed the program." Id.

---

[6] Plaintiff misquotes this passage from Johnson in her brief, again transposing "employer" and "employee." Pl. Mem. at 8.

In contrast, the DJRA has been heavily involved with the Plan since before it became effective. It negotiated directly with Hartford over numerous structural components, terms and conditions of the Plan. Supp. Smith Aff., ¶ 3. It reviewed and edited numerous draft Plan documents. Id. It sought and obtained changes to different components of the Plan after the Plan went into effect. Id., ¶ 6. It retains the right to cancel the Plan at any time. Id., ¶ 12. It won the right from Hartford to review and edit all marketing materials developed for the Plan. Id. at ¶ 7. The DJRA's cover memo to DOJ employees enthusiastically touted the Plan as a "great plan and one that every DOJ employee should take advantage of" and, since the Plan became effective, the DJRA has made "strong efforts" to increase enrollment, including numerous presentations to DOJ employees. Id. Instead of limiting itself to "ministerial" functions, since the Plan became effective the DJRA has been active in changing the way in which DOJ employees pay for the Plan through payroll deductions, and in resolving problems regarding employee participation. Id. at ¶ 8.

One of the most striking differences in the level of endorsement provided by the Johnson employer and the DJRA is an attitudinal one. In Johnson, the employer's matter-of-fact cover letter to its employees took pains not to advocate that employees enroll.[7] In contrast, the DJRA's cover memo enthusiastically promotes the Plan and unabashedly urges enrollment.[8] These different levels of endorsement are likely explained by the difference in the sponsoring organizations. The sponsor in Johnson was an employer. Its mission was to earn money for its

[7] Far from endorsing the plan, the Johnson employer announced the plan to its employees in the following lukewarm terms: "We believe this to be an attractive program available at substantially lower cost than similar coverage purchased on an individual basis; however, the decision is, of course, entirely an individual one." 63 F.3d at 1136.

[8] Contrast the Johnson employer's statement that "the decision [to enroll] is, of course, entirely an individual one" with the DJRA's admonition that "you need to act quickly to take advantage of the open enrollment period."

owners. Providing disability insurance to its employees was clearly secondary to that mission. In contrast, the DJRA is an employee organization. Its mission is not to maximize profits but to improve the well-being of DOJ employees. For that reason, the Plan is central to the DJRA's very existence. As Mr. Smith states, "if the DJRA did not offer this important benefit to DOJ employees, we would not be adequately performing our mission, which is to sponsor programs and activities of benefit to Justice employees." Supp. Smith Aff., ¶ 11.

Johnson holds that as long as the employer merely advises employees of the availability of group insurance and performs "ministerial tasks," it will not be deemed to have endorsed the program under 2510-1(j)(3). 63 F.3d at 1136-37. The DJRA clearly goes far beyond these limits. It has therefore endorsed the Plan.

**B. Endorsement As Interpreted By Other Courts**

In the nine years since Johnson was decided, many other courts have considered the "endorsement" element of the safe harbor regulation. As shown below, the criteria developed in those decisions confirms that the DJRA endorsed the Plan within the meaning of the regulation.

**1. The DJRA Was Substantially Involved In Creating The Plan**

In Thompson v. American Home Assurance Company, 85 F.3d 429, 436 (6th Cir. 1996), the Sixth Circuit of Appeals stated:

> After reviewing the relevant case law [including Johnson], the court determines that a finding of endorsement is appropriate if, upon examining all the relevant circumstances, there is some factual showing on the record of substantial employer involvement in the creation or administration of the plan ... (emphasis added)

The DJRA easily satisfies the Thompson test, because it was substantially involved in the creation of the Plan. Supp. Smith Aff., ¶ 3, 4.

2. **The DJRA Regularly Promotes The Plan**

In Steen v. John Hancock Mutual Life Ins. Co., 106 F.3d 904, 916-17 (9th Cir. 1997), the court found that an employer had endorsed a plan within the meaning of the safe harbor regulation because it "regularly promoted" the plan to its employees. Supp. Smith Aff. at ¶ 7. Here, the DJRA views the Plan as central to its mission, and for that reason regularly promotes the Plan to DOJ employees. For this reason also, the DJRA meets the standard for endorsement under the regulation.

3. **The DJRA Negotiated Terms Of The Insurance Coverage**

In Chamblin v. Reliance Standard Life Ins. Co., 168 F.Supp. 2d 1168, 1172 (N.D. Cal. 2001), the court found that an employer who negotiated the terms of insurance coverage necessarily endorsed the plan, with the result that the safe harbor regulation did not apply.[9] Since the DJRA negotiated the terms of coverage under the Plan with Hartford, it too endorsed the Plan under this standard.

4. **The DJRA Reserved The Right To Terminate The Plan**

Another factor that removes the Plan from the safe harbor regulation and subjects it to ERISA is that the DJRA reserves the right to terminate that Plan at its discretion. Supp. Smith Aff., ¶ 12. The Department of Labor has issued its opinion that, if an employer reserves the right to terminate a plan, the plan is not entitled to the safe harbor exemption. Department of Labor Opinion Letter No. 80-22A, at *3 (April 17, 1980). Since the DJRA can cancel the Plan at any time, the Plan lies outside the safe harbor.

[9] The holding in Chamblin is consistent with Department of Labor Opinion Letter No. 77-54, at 1-2 (Aug. 8, 1977), in which the Department ruled that the safe harbor exemption is inapplicable if the employer negotiates with the insurer as to the terms of coverage.) As the Department later opined in Opinion Letter No. 94-26A, at *4 (July 11, 1994), an employer's suggestions to the insurer regarding plan design and structure represent direct involvement in the plan in excess of that permitted by the safe harbor regulation, thus subjecting the plan to ERISA.

C. The DJRA Does Not Satisfy The Fourth Safe Harbor Criterion

There is a second reason why the safe harbor regulation does not apply. The DJRA does not satisfy the fourth criterion of the regulation, either. That criterion states as follows:

> The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

29 C.F.R. s 25103-1(j) (emphasis added).

This element of the regulation states that if an employee organization merely receives "consideration" for providing administrative services to a program, that fact will not take the program out of the safe harbor. But if the organization makes "any profit" in connection with its services, the regulation does not apply. Here, the DJRA earns 13 cents per enrollee per pay period in return for its contributions to the Plan. Supp. Smith Aff., ¶ 9. This income produces a profit for the organization. Id.[10] Because the DJRA earns a profit in connection with the Plan, this element of the safe harbor definition is not satisfied.

In sum, the Plan does not fall within the safe harbor regulation because (i) the DJRA endorsed it, and (ii) the DJRA earns a profit in connection with the Plan.

IV. ERISA's Savings Clause Does Not Apply To Plaintiff's Bad Faith Claim

The second count in Plaintiff's Complaint alleges a violation of R.I. Gen. Laws § 9-1-33, which provides a cause of action for the "bad faith refusal to pay a claim made under any insurance policy." Plaintiff argues that, even if ERISA applies to the Plan, her claim under § 9-1-33 is not preempted because it falls within ERISA's "savings" clause, which exempts from

[10] As Mr. Smith established in his first affidavit, the DJRA is a for-profit corporation that pays income taxes to the federal government and the District of Columbia. Smith Aff., ¶ 2.

preemption "any law of any State which regulates insurance." 29 U.S.C. § 1144(b)(2)(A). Pl. Mem. at 15.

Last year this Court ruled that ERISA preempts claims asserted under § 9-1-33. Morris v. Highmark Life Ins. Co., 255 F.Supp.2d 16, 23-24 (D.R.I. 2003) (Lagueux, J.). Plaintiff argues, however, that her § 9-1-33 claim is entitled to a "fresh look" in light of the Supreme Court's decision in Kentucky Association of Health Plus, Inc. v. Miller, 123 S.Ct. 1471 (2003). In Miller, the Supreme Court made a "clean break from the McCarran-Ferguson factors" that had previously been used to apply ERISA's savings clause.[11] The Miller court held that for a state law to be deemed a 'law . . . which regulates insurance' under § 1144(b)(2)(A), it must satisfy two requirements: "[f]irst, the state law must be specifically directed toward entities engaged in insurance[,] [s]econd, . . . the state law must substantially affect the risk pooling arrangement between the insurer and the insured." Miller, 123 S.Ct. at 1479.

To illustrate the "fresh look" to which she feels entitled after Miller, Plaintiff relies on a single decision: Rosenbaum v. UNUM Life Ins. Co. of America, 2003 WL 22078557 (E.D. Pa. Sept. 8, 2003). In Rosenbaum, Judge Clarence L. Newcomer concluded – before the Miller decision was rendered -- that Pennsylvania's bad faith statute was not preempted by ERISA. Rosenbaum v. UNUM Life Insurance Company of America, 2002 WL 1769899, at *3 (E.D. Pa. July 29, 2002) ("Rosenbaum I"). After the defendant moved for reconsideration and the Miller

[11] Prior to Miller, the Supreme Court had established a multi-factor test for determining whether a state law fell within ERISA's savings clause. See Metro. Life Ins. v. Massachusetts, 471 U.S. 724 (1985). The first inquiry was whether, from a "common-sense view of the matter," the law regulates insurance. Id. at 740. The second inquiry focused on the McCarran-Ferguson factors: "[F]irst whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entitles within the insurance industry." Id. at 743.

decision was released, Judge Newcomer revisited this question. Applying the two-part analysis announced in Miller, Judge Newcomber again concluded that Pennsylvania's bad faith statute fell under ERISA's savings clause and was therefore not preempted. Rosenbaum, 2003 WL 22078557, at *1 ("Rosenbaum II").

Plaintiff's exclusive reliance on Rosenbaum is problematic in many ways. First, Rosenbaum is very much an aberrant decision, even within its own federal District. After Rosenbaum I was decided in 2002, no fewer than nine different judges within the Eastern District of Pennsylvania issued decisions disagreeing with it and holding that Pennsylvania's bad faith statute was preempted by ERISA.[12] After Miller and Rosenbaum II were decided in 2003, another four judges within the Eastern District of Pennsylvania issued decisions disagreeing with Rosenbaum II and holding that, under Miller, Pennsylvania's bad faith statute was preempted under ERISA.[13]

Moreover, outside of the Eastern District of Pennsylvania, numerous federal courts – including two courts of appeals – have examined whether, in light of Miller, statutory bad faith

---

[12] Hill v. Thomas Jefferson Univ. Hospital, Inc. No. 02-7837, slip op. (E.D. Pa. Feb. 6, 2003) (Fullam J.); Eighmy v. Henry Francis Dupont Winterthur Museum, Inc. Long Term Disability Plan, No. 02-7136, (E.D. Pa. Dec., 17, 2002) (O'Neill, J.); Stevens v. Standard Ins. Co., No. 02-6597, slip op. (E.D. Pa. Dec. 4, 2002) (McLaughlin, J.); Thompson v. UNUM Provident Corp., No. 02-4593, slip op. (E.D. Pa. Nov. 13, 2002) (Padova, J.); Bell v. UNUM Provident Corp, 222 F. Supp. 2d 692 (E.D. Pa. September 19, 2002) (Baylson, J.); Smith v. Continental Casualty Co., No. 02-1915, 2002 U.S. Dist. LEXIS 18312 (E.D. Pa. Sept. 16, 2002) (Waldman, J.); Kirkhoff v. Lincoln Technical Institute, Inc., 221 F. Supp. 2d 572 (E.D. Pa. Sept. 6, 2002) (Bartle, J.).

[13] Morales-Ceballos v. First Unum Life Ins. Co. of Am., No. 03-925, 2003 WL 22097493, at *2 (E.D.Pa. May 27, 2003); McGuigan v. Reliance Standard Life Ins. Co., 256 F.Supp.2d 345, 348 (E.D. Pa. 2003); Nguyen v. Healthguard of Lancaster, Inc., 2003 U.S.Dist. LEXIS 15627, No. 03-3206, at *24 (E.D. Pa. Aug. 14, 2003); Dolce v. Hercules Inc. Insurance Plan, No. 03-CV-1747, 2003 WL 22992148 (E.D. Pa. Dec. 15, 2003).

claims are preempted under ERISA. Virtually all of these courts have concluded that they are.[14] In general, these courts have reached this conclusion on two grounds. First, numerous courts have found that statutory bad faith claims do not satisfy the second prong of the Miller test because they do not "substantially affect the risk pooling arrangement between the insurer and the insured." See, e.g., Kidneigh, supra, 345 F.3d at 1187 ("State law bad faith claims are not integral to the risk pooling arrangement..."); Leuthner, supra, 270 F. Supp. 2d at 594; Burgos, supra, 286 F. Supp. 2d at 819; Ercole, supra, 2003 WL 21104926, at *2). Dolce, supra, 2003 WL 22992148, at *3. Second, numerous courts have held that, even if a bad faith claim could be read to fall within ERISA's savings clause, such claims are nevertheless preempted because they conflict with the exclusive enforcement scheme set forth in ERISA. As the Supreme Court stated in Rush Prudential HMO, Inc. v. Moran, 122 S.Ct. 2151, 2165 (2002):

> [a]lthough we have yet to encounter a forced choice between the congressional policies of exclusively federal remedies and the "reservation of the business of insurance to the States," we have anticipated such a conflict, with the state insurance regulation losing out if it allows plan participants to "obtain remedies under state law that Congress rejected in ERISA."

---

[14] Post- Miller decisions holding that ERISA preempts bad faith and related claims include Kidneigh v. Unum Life Insurance Company of America, 345 F.3d 1182, 1185 (10th Cir. 2003) ("We hold that Colorado bad faith claims are preempted by ERISA because they conflict with ERISA's remedial scheme."); Elliot v. Fortis Benefits Insurance Company, 337 F.3d 1138 (9th Cir. 2003) (holding that ERISA preempts claims under Montana Unfair Trade Practices Act); Ercole v. Conective And Coventry Health Care Of Delaware, Inc., 2003 WL 21104926 (D. Del. 2003) (ERISA preempts claims under Delaware bad faith statute); Burgos v. Group & Pension Administrators, Inc., 286 F.Supp.2d 812, 818 (D.Tex. 2003) (ERISA preempts claims under Texas bad faith statute); Dwyer v. Unum Life Ins. Co. of America, 2003 WL 22844234 (N.D. Ill. 2003) (ERISA preempts claims under Illinois statute for vexatious refusal to pay insurance benefits); Bonnell v. Bank of America, 284 F.Supp.2d 1284 (D.Kan. 20030 (ERISA preempts claim under Kentucky bad faith statute); Glynn v. Bankers Life And Casualty Company, 297 F.Supp.2d 424 (D.Conn. 2003) (ERISA preempts Connecticut Unfair Trade Practices Act); Leuthner v. Blue Cross And Blue Shield Of Northeastern Pennsylvania, 270 F.Supp.2d 584 (M.D.Pa. 2003) (ERISA preempts claim under Pennsylvania bad faith statute).

(citing Pilot Life Ins. Co. v. Dedeaux, 481 S.Ct. 41, 54 (1987)).[15]

Here, application of Miller and the large body of authority cited above makes clear that ERISA's savings clause does not spare Plaintiff's claim under R.I. Gen. Laws §9-1-33 from preemption. First, Rhode Island's bad faith statute does not "substantially affect the risk pooling arrangement between the insurer [Hartford] and the insured [Plaintiff]." The best way to see this is by considering Pilot Life v. Deduaux, supra. There, the Supreme Court analyzed the Mississippi common law of bad faith and concluded that it "does not affect a spreading of policyholder risk." Pilot Life, 481 U.S. at 50. The basis for its conclusion was that the Mississippi common law of bad faith

> Does not define the terms of the relationship between the insurer and the insured; it declares only that, whatever the terms have been agreed upon in the insurance contract, a breach of that contract may in certain circumstances allow the policyholder to obtain punitive damages.

Id. at 51.

Exactly the same reasoning applies here. Section 9-1-33 has absolutely no effect on the risk pooling arrangement between insurers and insureds. That risk pooling arrangement is determined by the terms of the insurance relationship between insurers like Hartford and insureds like the Plaintiff. Instead, if an insurer breaches its obligations under the contract of insurance, § 9-1-33 permits a policyholder to obtain punitive damages. Section 9-1-33 therefore does not fall within ERISA's savings clause as interpreted by Miller.

Moreover, even if §9-1-33 did fall within the savings clause, Plaintiff's claim under that statute would still be preempted. That is because §9-1-33 provides for remedies beyond the

[15] Other cases that have employed this "direct preemption" rationale include Bonnell v. Bank of America, supra at 1288; Elliott v. Fortis Benefits Ins. Co., 337 F.3d 1138, 1147-48 (9th Cir. 2003); and Fink v. Dakotacare, 324 F.3d 685, 689 (8th Cir. 2003).

exclusive set of remedies available under ERISA.[16] The state statue therefore "expand[s] the potential scope of ultimate liability imposed upon employers by the ERISA scheme." Sprecher, supra, 2002 WL 1917711, at *7. Such an expansion of remedies is impermissible. As the Supreme Court stated in Rush, "state insurance regulation los[es] out if it allows plan participants to obtain remedies under state law the Congress rejected in ERISA." 107 S.Ct. at 2165 (quotation omitted).

For the foregoing reasons, Plaintiff's claim under §9-1-33 does not fall within ERISA's savings clause. And even if it did, it would still be preempted because it conflicts with the exclusive remedial scheme provided in ERISA.[17]

HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY

By Its Attorneys,

Mark A. Pogue (#3441)
Annemarie M. Carney (#6380)
EDWARDS & ANGELL, LLP
2800 Financial Plaza
Providence, RI 02903
(401) 274-9200
(401) 276-6611 (telecopy)

[16] ERISA's civil enforcement provisions allow an ERISA-plan participant to recover benefits, obtain a declaratory judgment, and to enjoin an improper refusal to pay benefits. 29 U.S.C. § 1132(a). Section 502(a) also allows an ERISA-plan participant to seek attorneys fees and costs. Id. Rhode Island's bad faith statute, on the other hand, allows insured's to recover punitive damages for bad faith conduct – a remedy nowhere found in ERISA.

[17] Even if ERISA did not preempt Plaintiff's State-law claims, Hartford does not concede that the law of Rhode Island would apply to this case. As Hartford stated in its motion to stay discovery in this case, if ERISA does not apply, then the substantive law of Washington, D.C. – where the DJRA is located, and where the Plan was negotiated and signed – does. If necessary, Hartford reserves the right to submit an additional motion at a later time on this choice-of-law issue.

**Certificate of Service**

I hereby certify that on this 2nd day of April, 2004 I served a copy of the within Reply To Plaintiff's Opposition To Hartford's Motion For Summary Judgment by first class mail, postage prepaid to:

Christopher M. Lefebvre
Law Offices of Claude Lefebvre & Sons
P.O. Box 479
Pawtucket, RI 02862

Jordan M. Lewis, Esq.
Siegel, Brill, Greupner, Duffy & Foster, P.A.
400 East Wisconsin Avenue
Suite 333, Floor 3A
Milwaukee, WI 53202

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| SHERYL SERREZE DESROSIERS,<br><br>Plaintiff,<br><br>v.<br><br>HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY, a Connecticut Corporation,<br><br>Defendant. | : | Civil Action No. 03-018-L |

**SUPPLEMENTAL AFFIDAVIT OF ARTHUR C. SMITH III**

I, Arthur Smith III, hereby declare and state as follows:

1. I am the president of the Department of Justice Recreation Association (the "DJRA"). I have personal knowledge of the facts set forth below.

2. The DJRA is the sponsor of a group long-term disability plan known as the Federal Employees Group Long-Term Disability Plan (the "Plan"). Hartford Life And Accident Insurance Company ("Hartford") issued a policy of insurance to the DJRA for the Plan. All participants of the Plan must be employees of the United States Department of Justice (the "DOJ").

3. The Plan became effective on March 1, 1995. Before that date, for the better part of a year, the DJRA was heavily involved in designing the structural components of the Plan and its subsidiary terms and conditions. Our involvement in this regard took occurred in two ways. First, the DJRA negotiated directly with Hartford over different issues relating to the design of the Plan. In addition, the DJRA reviewed numerous drafts of the Plan and marketing documents

associated with it. I personally participated in these negotiations and reviewed and edited these draft documents.

4. I remember several specific components of the Plan that were negotiated with Hartford before the Plan was acceptable to the DJRA. First, the DJRA wanted DOJ employees who were law enforcement officers to be eligible to participate in the Plan. Hartford initially resisted this concept, but the parties eventually agreed to make law enforcement officers eligible at a higher premium rate than for non-law enforcement employees. Second, the DJRA wanted employees of the Federal Bureau of Investigation (the "FBI") to be eligible for the Plan. After some negotiation, Hartford and the DJRA resolved this point by allowing FBI employees to participate so long as they were not counted toward the minimum number of participants necessary to activate the Plan. Third, the DJRA insisted that pregnancy be recognized as a disability within the meaning of the Plan. Hartford acceded to this point. Fourth, I recall that the DJRA wanted the definition of the term "elimination period" in the draft Plan I reviewed changed to clarify its provisions for our membership. Hartford accepted our changes to this definition.

5. The DJRA selected many of the other basic terms of the Plan from among a range of options presented to us by our insurance broker. For example, we specified that we wanted a definition of disability in the Plan that would include disabilities caused by mental health problems.

6. Since the Plan went into effect, the DJRA has continued to play an active role in establishing the Plan's terms, conditions, and basic structure. For example, in April 2000, the DJRA requested that the Plan's definition of "Cost Of Living Adjustment" be changed. In the

same month we also requested a specific definition of the term "Monthly Rate of Basic Earnings" be added to the Plan. Hartford agreed to make these requested changes.

7. In addition to plan design, the DJRA has also played a very active role in promoting the Plan to DOJ employees. During our initial negotiations in 1995, Hartford agreed that the DJRA would have the right to review, edit and approve all marketing materials developed for the Plan. I personally have reviewed and edited numerous such documents over the years. In addition, when the Plan first became effective, I distributed the memo attached hereto as Exhibit A to all DOJ employees. That memo describes the Plan as a "great" plan, and that description is consistent with the DJRA's strong efforts to encourage DOJ employees to enroll. Since the Plan became effective, the DJRA has given numerous briefings at which it has endorsed the Plan and encouraged DOJ employees to enroll.

8. One of the purposes for which the DJRA exists today is to deal with the DOJ on particular matters relating to the Plan. For example, from time to time a problem will arise in connection with a DOJ employee's participation in the Plan. On several of these occasions, I have dealt directly with management at the DOJ, explaining how the Plan works and is paid for, in order to straighten out the problem. In addition, the DJRA has been very active in making it easier for DOJ employees to pay for the Plan through payroll deductions. Two years ago, as a direct result of the efforts of the DJRA and others, the payroll deduction system used by the DOJ was changed from a system based on discretionary monthly allotments to one based on pay-period allotments. This has made it easier for DOJ employees to participate in the Plan. Apart from straightening out such problems and working on payroll deduction issues, however, the DJRA generally does not deal with the DOJ.

9. The DJRA receives 13 cents per enrollee per pay period as compensation for the services it provides in connection with the Plan. Although we do not maintain strict cost accounting, this income results in a small profit for the DJRA because we incur very few costs in connection with the services we provide for the Plan.

10. The DJRA has a board of directors and two officers. The Board members are elected from the membership. Over the years, DJRA members have participated in our Association in many different ways. DJRA members have formed and participated in activity groups focused on sports activities, photography and art. They have fielded sports teams and sponsored Little League teams, and have provided financial support to worthy groups such as day care centers.

11. Since the Plan became effective in 1995, one of the most important reasons why the DJRA has been organized and in existence is for the purpose of establishing and offering to DOJ employees a disability income protection plan. In fact, if the DJRA did not offer this important benefit to DOJ employees, we would not be adequately performing our mission, which is to sponsor programs and activities of benefit to justice employees.

12. Under the terms of the plan, the DJRA may terminate its participation in the Plan at any time.

Arthur C. Smith, III

Sworn to before me under the penalties of perjury this 19th day of March, 2004.

ROWENA G. DENNIS-BRIGHT
Notary Public of Commonwealth of Virginia
My Commission Expires November 30, 2007

DJRA

Department of Justice Recreation Association
U.S. Department of Justice
10th & Pennsylvania Avenue N.W.
Main Justice Building, Room 6240
Washington, D.C. 20530

TO: ALL DEPARTMENT OF JUSTICE EMPLOYEES

FROM: ARTHUR C. SMITH, III *Arthur C. Smith*
PRESIDENT,
DEPARTMENT OF JUSTICE RECREATION ASSOCIATION

RE: FEDERAL EMPLOYEE GROUP LONG TERM DISABILITY PLAN (FEGLTD)

As you know, Department of Justice employees, like other Federal employees, do not have available to them a government sponsored high quality, low cost long-term disability program. Financial planners will probably tell you that *disability insurance should be the cornerstone of your financial security.* Disability insurance provides you with income when you are disabled, unable to work and your paycheck has stopped.

The effects of a disability can be devastating to an individual and their family; physically, emotionally and financially. Disability is a major concern for many of us because we know that, if we are disabled by an accident or illness, especially off the job, most of us don't have enough accrued annual leave or sick leave to enable us to meet our financial obligations for more than a few weeks. We could suddenly find ourselves at risk of losing all those things we have worked so hard for: our home, college for our children, our retirement security, etc.

Recently, I was surprised to learn that many DOJ employees did not receive the enrollment materials for the **Federal Employees Group Long Term Disability** plan introduced in April. If you did not receive the FEGLTD information you should contact the Plan Administrator at (415) 538-8625 as the open enrollment period will be closing soon. The DJRA wants to ensure that all Justice employees have the opportunity to review the FEGLTD plan and take advantage of the guaranteed acceptance during the open enrollment period. Open enrollments are not offered on an annual basis and if you apply after the open enrollment period ends you may be required to supply medical proof of insurability before you will be accepted.

The FEGLTD Plan provides DOJ employees with a number of very important benefits:

- Guaranteed Acceptance during the open enrollment period or your first 61 days as a new employee
- Choice of two benefit levels:

  Option I:
  50% of salary to $3,500 / month with a 60 day elimination period

  Option II:
  65% of salary to $8,000 / month with a 90 day elimination period
- Tax Free FEGLTD benefits
- Maternity covered as any other disability
- Pre-existing conditions covered after 12 or 24 months
- Partial disability and rehabilitation benefits.
- COLA benefits (Option II only)
- 3 Month Survivor Benefit
- All law enforcement officers are eligible

**This is a great plan and one that every DOJ employee should take advantage of. If you haven't already enrolled in the FEGLTD program you need to act quickly to take advantage of the open enrollment period. Call the FEGLTD plan administrator at (415) 636-8427 today.**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| SHERYL SERREZE DESROSIERS,<br><br>Plaintiff,<br><br>v.<br><br>HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY, a Connecticut Corporation,<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Civil Action No. 03-018-L |

**APPENDIX OF DEPARTMENT OF LABOR**
**<u>OPINION LETTERS CITED IN PLAINTIFF'S REPLY BRIEF</u>**

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY

Mark A. Pogue (#3441)
Annemarie M. Carney (#6380)
EDWARDS & ANGELL, LLP
2800 Financial Plaza
Providence, RI 02903
(401) 274-9200
(401) 276-6611 (telecopy)

*1 Mr. James R. Deveney, II
Weinberg and Green
Nineteenth Floor
10 Light Street
Baltimore, Maryland 21202

April 17, 1980

ERISA Sections:
3(1)
4(a)

Dear Mr. Deveney:

This is in reply to your letters of November 17, 1978, and May 29, 1979, requesting an advisory opinion regarding applicability of the Employee Retirement Income Security Act of 1974 (ERISA) to the Maryland Classified Employees Association Insurance Trust (the Trust). The following is a summa of the material representations contained in both your letters and the docum submitted therewith.

You advise that the Trust is sponsored by the Maryland Classified Employees Association (MCEA), a state-wide organization which represents employees of State if Maryland with regard to employment and working conditions. Members in MCEA is voluntary and employees from various state agencies pay annual du thereto. The Trust was created and is maintained by MCEA to enable MCEA memb to obtain life insurance, sickness and accident insurance, hospitalization insurance, or other insurance or similar benefits under group insurance programs.

The Trust is administered by a Board of Trustees who are appointed by the president of MCEA for unspecified terms. The trustees serve on the Board without compensation and are subject to removal, at any time, by the preside of MCEA. However, the president cannot remove more than one-half of the cur trustees in any calendar year without the approval of the Executive Committe MCEA. The president of MCEA also serves as a member of the Board of Trustee for the duration of his term. According to the trust agreement, all insuran policies obtained by the Trust, and the terms and conditions of the insurance coverage provided through the Trust are subject to any and all conditions wh the Board of Trustees deems to be necessary. The trustees select and endors those insurance plans which will be made available to MCEA members through t Trust. Insurance brokers present various plans to the trustees for their approval or disapproval. Upon selection of an insurance plan by the Board o Trustees, they approve the descriptive literature which will be sent to memb of MCEA under the auspices of MCEA. Insurance plans available to MCEA membe include group term life insurance, whole life insurance, sickness, accident disability insurance, cancer care, and hospitalization indemnity. All plans other than the group term life insurance plan utilize individual contracts i providing coverage and benefits to plan participants. Participation in the Trust for all MCEA members is voluntary. However, a MCEA member's eligibilit

participate in the Trust, under the terms of a particular insurance policy, determined by the Board of Trustees. If the application submitted by a MCE member is accepted, the necessary insurance premiums are deducted from the of the participating member by his employer via payroll deductions, and the premiums are then forwarded to the insurance broker who in turn remits them the insurance carrier. No funds are contributed by MCEA.

*2 To the extent that excess premium payments are received by the insuranc broker under the group term life insurance plan, retroactive rebates are remitted to the Trust, which are then accumulated by the trustees in a spec reserve fund to be used to defray the cost of insurance in the future. In addition, the insurer under the group term life insurance plan pays administrative fees to the Trust in an amount equal to 6 percent of the tota annual insurance premiums. The Trust, in turn, pays an administrative fee c percent of these annual insurance premiums to MCEA for administrative and ot recordkeeping services performed for the Trust by MCEA.

The trustees of the Trust have the power to promulgate rules and regulation regarding the operation and policies of the Trust, and are empowered to amen the Trust by written instrument in any manner which is not inconsistent with stated purpose of affording insurance benefits to MCEA members. The trustee are required to make a semi-annual report to MCEA concerning the status of t Trust; however, MCEA has the authority at any time to request reports from t trustees regarding application of funds received from MCEA members and other information concerning the operation of the Trust. The Trust can be termina by MCEA at any time.

In your letters you inquire whether benefits provided through the Trust amo to one or more employee welfare benefit plans, within the meaning of section 3(1) of ERISA, and are therefore subject under section 4(a) of ERISA to titl of ERISA, including the reporting and disclosure requirements set forth in p 1 of that title.

Section 3(1) of ERISA defines an employee welfare benefit plan as follows:

. . . any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or b both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 30 of the Labor Management Relations Act, 1947 (other than pensions on retiremer or death, and insurance to provide such pensions). Department of Labor regulation 29 CFR 2510.3-1(j) clarifies the definition of the term 'employee welfare benefit plan' for purposes of title I of ERISA by indicating that the term 'employe welfare benefit plan' will not include group or group-type insurance programs offered by an insurer to employees or members of an employ organization if certain criteria are satisfied. As indicated therein, the criteria are that the arrangement must be one on which (1) no contributions a made by an employer or employee organization, (2) participation is voluntary, (3) the sole function of the employer or employee organization with respect t the program is, without endorsing the program, to permit the insurer to

Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works

publicize the program and to collect and remit premiums to the insurer, and the employer or employee organization receives no consideration in connecti with the program other than reasonable compensation for administrative serv actually rendered in connection with payroll deductions or dues checkoffs.

*3 In your November 17, 1978 letter, you suggest that the benefit programs provided through the Trust may be group or group-type insurance programs as described in regulation 2510.3-1(j). As previously noted, you have informe that the Trust receives retroactive rebates attributable to excess premium payments resulting from experience-rating credits from the group term life insurance policy. You inquire as to whether these rebates, accumulated by t trustees in a special reserve fund, which are used to defray the cost of insurance in the future, amount to 'consideration' within the meaning of regulation 2510.3-1(j)(4). As noted above, regulation 2510.3-1(j)(4) does r permit the receipt of consideration other than reasonable compensation for administrative services actually rendered. Since no portion of these retroactive rebates inures to the benefit of either the Trust or MCEA, it is Department's opinion that the benefit programs provided through the Trust me the conditions of regulation 2510.3-1(j)(4).

You also inquire whether the benefit programs provided through the Trust me the conditions of regulation 2510.3-1(j)(3). As noted above, your letters indicate that the Trust was created by MCEA and is sponsored by MCEA, that t Trust may be terminated by MCEA at any time, that the Board of Trustees of t Trust is composed of the incumbent president of MCEA and several other trust appointed by the president of MCEA, that the trustees select and endorse tho insurance plans which are available to MCEA members, and that descriptive literature regarding the insurance programs is sent to members of MCEA under auspices of MCEA. Under these circumstances, it appears that the MCEA's functions with respect to the insurance programs provided through the Trust not limited, within the criterion set forth in regulation 2510.3-1(j)(3), to merely permitting insurers to publicize such programs, without endorsement, to collecting and remitting premiums to the insurers. In our opinion, therefore, the insurance programs provided through the Trust are not group o group-type insurance programs described in regulation 29 CFR 2510.3-1(j).

You further inquire whether the Trust is to be considered the employee organization maintaining the insurance programs or whether the employee organization maintaining these programs is MCEA. The term 'employee organization' is defined in section 3(4) of ERISA to mean '. . . any labor u or any organization of any kind, or any agency or employee representation committee, association, group, or plan, in which employees participate and wh exists for the purpose, in whole or in part, of dealing with employers concerning an employee benefit plan, or other matters incidental to employme relationships; or any employees' beneficiary association organized for the purpose in whole or in part, of establishing such a plan.'

Regardless of whether the Trust might be deemed to be an employees' benefic association, we think that in view of the fact that the Trust was created by MCEA, and in view of the control that the MCEA exercises over the Trust, the benefit programs provided through the Trust are maintained by the MCEA. Sinc as you recognize MCEA is clearly an employee organization within the meaning section 4(a)(2) of ERISA and since the benefit programs offered through the Trust provide benefits described in section 3(1) of ERISA, it is the

Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works

Department's opinion that these benefit programs amount to one or more empl welfare benefit plans within the meaning of section 3(1).

*4 Under section 4(a) of ERISA, title I generally applies, except as provi in section 4(b), to any employee benefit plan if it is established or maint by, among other entities, any employee organization representing employees engaged in commerce or in any industry affecting commerce. The phrase 'ind or activity affecting commerce' is broadly defined in section 3(12) of ERIS the exceptions from title I coverage listed in section 4(b), only section 4(b)(1) appears to be of potential relevance in this matter. Section 4(b)(1 provides that title I of ERISA does not apply to a plan which is a governme plan, as defined in section 3(32).

The term 'governmental plan' is defined in section 3(32) of ERISA as '. . plan established or maintained for its employees by the Government of the U States, by the government of any State or political subdivision thereof, or any agency or instrumentality of any of the foregoing . . ..'

From the information submitted it appears that the Trust was established a maintained by MCEA and is not maintained nor was it established by a governmental entity.

Thus, the Trust is an employee welfare benefit plan subject to title I of ERISA, including the reporting and disclosure provisions set forth in part 1 that title.

This letter constitutes an advisory opinion under ERISA Procedure 76-1. Accordingly, this letter is issued subject to the provisions of the procedur including section 10 thereof relating to the effect of advisory opinions.

Sincerely,

Ian D. Lanoff
Administrator of Pension and Welfare Benefit Programs

OFFICE OF PENSION AND WELFARE BENEFIT PROGRAMS (E.R.I.S.A.)
U.S. DEPARTMENT OF LABOR
Opinion No. 80-22A, 1980 WL 8926 (E.R.I.S.A.)
END OF DOCUMENT

Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.



*1 August 8, 1977

ERISA Section:
3(1)

Dear ***:

Thank you for your letter requesting an opinion regarding coverage under t Employee Retirement Income Security Act of 1974 (ERISA). Specifically, you whether the (named) Disability Plan (Disability Plan) and the Accidental De and Dismemberment Plan (Accident Plan) of the (named) Association constitut welfare benefit plans under ERISA. We regret that our heavy workload has resulted in a delay in responding to your request.

You advise that the Association makes no contribution to either the Disabi or Accident Plan and that participation in either is completely voluntary f members. Further, the Association receives no compensation or consideratio any form in connection with these plans. The Association has appointed (nam Inc., to negotiate with the insurer, send premium notices to participants an collect premiums as directed by the insurer and transmit them to the insurer keep the records, and to use its facilities to efficiently handle claims. Y also submitted copies of both Plan contracts, the premium notice, and Association brochures used to publicize the Plans with your request.

Section 2510.3-1(j) of the Department of Labor regulations issued August 15 1975, provides that:

For purposes of Title I of the Act and this chapter, the terms 'employee welfare benefit plan' and 'welfare plan' shall not include a group or group-type insurance program offered by an insurer to employees or members of an employee organization, under which

(1) no contributions are made by an employer or employee organization;

(2) participation in the program is completely voluntary for employees o members;

(3) the sole functions of the employer or employee organization with res to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and

(4) the employer or employee organization receives no consideration in t form of cash or otherwise in connection with the program, other than reasona compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

Based on the information you supplied in your request, both the Disability P and the Accident Plan meet the conditions 1, 2, and 4 of the cited regulatio However, neither Plan complies with the third condition. Through (named), Inc the Association bills and collects premiums in a procedure that is neither a payroll deduction nor a dues checkoff for transmittal to the insurer. In addition, the Association through (named), Inc., negotiates with the insurer assists members with claims. This exceeds the limited employee organization involvement contemplated in the regulations. In Opinion Letter 75-06 (copy enclosed) issued November 3, 1975, the Department of Labor held such employer

Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works

involvement would remain the key for determining whether a plan is exempted under the regulations. The same would hold true for employee organization involvement.

*2 Accordingly, both the Disability Plan and the Accident Plan are employe welfare benefit plans covered by Title I of ERISA.

Sincerely,

OFFICE OF PENSION AND WELFARE BENEFIT PROGRAMS (E.R.I.S.A.)
U.S. DEPARTMENT OF LABOR
Opinion No. 77-54, 1977 WL 5421 (E.R.I.S.A.)
END OF DOCUMENT

Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works

*1 Ms. Catherine A. Powers
Benefits Attorney
Air Line Pilots Association
535 Herndon Parkway
P.O. Box 1169
Herndon, Virginia 22070

July 11, 1994

ERISA SECTIONS:
3(1)
2510.3-1(j)

Dear Ms. Powers:

This is in response to your request on behalf of the Air Line Pilots Association, International (ALPA) regarding the applicability of the Employe Retirement Income Security Act of 1974 (ERISA). Specifically, you ask wheth the ALPA Group Loss of License Disability Income Plan (the LLD Plan) and the ALPA Group Extended Total Disability Income Insurance Plan (the TDI Plan) ar "employee welfare benefit plans" within the meaning of section 3(1) of ERISA

You advise that ALPA is an unincorporated association that represents, for purposes of collective bargaining under the Railway Labor Act, 42,000 pilot members who fly for 44 commercial airlines. The Department of Labor (the Department) notes that ALPA files yearly as a labor organization (File No. 000179) under the provisions of the Labor-Management Reporting and Disclosur Act of 1959.

Section 3(4) of Title I of ERISA provides:

(4) The term "employee organization" means any labor union or any organization of any kind, or any agency or employee representation committee, association, group, or plan, in which employees participate and which exists the purpose, in whole or in part, of dealing with employers concerning an employee benefit plan, or other matters incidental to employment relationshi or any employees' beneficiary association organized for the purpose in whole in part, of establishing such a plan.

For the purposes of this opinion, we assume that ALPA is an employee organization within the meaning of ERISA section 3(4).

You represent that the LLD Plan was established in 1953 to provide group lo of license disability insurance to ALPA members who experience medical proble resulting in loss of the medical certificate issued to them by the Federal Aviation Administration, and who thus can no longer operate commercial aircr The TDI Plan was established in 1963 to provide long-term disability insuran benefits to ALPA members who are unable to work in any occupation. ALPA memb must first participate in the LLD Plan in order to be a beneficiary under th TDI Plan.

The group insurance under the TDI Plan and the group insurance under the LL Plan are both held in ALPA's name. You state that ALPA makes suggestions to

Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works

insurer that provides the disability insurance under the LLD Plan and the T Plan regarding the design and structure of the plans. You state that "[a]f considering [ALPA's]input on plan design and structure, along with plan experience [in the LLD Plan] and market competition, the insurer sets the premium rates on an actuarial basis."

You further represent that ALPA provides its members with information rega the LLD Plan and the TDI Plan, including a copy of a brochure that displays ALPA logo and address and refers to the LLD Plan and the TDI Plan as "ALPA's Loss of License Program for the protection you need."

*2 You represent that participation in the LLD Plan and the TDI Plan is voluntary and that participants in the LLD Plan and the TDI Plan may elect either to have premiums for these two plans deducted from their paychecks or be billed for the premiums directly by ALPA. Premiums are collected by ALPA forwarded to the insurer. In addition to forwarding members' premiums, you state that ALPA forwards to the insurer the LLD Plan premiums for all the pi of one "major airline" employer. This employer pays to ALPA the LLD Plan premiums for its pilot employees pursuant to a negotiated collective bargain agreement.

Apprentice members of ALPA may accept or reject an automatic participation the LLD Plan during a probationary employment period. You represent that insurance premiums are not charged to the apprentice members who accept participation and that ALPA does not pay the premiums for this coverage. Further, you state, "[a]ny loss associated with this coverage is charged aga [the LLD] Plan experience."

Section 3(1) of Title I of ERISA defines the term "employee welfare benefit plan" to include:

> [A]ny plan, fund, or program which was heretofore or is hereafter establi or maintained by an employer or by an employee organization, or by both, to t extent that such plan, fund, or program was established or is maintained for purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care c benefits, or benefits in the event of sickness, accident, disability, death c unemployment, or vacation benefits, apprenticeship or other training programs or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 302(c) of the Labor Management Relations Act, 19 (29 USCS section 186(c)] (other than pensions on retirement or death, and insurance to provide such pensions).

Although the LLD Plan and the TDI Plan provide a benefit that is specified i ERISA section 3(1), in order to be employee welfare benefit plans, they must also, among other criteria, be established or maintained by an employer or an employee organization, within the meaning of section 3(1). You assert that A does not establish or maintain the LLD Plan and the TDI Plan because the programs meet the requirements for group insurance programs set forth in regulations of the Department at 29 C.F.R. section 2510.3-1(j). Regulation section 2510.3-1(j) describes certain group or group-type insurance programs which the involvement of the employer or employee organization in the operati of the program is so minimal that such involvement does not constitute establishment or maintenance of the arrangement for purposes of ERISA section 3(1). Thus, the issue presented in this case is whether the LLD Plan and the TDI Plan are group insurance programs as described in regulation section 2510

Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works

1(j) and therefore not "employee welfare benefit plans" within the meaning ERISA section 3(1).

*3 Regulation section 2510.3-1(j) provides:

(j) Certain group or group-type insurance programs. For purposes of Tit of the Act and this chapter, the terms "employee welfare benefit plan" and "welfare plan" shall not include a group or group-type insurance program of by an insurer to employees or members of an employee organization, under wh

(1) no contributions are made by an employer or employee organization;

(2) participation in the program is completely voluntary for employees or members;

(3) the sole functions of the employer or employee organization with resp to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and

(4) the employer or employee organization receives no consideration in th form of cash or otherwise in connection with the program, other than reasona compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

It is the Department's position that a program will be excluded from Title ERISA pursuant to regulation section 2510.3-1(j) only if the activities of t employer or employee organization do not exceed any of the limitations set f in the regulation. In the Department's view, ALPA's involvement in the operations of the LLD Plan and the TDI Plan, as described below, exceeds cert limitations of regulation section 2510.3-1(j).

First, ALPA endorses the LLD Plan and the TDI Plan within the meaning of section 2510.3-1(j)(3). An employee organization will be considered to have endorsed a group or group-type insurance program if the employee organizatio expresses to its members any positive, normative judgment regarding the progr An employee organization may, in the course of permitting an insurer, insurar agent, or insurance broker to market a group or group-type insurance program its employees or members, facilitate the publicizing and marketing of the program, but only to an extent short of endorsing the program. [FN1] An endorsement within the meaning of section 2510.3-1(j)(3) occurs if the employ organization urges or encourages members' participation in the program or engages in activities that would lead a member reasonably to conclude that th program is part of a benefit arrangement established or maintained by the employee organization.

The brochure that ALPA provides to its members specifically and clearly characterizes the LLD Plan and the TDI Plan as "ALPA's Loss of License Progra The ALPA logo and address, are prominently displayed on the front of the brochure. We view this labeling and packaging as expressions of ALPA's positive, normative judgement regarding the program. An ALPA member, reading this brochure, would reasonably conclude that the program is part of a benefi arrangement established or maintained by ALPA.

*4 Furthermore, ALPA's suggestions to the insurer on plan design and structu represent direct involvement in the LLD Plan and the TDI Plan in excess of th permitted by regulation section 2510.3-1(j)(3). Regulation section 2510.3-1(j)(3) limits the functions of the employer or employee organization with respect to the program to permitting the insurer to publicize the program to employees or members, collecting premiums through payroll deductions or dues

Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works

checkoffs, and remitting them to the insurer.

Therefore, on the basis of the facts, representations, and documents provi we conclude that ALPA's involvement in the LLD Plan and the TDI Plan exceed minimal and neutral involvement contemplated by ERISA. section 2510.3- 1(j) is the opinion of the Department that the LLD Plan and the TDI Plan are established or maintained by ALPA and that they are employee welfare benefi plans subject to Title I of ERISA.

This letter constitutes an advisory opinion under ERISA Procedure 76-1. Accordingly, it is issued subject to the provisions of the procedure, incluc section 10 thereof relating to the effect of advisory opinions.

Sincerely,

Robert J. Doyle
Director of Regulations and Interpretations

FN1. See, e.g., Letter to Mr. Jerry L. Oppenheimer, dated Dec. 16, 1976, (cc enclosed). In that letter the Department opined that a communication to employees or members that states that the employer or employee organization "enthusiastic" about a program would be an endorsement within the meaning of section 2510.3-1(j)(3). Similarly, a communication that states that the empl or employee organization has "arranged" for a group or group-type insurance program might be an endorsement if, taken together with other employer or employee organization activities, it leads employees or members to reasonabl conclude that the insurance program is one established or maintained by the employer or employee organization.

OFFICE OF PENSION AND WELFARE BENEFIT PROGRAMS (E.R.I.S.A.)
U.S. DEPARTMENT OF LABOR
Opinion No. 94-26A, Pens. Plan Guide (CCH) P 23,897B, 1994 WL 369282 (E.R.I.S.A.)
END OF DOCUMENT

Copr. (C) West 2004 No Claim to Orig. U.S. Govt. Works

*1 Mr. Ernest P. Ritchey
Vice President
Federal Employee Association
1747 Citadel Plaza, # 01-
San Antonio, Texas 78209

August 18, 1989

ERISA Section:

3(1)

Dear Mr. Ritchey:

This is in reply to your letter requesting an advisory opinion regarding the applicability of title I of the Employee Retirement Income Security Act of 1974 (ERISA). Specifically, you have inquired whether the FEA/GEA Dental Health Care Plan (the Plan) is an employee welfare benefit plan within the meaning of section 3(1) of title I of ERISA.

You advise that the Plan was adopted by the Federal Employees Association d/b/a FEA/GEA (FEA) effective July 1, 1980, to provide a dental program for its members. Participation in the Plan is limited to any member of FEA and their dependents. The Plan is funded by monthly contributions from participating members. It is administered by a committee appointed by the Board of Directors of FEA.

FEA is a Texas corporation which, according to Article Four of its Articles of Incorporation, is organized for the purpose of organizing Federal employees of local communities into a single body for the purpose of promoting their common social and economic positions and the enhancement of the image of the professional Federal employee. The members of FEA elect annually a board of trustees which selects the officers of FEA.

Section 3(1) of title I of ERISA defines the term "employee welfare benefit plan" to include:

... any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 302(c) of the Labor Management Relations Act, 1947 (other than pensions on retirement or death, and insurance to provide such pensions).

Although the Plan provides benefits among those identified in section 3(1), to be an employee welfare benefit plan a plan must also, among other criteria, be established or maintained by an employer, an employee organization, or both. From the information you submitted there is no indication that an employer is in any way

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

involved in the establishment or maintenance of the Plan. Accordingly the only issue appears to be whether FEA is an employee organization.

Section 3(4) of title I of ERISA defines the term "employee organization" to include:

... any labor union or any organization of any kind, or any agency or employee representation committee, association, group, or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning an employee benefit plan, or other matters incidental to employment relationships; or any employees' beneficiary association organized for the purpose in whole or in part, of establishing such a plan.

*2 There is no indication in the information you submitted to indicate that FEA exists for the purpose of dealing with an employer or employers. Therefore FEA would not be an employee organization within the meaning of the first part of the definition contained in section 3(4), i.e., before the semi-colon. However, as reflected above, the term "employee organization" also includes, i.e., after the semi-colon, any employees' beneficiary association organized for the purpose, in whole or in part, of establishing an employee benefit plan.

While the term "employees' beneficiary association" is not further defined in title I of ERISA, the Department applies the criteria it developed for the same term under the Welfare and Pension Plans Disclosure Act (WPPDA) in determining whether a particular association or organization is an "employees' beneficiary association," within the meaning of ERISA section 3(4). Therefore, in order to conclude that an association or organization is an "employees' beneficiary association" within the meaning of ERISA section 3(4), the Department must find that:

1) membership in the association is conditioned on employment status--for example, membership is limited to employees of a certain employer or union;
2) the association has a formal organization, with officers, by-laws or other indications of formality;
3) the association is organized for the purpose, in whole or in part, of establishing a welfare or pension plan, and
4) the association generally does not deal with employers.

Based on the information submitted, it appears that FEA constitutes an employees' beneficiary association under the Department's criteria and, therefore, an "employee organization" within the meaning of section 3(4) of ERISA. Accordingly, because the Plan provides benefits within the meaning of ERISA section 3(1) and is maintained by an employee organization within the meaning of ERISA section 3(4), it is the view of the Department that the Plan is an "employee welfare benefit plan", within the meaning of section 3(1), subject to the provisions of title I of ERISA.

We note that, ERISA section 4(b)(1) excludes "governmental plans" from coverage under title I [FN1]. However, based on the information provided, there is no indication that any governmental entity is involved in any way with the establishment or maintenance of the Plan. Accordingly, the Plan would not, in the view of the Department, constitute a governmental plan for purposes the exclusion from title I coverage under ERISA section 4(b)(1).

Finally, nothing herein should be interpreted as indicating whether or not the Plan is in compliance with the provisions of title I of ERISA.

This letter constitutes an advisory opinion under ERISA Procedure 76-1. Accordingly, this letter is issued subject to the provisions of the procedure, including section 10 thereof relating to the effect of advisory opinions.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Sincerely,

Robert J. Doyle

*3 Director of Regulations and Interpretations

FN1 The term "governmental plan" is defined in ERISA section 3(32) to mean "... a plan established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing...."

OFFICE OF PENSION AND WELFARE BENEFIT PROGRAMS (E.R.I.S.A.)

U.S. DEPARTMENT OF LABOR

Opinion No. 89-20A, 1989 WL 206424 (E.R.I.S.A.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

*1 Mr. Keith B. Betzina
Heller, Ehrman, White & McAuliffe
333 Bush Street
San Francisco, California 94104-2878

October 3, 1995

ERISA SECTION:

3(32)

Dear Mr. Betzina:

This is in reply to your request for an opinion on behalf of the Los Angeles Police Relief Association, Inc. (hereinafter, LAPRA). You ask whether three LAPRA benefit arrangements (hereinafter, the Plans) are excluded from Title I of the Employee Retirement Income Security Act of 1974 (ERISA) as "governmental plans" within the meaning of section 3(32) of that Title. You state that the Plans cover only police officers employed by the Police Department of the City of Los Angeles, California (hereinafter, the LAPD) and employees of LAPRA itself; that LAPRA pays most of the cost of providing benefits from the Plans for LAPRA's employees; and that the unions representing participating police officers bargain collectively with the LAPD to secure its payment of most of the cost of providing benefits from the Plans for police officers.

You represent that LAPRA is a nonprofit corporation under California law and has a constitution and bylaws that describe its operations. According to these documents, the primary source of LAPRA's operating funds is its members' dues, but LAPRA may also accept contributions and gifts. LAPRA accepts as members only current and former LAPD officers. [FN1] Membership is voluntary and limited; there currently are approximately 12,200 members, who include 8,100 police officers who currently work for the LAPD and 4,100 of the LAPD's retired police officers. LAPRA members elect from among themselves a board of directors consisting of eleven members. Those directors also elect the officers for LAPRA from among themselves.

LAPRA's constitution and bylaws prohibit bargaining, or otherwise dealing, with the LAPD concerning members' employment. Other, separate organizations represent the LAPD's police officers in bargaining with their employer. [FN2] LAPRA is intended to benefit retired and active LAPD police officers and their beneficiaries solely through the provision of health and other welfare-type benefits. [FN3] The guidance that you request pertains to only three of LAPRA's benefit arrangements: LAPRA's group medical insurance with Blue Cross (hereinafter, LAPRA Health),its supplemental dental plan with Safeguard (hereinafter, LAPRA Dental), and its group medical insurance plan with California Care (hereinafter, LAPRA Medical).

With respect to LAPRA members who participate in the Plans, the LAPD is required, pursuant to collective bargaining agreements in effect for them, to contribute a major portion of the cost of their participation. The LAPD's contributions to LAPRA Health and LAPRA Medical constitute approximately 80 percent of the cost of

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

coverage for participating LAPRA members; for LAPRA Dental, they equal about 54 percent of the cost of coverage. LAPRA members who are active employees of the LAPD pay the remaining cost of their coverage through a payroll deduction system managed by the LAPD. You do not specify whether retired LAPRA members must also contribute to the cost of their coverage under the Plans.

*2 LAPRA employs individuals who, among other matters, administer the Plans, and (as mentioned above) it allows its employees to participate in the Plans. The Plans currently cover 17 LAPRA employees, who thus constitute less than two-tenths of one percent of all Plan participants. Also as mentioned above, LAPRA contributes to the Plans to cover part of the cost of providing coverage to its employees, and it provides a payroll deduction system through which its employees contribute the remaining cost of their coverage by the Plans.

ERISA section 4(b)(1) provides that Title I of ERISA does not apply to "governmental plans" as defined in ERISA section 3(32). ERISA section 3(32) defines the term "governmental plan," in pertinent part, as "a plan established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof" or by any of their "agenc[ies] or instrumentalit[ies]."

It is evident that the LAPD is a governmental employer within the meaning of ERISA section 3(32), inasmuch as it operates as an integral part of the government of the City of Los Angeles, either as a "political subdivision" or an "agency or instrumentality" of that City. Moreover, it appears that, based on your representations, LAPRA constitutes an "employee organization," within the meaning of ERISA section 3(4). Although LAPRA is not a labor union (as referenced in the first part of section 3(4)), in that it does not deal with employers on behalf of its members, it satisfies the criteria applicable to an "employees' beneficiary association" (as referenced in the second part of section 3(4)): [FN4]

1) membership in the association is conditioned on employment status -- for example, membership is limited to employees of a certain employer or union; [FN5]

2) the association has a formal organization, with officers, bylaws, or other indications of formality;

3) the association generally does not deal with employers (as distinguished from organizations described in the first part of the definition of an "employee organization" (e.g., a labor union)); and

4) the association is organized for the purpose, in whole or in part, of establishing a welfare or pension plan.

First, you represent that LAPRA's members are exclusively active police officers employed by the LAPD and former police officers retired from the LAPD. Second, LAPRA is formally organized as a nonprofit corporation, with a constitution and bylaws that provide for LAPRA members to elect its directors, who further elect its officers; and, at least in form, LAPRA members appear to control their organization, either directly through their voting or indirectly through their election of directors whose right it is to elect LAPRA's officers. Further, nothing in your submission indicates that LAPRA's members fail in fact to control its operations. Third, LAPRA does not deal on behalf of its members with the LAPD regarding their conditions of employment or other matters. Fourth, LAPRA was established, at least in part, to provide welfare- type benefit arrangements to its members, who, in this instance, are all government employees.

*3 Inasmuch as the facts and representation contained in your letter and accompanying documents establish that the LAPD is a governmental employer described in ERISA section 3(32) that provides substantial funding for the Plans, and

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

inasmuch as participation in the Plans is limited to LAPRA members (i.e., only current or former employees of the contributing governmental employer) and employees of LAPRA who constitute less than two-tenths of one percent of participants, it is the view of the Department that the Plans constitute "governmental plans" within the meaning of section 3(32) of ERISA and thus are not subject to the provisions of Title I of ERISA pursuant to section 4(b)(1) thereof.

This letter constitutes an advisory opinion under ERISA Procedure 76-1. Accordingly, it is issued subject to the provisions of that procedure, including the procedure's section 10 concerning the effect of advisory opinions.

Sincerely,

ROBERT J. DOYLE

Director of Regulations and Interpretations

FN1. Specifically, the constitution and bylaws of LAPRA confine its membership to "the Chief of Police, and to sworn members of the Los Angeles Police Department, as defined in the Charter of the City of Los Angeles . . . . " According to LAPRA's rules about membership, its membership before 1971 may have included individuals other than LAPD police officers, but you represent that currently only LAPD police officers are eligible to be members of LAPRA.

FN2. The Command Officers' Association represents those LAPD police officers with the rank of captain and above, and the Police Protective League represents those LAPD police officers with the rank of lieutenant and below.

FN3. The Internal Revenue Service (hereinafter, IRS) recognizes LAPRA as a "voluntary employees' beneficiary association" (VEBA) within the meaning of section 501(c)(9) of the Internal Revenue Code (hereinafter, the Code). However, as the Department of Labor has noted in many previous advisory opinions, the meaning of the term "VEBA" in the Code is not necessarily coextensive with the term "employees' beneficiary association" as used in the definition of an "employee organization" in section 3(4) of Title I of ERISA.

FN4. The criteria were developed while the Welfare and Pension Plans Disclosure Act (WPPDA), 29 U.S.C. § 302 (1970) was in effect. The WPPDA, which was repealed in 1975 when ERISA was enacted as its successor law, also used the term "employees' beneficiary association."

FN5. Participants in an "employees' beneficiary association" must share commonality of interest with respect to their employment relationship (i.e., they constitute employees of a single employer or members of one union). The employees must participate in the organization in such a way that its functions and activities are controlled by its members, in form as well as in fact, either directly or through regular election of directors, officers, or other similar representatives of members.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

OFFICE OF PENSION AND WELFARE BENEFIT PROGRAMS (E.R.I.S.A.)

U.S. DEPARTMENT OF LABOR

Opinion No. 95-25A, Pens. Plan Guide (CCH) P 19,984A, 1995 WL 582729 (E.R.I.S.A.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

**UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

---

No. 06-2609

SHERYL SERREZE DESROSIERS

Plaintiff - Appellant

v.

HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY,
A Connecticut Corporation

Defendant - Appelle

---

**AFFIDAVIT OF SERVICE**

STATE OF MINNESOTA )
) ss:
COUNTY OF HENNEPIN )

Carolyn J. Larson Glover of the County of Pine, in the State of Minnesota, being duly sworn, says that on the 16th day of January, 2007, she served by United State Mail, Joint Motion To Correct District Court Docket on the following person:

Mark A. Pogue, Esq.
EDWARD AND ANGELLI, LLP
2800 Financial Plaza
Providence, RI 02903.

Carolyn J. Larson Glover
Carolyn J. Larson Glover

Subscribed and sworn to before me
this 16th day of January, 2007.

Amy Jo Ditty
Notary Public

AMY JO DITTY
NOTARY PUBLIC-MINNESOTA
My Commission Expires Jan. 31, 2010