UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| SHERYL SERREZE DESROSIERS, | : | |
| Plaintiff, | : | |
| v. | : | Civil Action No. 03-018-L |
| HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY, a Connecticut Corporation, | : | |
| Defendant. | : | |

**REPLY TO PLAINTIFF'S OPPOSITION**
**TO HARTFORD'S MOTION FOR SUMMARY JUDGMENT**

In her opposition to Hartford's summary judgment motion, Plaintiff abandons her earlier position that ERISA's governmental plan exemption applies to the disability plan in question. Plaintiff instead offers several new arguments in an effort to stave off ERISA preemption. First, she contends that the DJRA, which sponsors the plan, is not an "employee organization" within the meaning of ERISA. Second, she asserts that ERISA coverage is precluded by the "safe harbor" regulation, 29 U.S.C. § 2244(b)(2)(A), promulgated by the United States Department of Labor. Finally, she contends that, even if ERISA applies, it does not preempt her state law claim under R. I. Gen. Laws §9-1-33.

As shown below, all of these arguments are groundless. As a result, Hartford's motion for summary judgment should be granted.

**Background**

At a settlement conference conducted in this matter on November 19, 2003, Plaintiff took the position that the group long-term disability plan under which she is claiming benefits (the

"Plan") was covered by ERISA's governmental plan exception. See 29 U.S.C. §1003(b)(1). Following the settlement conference, Hartford moved for summary judgment on grounds that the governmental plan exception did not apply and that Plaintiff's claims were therefore preempted by ERISA. Hartford supported its motion with an affidavit from Arthur C. Smith III, the president of the DJRA, which addressed issues relevant to the governmental plan exception.

In her opposition brief, Plaintiff now states that she "does not contend that the Hartford insurance at issue fits within the governmental plan exception."[1] Instead, plaintiff asserts that ERISA does not apply because the DJRA does not meet the definition of an "employee organization" set forth in ERISA. See 29 U.S.C. §1002(4). She further contends that the Plan is covered by the regulatory safe harbor set forth at 29 C.F.R. §25103-1(j), with the result that ERISA cannot preempt her state law claims.

In response to these contentions, Hartford has obtained a supplemental affidavit from Arthur C. Smith III (attached as Exhibit A). The supplemental affidavit establishes facts relevant to the "employee organization" and "safe harbor" issues. In particular, the affidavit establishes the following:

1. The Plan became effective on March 1, 1995. "Before that date, for the better part of a year, the DJRA was heavily involved in designing the structural components of the Plan and its subsidiary terms and conditions." Supplemental Affidavit of Arthur C. Smith III ("Supp. Smith Aff."), ¶ 3 The DJRA's heavy involvement in designing the plan took two forms. First, the DJRA was directly involved in selecting and negotiating the basic terms of the Plan. After specifying many of the basic terms it wanted, id. at 5, the DJRA negotiated directly with Hartford over other terms and conditions. Id. at 3, 4. For example, the Supplemental Smith

[1] Plaintiff's Memorandum In Opposition To Defendant's Motion For Summary Judgment ("Pl. Mem."), p. 3.

Affidavit establishes that the DJRA negotiated directly with Hartford over (i) whether law enforcement officers who were employees of the Department of Justice (the "DOJ") would be eligible to participate in the Plan, and at what premium rate; (ii) whether employees of the Federal Bureau of Investigation would be eligible to participate in the Plan or would be counted toward the minimum number of participants necessary to activate the Plan; (iii) whether pregnancy would be recognized as a disability within the meaning of the Plan; and (iv) the definition of "elimination period" within the meaning of the Plan. Id.

2. In the course of its very active role in setting up the components and terms of the Plan in 1995, the DJRA reviewed and edited numerous drafts of the Plan. Supp. Smith Aff., ¶ 3.

3. "Since the Plan went into effect, the DJRA has continued to play an active role in establishing the Plan's terms, conditions, and basic structure." Supp. Smith Aff., ¶ 6. For example, in April 2000 the DJRA requested that the Plan's definition of "Cost Of Living Allowance" be changed, and that a definition of "Monthly Rate Of Basic Earnings" be added to the Plan. Hartford agreed to make these amendments. Id.

4. In addition to plan design, the DJRA has also played a very active role in marketing the Plan and promoting it to DOJ employees. Supp. Smith Aff., ¶ 7. In 1995, the DJRA won the right from Hartford to review, edit and approve all marketing materials developed for the Plan. Id. When the Plan first became effective, the DJRA distributed a memo on DJRA letterhead to all DOJ employees which touted the Plan as "a great plan that every DOJ employee should take advantage of." Id., Exh. A. The memo further exhorted DOJ employees to "act quickly" to enroll. Id. Since that time, the DJRA has made "strong efforts" to encourage DOJ employees to enroll in the Plan. These efforts have included numerous briefings encouraging DOJ employees to participate. Id.

5. One of the purposes for which the DJRA exists is to deal with the DOJ on particular matters related to the Plan. Supp. Smith Aff., ¶ 8. There are two types of matters on which the DJRA deals with the DOJ. One concerns problems arising from particular employees' participation in the Plan. Id. A second relates to the system used by the DOJ to deduct Plan premiums from DOJ employees' paychecks. Id. Apart from these issues, however, the DJRA does not generally deal with the DOJ. Id.

6. The DJRA receives 13 cents per Plan enrollee per pay period as compensation for the services it provides under the Plan. Supp. Smith Aff., ¶ 9. Because the DJRA incurs very few costs in connection with the Plan, this income produces a small profit for the DJRA. Id.

7. The DJRA has a board of directors and two officers. Supp. Smith Aff., ¶ 10. The officers are elected from the membership. Id. DJRA members have participated in a wide variety of DJRA activities over the years, including participation in activity groups and sports teams, sponsorship of Little League teams, and donations to worthy causes. Id.

8. One of the most important reasons why the DJRA is organized and exists today is for the purpose of offering a disability income plan to DOJ employees. Supp. Smith Aff., ¶ 12. Indeed, making the Plan available to DOJ employees is central to the very mission of the DJRA. Id.

## Argument

The DJRA is an "employee organization" within the meaning of ERISA. As a consequence, the Plan is governed by ERISA. The regulatory "safe harbor" does not preclude ERISA preemption, moreover, because the DJRA endorsed the Plan and earns a profit from its operations. Finally, Plaintiff's claim for bad faith under R.I. Gen. Laws §9-1-33 is not saved from preemption by ERISA's savings clause.

## I. ERISA Applies Because The DJRA Is An "Employee Organization"

ERISA defines the term "Employee Organization" as follows:

> [A]ny organization of any kind . . . in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning an employee benefit plan, or other matters incidental to employment relationships; or any employees' beneficiary association organized for the purpose in whole or in part, of establishing such a plan.

29 U.S.C. §1002(4). Plaintiff does not recite this critical definition accurately in her opposition brief.[2] The plain and complete language of the statute, however, makes clear that there are two separate classes that fall under the definition of "Employee Organization."

### A. The DJRA Is An "Employee Organization" Since It Is An "organization of any kind . . . in which employees participate and which exist for the purpose, in whole or in part, of dealing with employers concerning an employee benefit plan, or other matters incidental to employment relationships"

Plaintiff offers three arguments why, in her view, the DJRA is not an "employee organization." As more fully set forth below, her arguments are without merit.

#### 1. DOJ Employees Participate In The DJRA

To qualify as an Employee Organization under ERISA, employees must participate in the organization. 29 U.S.C. § 1002(4). Plaintiff asserts that "[n]either [Plaintiff] nor any other insured participates. At best, then, employee "participation" is unproved." Pl. Mem. at 6.

---

[2] Plaintiff states that an "Employee Organization" is an organization "which exists for the purpose, in whole or in part, of dealing with employees concerning an employee benefit plan..." Pl. Mem. at 5 (emphasis added). Plaintiff's reference to "employees" should be to "employers." In addition, Plaintiff completely omits the clause "or other matters incidental to employment relationships" following the ellipsis in her quote. Further, at page 6 of her brief, Plaintiff misquotes Fiero v. Commercial Life Ins. Co., 2000 WL 1808502 (E.D. La. 2000) for the proposition that an employee organization exists "for the purpose of dealing with employees about employee benefit plans." Pl. Mem. at 6. Again, Plaintiff has incorrectly substituted "employees" for "employers," then incorrectly attributes the substitution to the Fiero court.

As an initial matter, it is unclear how Plaintiff's lawyers[3] are in a position to make the blanket statement that no DOJ employee participates in any DJRA activity. But that point is academic, because the Supplemental Smith Affidavit makes clear that DJRA members – all of whom are DOJ employees – in fact participate in a wide variety of DJRA activities. Supp. Smith Aff., ¶ 10. The DJRA therefore meets the "employee participation" element of the definition of "employee organization."

**2. The DJRA Exists In Part For The Purpose Of Dealing With The DOJ**

To qualify as an Employee Organization under ERISA, the organization must exist, at least in part, for the purpose of dealing with an employer concerning a plan or matters incidental to the employment relationship. 29 U.S.C. § 1002(4). Plaintiff contends that the DJRA does not meet this part of the definition because it is not an entity "whose primary function concerns [Plaintiff's] disability insurance." Pl. Mem. at 6 (emphasis in original).

Again, however, Plaintiff has mischaracterized the language in the statute. Under ERISA, the question is not whether the DJRA's "primary function" is Plaintiff's "disability insurance." Instead, the question is whether the DJRA exists, at least in part, for the purpose of dealing with an employer about a plan or other incidental matters. See 29 U.S.C. § 1002(4). The Supplemental Smith Affidavit shows that the DJRA meets this part of the definition. Smith avers that one of the purposes for which the DJRA exists is to deal with the DOJ on two discrete issues: payroll deductions used to pay employee premiums for the Plan, and problems involving particular employees' participation in the Plan. Supp. Smith Aff., ¶ 8. This evidence amply fulfills this element of the statutory definition.

[3] Plaintiff did not submit an affidavit or any other evidence in support of this argument.

### 3. Participation In The Plan Is Limited To DOJ Employees

Plaintiff's third contention is hard to understand. She argues that the DJRA "cannot be an employee association" because participation is not limited to DJRA members. Pl. Mem. at 7. According to Plaintiff, "that fact alone destroys Hartford's claim that this is an ERISA plan." Id. Plaintiff further argues that "Hartford cannot rely on the employee prong [of the statutory definition], because it specifically disclaims any involvement by the employer, the Department of Justice." Id.

To begin with, Plaintiff's use of the term "employee association" is confusing. That term does not appear in ERISA, and it is not used in the decision by Magistrate Judge Lovegreen[4] cited by Plaintiff to support her use of that term. Pl. Mem. at 6. More importantly, Fiero v. Commercial Life Ins. Co. – a case relied on by Plaintiff – makes clear that Plaintiff's position is wrong. In Fiero, the court confronted an argument very similar to the argument Plaintiff appears to advance here: that because plan participation was open to DOJ employees who were not members of the organization that sponsored the plan, the organization could not be an "employee organization" within the meaning of ERISA. The Fiero court rejected that argument because mandatory employee membership in the organization is simply not a part of ERISA's definition of "employee organization":

> With respect, mandatory membership is irrelevant to either method of qualifying as an employee organization under Section 1002(4).

Fiero, 2000 WL 1808502 * 3.

Ultimately, Plaintiff's argument goes awry because it relies on an incorrect predicate. Plaintiff's statement that "Hartford cannot rely on the employee prong, because it specifically disclaims any involvement by the employer," Pl. Mem. at 6, confuses the governmental plan

[4] Caranci v. Blue Cross & Blue Shield of Rhode Island, 1999 WL 766974 (D.R.I. 1999).

exemption to ERISA and participant eligibility for an ERISA plan. It is true that Hartford disclaims that the DOJ sponsors or holds the Plan. (That is one reason why the governmental plan exemption in ERISA does not apply.) But Hartford certainly does rely on "the employee prong" to support its contention that the Plan is governed by ERISA. As the two Smith affidavits establish, participation in the Plan is limited to DOJ employees (whether or not they are also members of the DJRA). That is enough to establish that they are participants in an ERISA plan. See Caranci, 1999 WL 766874 *9 ("[I]n order to qualify as a plan participant, [plaintiffs] must be either "employees" or "members of an employee organization.").

### B. The DJRA Is An "Employee Organization" Since It Qualifies As An "employees' beneficiary association"

Plaintiff's opposition also completely overlooks the fact that there is an entirely separate basis on which an organization like the DJRA can qualify as an "Employee Organization" under ERISA. The statute's definition of "Employee Organization" also includes any "employees' beneficiary association." 29 U.S.C. § 1002(4). Consequently, even if this Court rejects the argument that the DJRA is an Employee Organization of the type discussed above, it should nevertheless find that the DJRA is an employees' beneficiary association under ERISA.

In a series of opinion letters, the United States Department of Labor has developed four criteria for identifying an "employees' beneficiary association." Department of Labor Opinion Letter, No. 89-20A, 1989 WL 206424 (August 8, 1989);[5] see also Department of Labor Opinion Letter, No. 95-25A, 1995 WL 582729 (Oct. 3, 1995). Although Department of Labor opinion letters lack the force of law, they are "entitled to respect" to the extent they have the power to persuade. Christensen v. Harris County, 529 U.S. 576, 587, 120 S.Ct. 1655, 1662-63 (2000)

[5] Copies of all Department Of Labor Opinion Letters cited in this memorandum have been provided to the Court in a separate appendix.

(citing Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164 (1944)). At least one court has found the definition of employees' beneficiary association developed by the Department of Labor to be "informative and persuasive." Fiero v. Commercial Life Ins. Co., 2000 WL 1808502 * 3.

Under the criteria developed by the Department of Labor, to qualify as an employees' beneficiary association the following factors must be met:

1) membership in the association is conditioned on employment status – for example, membership is limited to employees of a certain employer or union;
2) the association has a formal organization, with officers, by-laws or other indications of formality;
3) the association is organized for the purpose, in whole or in part, of establishing a welfare or pension plan; and
4) the association generally does not deal with employers.

Department of Labor Opinion Letter 89-20 A at 2.

The DJRA clearly meets these criteria. First, membership in the DJRA is conditioned on employment status. All DJRA members must be DOJ employees. Smith Aff., ¶ 2. Second, the DJRA has a formal organization, with officers, elections and other indications of formality. Supp. Smith Aff., ¶ 10. Third, one of the most important purposes for which the DJRA is organized and exists is for the purpose of establishing and offering the Plan to DOJ employees. Id., ¶ 11. Finally, although the DJRA interacts with the DOJ on particular issues such as payroll deductions and participation issues, as a general matter the DJRA does not deal with the DOJ. Id., ¶ 8.

The fact that the DJRA qualifies as an employees' beneficiary association confirms that it is an "employee organization" within the meaning of 29 U.S.C. § 1004(2). And because the DJRA is an Employee Organization, the Plan is an "employee welfare benefit plan" within the meaning of 29 U.S.C. § 1002(1). ERISA therefore applies.

**III. The "Safe Harbor" Regulation Does Not Apply**

As a fall-back, Plaintiff argues that "even if the Court concludes that Hartford's insurance coverage is preempted by ERISA, 29 C.F.R. § 25103-1(j) pulls the coverage back outside ERISA preemption." Pl. Mem. at 7. As shown below, this argument is incorrect.

To be covered by ERISA, an employee welfare benefit plan must be "established or maintained" by an employer or employee organization. 29 U.S.C. § 1002(1). In 1975, the Department of Labor promulgated "safe harbor" regulations describing when an organization may be involved with such a plan without being deemed to have "established or maintained" it. 40 Fed.Reg. 34, 527 (1975); see 29 C.F.R. § 25103-1(j). Under the regulation, a plan that meets all of the following criteria will be deemed not to have been "established or maintained" by the employer or employee organization, and will therefore be beyond the reach of ERISA:

1. No contributions are made by an employer or employee organization;
2. Participation [in] the program is completely voluntary for employees or members;
3. The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and
4. The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

29 C.F.R. § 25103-1(j) (emphasis added).

Hartford concedes that criteria 1 and 2 are met with respect to the DJRA plan. But criteria 3 and 4 are not.

### A. The DJRA Endorsed The Plan

Plaintiff contends that the applicable test for "endorsement" under the safe harbor regulation is set forth in Johnson v. Watts Regulator Co., 63 F.3d 1129 (1st Cir. 1995). That is not entirely clear. Johnson dealt with a situation in which an employer obtained disability insurance for its employees. The test for endorsement fashioned by the Johnson court therefore focused on how an employer – as opposed to an employee organization – endorses a plan under the safe harbor regulation:

> [A]n employer will be said to have endorsed a program… if, in light of all the surrounding facts and circumstances, an objectively reasonable employee would conclude … that the employer had not merely facilitated the program's availability but had exercised control over it or made it appear to be part and parcel of the company's own benefit package.

63 F.3d at 1135.[6] It is obvious that certain parts of this test, such as the reference to "the company's own benefit package," would have no application where, as here, an employee organization is the sponsor of the plan.

To the extent that Johnson is applicable to the present case, however, it actually confirms that the DJRA endorsed the Plan within the meaning of the safe harbor regulation. This is apparent from the sharply different roles played by the employer in Johnson and the DJRA here. In Johnson, the employer exercised no control at all over the plan in question; its role was passive and neutral. "It had no hand in drafting the plan [or] working out its structural components…" 63 F.3d at 1136. It performed "only ministerial activities." Id. It announced the plan to its employees with a four-sentence cover letter that did not "state[] that the employer endorsed the program." Id.

---

[6] Plaintiff misquotes this passage from Johnson in her brief, again transposing "employer" and "employee." Pl. Mem. at 8.

In contrast, the DJRA has been heavily involved with the Plan since before it became effective. It negotiated directly with Hartford over numerous structural components, terms and conditions of the Plan. Supp. Smith Aff., ¶ 3. It reviewed and edited numerous draft Plan documents. Id. It sought and obtained changes to different components of the Plan after the Plan went into effect. Id., ¶ 6. It retains the right to cancel the Plan at any time. Id., ¶ 12. It won the right from Hartford to review and edit all marketing materials developed for the Plan. Id. at ¶ 7. The DJRA's cover memo to DOJ employees enthusiastically touted the Plan as a "great plan and one that every DOJ employee should take advantage of" and, since the Plan became effective, the DJRA has made "strong efforts" to increase enrollment, including numerous presentations to DOJ employees. Id. Instead of limiting itself to "ministerial" functions, since the Plan became effective the DJRA has been active in changing the way in which DOJ employees pay for the Plan through payroll deductions, and in resolving problems regarding employee participation. Id. at ¶ 8.

One of the most striking differences in the level of endorsement provided by the Johnson employer and the DJRA is an attitudinal one. In Johnson, the employer's matter-of-fact cover letter to its employees took pains not to advocate that employees enroll.[7] In contrast, the DJRA's cover memo enthusiastically promotes the Plan and unabashedly urges enrollment.[8] These different levels of endorsement are likely explained by the difference in the sponsoring organizations. The sponsor in Johnson was an employer. Its mission was to earn money for its

---

[7] Far from endorsing the plan, the Johnson employer announced the plan to its employees in the following lukewarm terms: "We believe this to be an attractive program available at substantially lower cost than similar coverage purchased on an individual basis; however, the decision is, of course, entirely an individual one." 63 F.3d at 1136.

[8] Contrast the Johnson employer's statement that "the decision [to enroll] is, of course, entirely an individual one" with the DJRA's admonition that "you need to act quickly to take advantage of the open enrollment period."

owners. Providing disability insurance to its employees was clearly secondary to that mission. In contrast, the DJRA is an employee organization. Its mission is not to maximize profits but to improve the well-being of DOJ employees. For that reason, the Plan is central to the DJRA's very existence. As Mr. Smith states, "if the DJRA did not offer this important benefit to DOJ employees, we would not be adequately performing our mission, which is to sponsor programs and activities of benefit to Justice employees." Supp. Smith Aff., ¶ 11.

Johnson holds that as long as the employer merely advises employees of the availability of group insurance and performs "ministerial tasks," it will not be deemed to have endorsed the program under 2510-1(j)(3). 63 F.3d at 1136-37. The DJRA clearly goes far beyond these limits. It has therefore endorsed the Plan.

**B. Endorsement As Interpreted By Other Courts**

In the nine years since Johnson was decided, many other courts have considered the "endorsement" element of the safe harbor regulation. As shown below, the criteria developed in those decisions confirms that the DJRA endorsed the Plan within the meaning of the regulation.

**1. The DJRA Was Substantially Involved In Creating The Plan**

In Thompson v. American Home Assurance Company, 85 F.3d 429, 436 (6th Cir. 1996), the Sixth Circuit of Appeals stated:

> After reviewing the relevant case law [including Johnson], the court determines that a finding of endorsement is appropriate if, upon examining all the relevant circumstances, there is some factual showing on the record of substantial employer involvement in the creation or administration of the plan … (emphasis added)

The DJRA easily satisfies the Thompson test, because it was substantially involved in the creation of the Plan. Supp. Smith Aff., ¶ 3, 4.

**2. The DJRA Regularly Promotes The Plan**

In Steen v. John Hancock Mutual Life Ins. Co., 106 F.3d 904, 916-17 (9th Cir. 1997), the court found that an employer had endorsed a plan within the meaning of the safe harbor regulation because it "regularly promoted" the plan to its employees. Supp. Smith Aff. at ¶ 7. Here, the DJRA views the Plan as central to its mission, and for that reason regularly promotes the Plan to DOJ employees. For this reason also, the DJRA meets the standard for endorsement under the regulation.

**3. The DJRA Negotiated Terms Of The Insurance Coverage**

In Chamblin v. Reliance Standard Life Ins. Co., 168 F.Supp. 2d 1168, 1172 (N.D. Cal. 2001), the court found that an employer who negotiated the terms of insurance coverage necessarily endorsed the plan, with the result that the safe harbor regulation did not apply.[9] Since the DJRA negotiated the terms of coverage under the Plan with Hartford, it too endorsed the Plan under this standard.

**4. The DJRA Reserved The Right To Terminate The Plan**

Another factor that removes the Plan from the safe harbor regulation and subjects it to ERISA is that the DJRA reserves the right to terminate that Plan at its discretion. Supp. Smith Aff., ¶ 12. The Department of Labor has issued its opinion that, if an employer reserves the right to terminate a plan, the plan is not entitled to the safe harbor exemption. Department of Labor Opinion Letter No. 80-22A, at *3 (April 17, 1980). Since the DJRA can cancel the Plan at any time, the Plan lies outside the safe harbor.

---

[9] The holding in Chamblin is consistent with Department of Labor Opinion Letter No. 77-54, at 1-2 (Aug. 8, 1977), in which the Department ruled that the safe harbor exemption is inapplicable if the employer negotiates with the insurer as to the terms of coverage.) As the Department later opined in Opinion Letter No. 94-26A, at *4 (July 11, 1994), an employer's suggestions to the insurer regarding plan design and structure represent direct involvement in the plan in excess of that permitted by the safe harbor regulation, thus subjecting the plan to ERISA.

C. <u>The DJRA Does Not Satisfy The Fourth Safe Harbor Criterion</u>

There is a second reason why the safe harbor regulation does not apply. The DJRA does not satisfy the fourth criterion of the regulation, either. That criterion states as follows:

> The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, <u>excluding any profit</u>, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

29 C.F.R. s 25103-1(j) (emphasis added).

This element of the regulation states that if an employee organization merely receives "consideration" for providing administrative services to a program, that fact will not take the program out of the safe harbor. But if the organization makes "any profit" in connection with its services, the regulation does not apply. Here, the DJRA earns 13 cents per enrollee per pay period in return for its contributions to the Plan. Supp. Smith Aff., ¶ 9. This income produces a profit for the organization. <u>Id.</u>[10] Because the DJRA earns a profit in connection with the Plan, this element of the safe harbor definition is not satisfied.

In sum, the Plan does not fall within the safe harbor regulation because (i) the DJRA endorsed it, and (ii) the DJRA earns a profit in connection with the Plan.

IV. <u>ERISA's Savings Clause Does Not Apply To Plaintiff's Bad Faith Claim</u>

The second count in Plaintiff's Complaint alleges a violation of R.I. Gen. Laws § 9-1-33, which provides a cause of action for the "bad faith refusal to pay a claim made under any insurance policy." Plaintiff argues that, even if ERISA applies to the Plan, her claim under § 9-1-33 is not preempted because it falls within ERISA's "savings" clause, which exempts from

---

[10] As Mr. Smith established in his first affidavit, the DJRA is a for-profit corporation that pays income taxes to the federal government and the District of Columbia. Smith Aff., ¶ 2.

preemption "any law of any State which regulates insurance." 29 U.S.C. § 1144(b)(2)(A). Pl. Mem. at 15.

Last year this Court ruled that ERISA preempts claims asserted under § 9-1-33. Morris v. Highmark Life Ins. Co., 255 F.Supp.2d 16, 23-24 (D.R.I. 2003) (Lagueux, J.). Plaintiff argues, however, that her § 9-1-33 claim is entitled to a "fresh look" in light of the Supreme Court's decision in Kentucky Association of Health Plus, Inc. v. Miller, 123 S.Ct. 1471 (2003). In Miller, the Supreme Court made a "clean break from the McCarran-Ferguson factors" that had previously been used to apply ERISA's savings clause.[11] The Miller court held that for a state law to be deemed a 'law . . . which regulates insurance' under § 1144(b)(2)(A), it must satisfy two requirements: "[f]irst, the state law must be specifically directed toward entities engaged in insurance[,] [s]econd, . . . the state law must substantially affect the risk pooling arrangement between the insurer and the insured." Miller, 123 S.Ct. at 1479.

To illustrate the "fresh look" to which she feels entitled after Miller, Plaintiff relies on a single decision: Rosenbaum v. UNUM Life Ins. Co. of America, 2003 WL 22078557 (E.D. Pa. Sept. 8, 2003). In Rosenbaum, Judge Clarence L. Newcomer concluded – before the Miller decision was rendered -- that Pennsylvania's bad faith statute was not preempted by ERISA. Rosenbaum v. UNUM Life Insurance Company of America, 2002 WL 1769899, at *3 (E.D. Pa. July 29, 2002) ("Rosenbaum I"). After the defendant moved for reconsideration and the Miller

[11] Prior to Miller, the Supreme Court had established a multi-factor test for determining whether a state law fell within ERISA's savings clause. See Metro. Life Ins. v. Massachusetts, 471 U.S. 724 (1985). The first inquiry was whether, from a "common-sense view of the matter," the law regulates insurance. Id. at 740. The second inquiry focused on the McCarran-Ferguson factors: "[F]irst whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entitles within the insurance industry." Id. at 743.

decision was released, Judge Newcomer revisited this question. Applying the two-part analysis announced in Miller, Judge Newcomber again concluded that Pennsylvania's bad faith statute fell under ERISA's savings clause and was therefore not preempted. Rosenbaum, 2003 WL 22078557, at *1 ("Rosenbaum II").

Plaintiff's exclusive reliance on Rosenbaum is problematic in many ways. First, Rosenbaum is very much an aberrant decision, even within its own federal District. After Rosenbaum I was decided in 2002, no fewer than nine different judges within the Eastern District of Pennsylvania issued decisions disagreeing with it and holding that Pennsylvania's bad faith statute was preempted by ERISA.[12] After Miller and Rosenbaum II were decided in 2003, another four judges within the Eastern District of Pennsylvania issued decisions disagreeing with Rosenbaum II and holding that, under Miller, Pennsylvania's bad faith statute was preempted under ERISA.[13]

Moreover, outside of the Eastern District of Pennsylvania, numerous federal courts – including two courts of appeals -- have examined whether, in light of Miller, statutory bad faith

---

[12] Hill v. Thomas Jefferson Univ. Hospital, Inc. No. 02-7837, slip op. (E.D. Pa. Feb. 6, 2003) (Fullam J.); Eighmy v. Henry Francis Dupont Winterthur Museum, Inc. Long Term Disability Plan, No. 02-7136, (E.D. Pa. Dec., 17, 2002) (O'Neill, J.); Stevens v. Standard Ins. Co., No. 02-6597, slip op. (E.D. Pa. Dec. 4, 2002) (McLaughlin, J.); Thompson v. UNUM Provident Corp., No. 02-4593, slip op. (E.D. Pa. Nov. 13, 2002) (Padova, J.); Bell v. UNUM Provident Corp, 222 F. Supp. 2d 692 (E.D. Pa. September 19, 2002) (Baylson, J.); Smith v. Continental Casualty Co., No. 02-1915, 2002 U.S. Dist. LEXIS 18312 (E.D. Pa. Sept. 16, 2002) (Waldman, J.); Kirkhoff v. Lincoln Technical Institute, Inc., 221 F. Supp. 2d 572 (E.D. Pa. Sept. 6, 2002) (Bartle, J.).

[13] Morales-Ceballos v. First Unum Life Ins. Co. of Am., No. 03-925, 2003 WL 22097493, at *2 (E.D.Pa. May 27, 2003); McGuigan v. Reliance Standard Life Ins. Co., 256 F.Supp.2d 345, 348 (E.D. Pa. 2003); Nguyen v. Healthguard of Lancaster, Inc., 2003 U.S.Dist. LEXIS 15627, No. 03-3206, at *24 (E.D. Pa. Aug. 14, 2003); Dolce v. Hercules Inc. Insurance Plan, No. 03-CV-1747, 2003 WL 22992148 (E.D. Pa. Dec. 15, 2003).

claims are preempted under ERISA. Virtually all of these courts have concluded that they are.[14] In general, these courts have reached this conclusion on two grounds. First, numerous courts have found that statutory bad faith claims do not satisfy the second prong of the Miller test because they do not "substantially affect the risk pooling arrangement between the insurer and the insured." See, e.g., Kidneigh, supra, 345 F.3d at 1187 ("State law bad faith claims are not integral to the risk pooling arrangement..."); Leuthner, supra, 270 F. Supp. 2d at 594; Burgos, supra, 286 F. Supp. 2d at 819; Ercole, supra, 2003 WL 21104926, at *2). Dolce, supra, 2003 WL 22992148, at *3. Second, numerous courts have held that, even if a bad faith claim could be read to fall within ERISA's savings clause, such claims are nevertheless preempted because they conflict with the exclusive enforcement scheme set forth in ERISA. As the Supreme Court stated in Rush Prudential HMO, Inc. v. Moran, 122 S.Ct. 2151, 2165 (2002):

> [a]lthough we have yet to encounter a forced choice between the congressional policies of exclusively federal remedies and the "reservation of the business of insurance to the States," we have anticipated such a conflict, with the state insurance regulation losing out if it allows plan participants to "obtain remedies under state law that Congress rejected in ERISA."

---

[14] Post- Miller decisions holding that ERISA preempts bad faith and related claims include Kidneigh v. Unum Life Insurance Company of America, 345 F.3d 1182, 1185 (10th Cir. 2003) ("We hold that Colorado bad faith claims are preempted by ERISA because they conflict with ERISA's remedial scheme."); Elliot v. Fortis Benefits Insurance Company, 337 F.3d 1138 (9th Cir. 2003) (holding that ERISA preempts claims under Montana Unfair Trade Practices Act); Ercole v. Conective And Coventry Health Care Of Delaware, Inc., 2003 WL 21104926 (D. Del. 2003) (ERISA preempts claims under Delaware bad faith statute); Burgos v. Group & Pension Administrators, Inc., 286 F.Supp.2d 812, 818 (D.Tex. 2003) (ERISA preempts claims under Texas bad faith statute); Dwyer v. Unum Life Ins. Co. of America, 2003 WL 22844234 (N.D. Ill. 2003) (ERISA preempts claims under Illinois statute for vexatious refusal to pay insurance benefits); Bonnell v. Bank of America, 284 F.Supp.2d 1284 (D.Kan. 20030 (ERISA preempts claim under Kentucky bad faith statute); Glynn v. Bankers Life And Casualty Company, 297 F.Supp.2d 424 (D.Conn. 2003) (ERISA preempts Connecticut Unfair Trade Practices Act); Leuthner v. Blue Cross And Blue Shield Of Northeastern Pennsylvania, 270 F.Supp.2d 584 (M.D.Pa. 2003) (ERISA preempts claim under Pennsylvania bad faith statute).

(citing Pilot Life Ins. Co. v. Dedeaux, 481 S.Ct. 41, 54 (1987)).[15]

Here, application of Miller and the large body of authority cited above makes clear that ERISA's savings clause does not spare Plaintiff's claim under R.I. Gen. Laws §9-1-33 from preemption. First, Rhode Island's bad faith statute does not "substantially affect the risk pooling arrangement between the insurer [Hartford] and the insured [Plaintiff]." The best way to see this is by considering Pilot Life v. Deduaux, supra. There, the Supreme Court analyzed the Mississippi common law of bad faith and concluded that it "does not affect a spreading of policyholder risk." Pilot Life, 481 U.S. at 50. The basis for its conclusion was that the Mississippi common law of bad faith

> Does not define the terms of the relationship between the insurer and the insured; it declares only that, whatever the terms have been agreed upon in the insurance contract, a breach of that contract may in certain circumstances allow the policyholder to obtain punitive damages.

Id. at 51.

Exactly the same reasoning applies here. Section 9-1-33 has absolutely no effect on the risk pooling arrangement between insurers and insureds. That risk pooling arrangement is determined by the terms of the insurance relationship between insurers like Hartford and insureds like the Plaintiff. Instead, if an insurer breaches its obligations under the contract of insurance, § 9-1-33 permits a policyholder to obtain punitive damages. Section 9-1-33 therefore does not fall within ERISA's savings clause as interpreted by Miller.

Moreover, even if §9-1-33 did fall within the savings clause, Plaintiff's claim under that statute would still be preempted. That is because §9-1-33 provides for remedies beyond the

---

[15] Other cases that have employed this "direct preemption" rationale include Bonnell v. Bank of America, supra at 1288; Elliott v. Fortis Benefits Ins. Co., 337 F.3d 1138, 1147-48 (9th Cir. 2003); and Fink v. Dakotacare, 324 F.3d 685, 689 (8th Cir. 2003).

exclusive set of remedies available under ERISA.[16] The state statue therefore "expand[s] the potential scope of ultimate liability imposed upon employers by the ERISA scheme." Sprecher, supra, 2002 WL 1917711, at *7. Such an expansion of remedies is impermissible. As the Supreme Court stated in Rush, "state insurance regulation los[es] out if it allows plan participants to obtain remedies under state law the Congress rejected in ERISA." 107 S.Ct. at 2165 (quotation omitted).

For the foregoing reasons, Plaintiff's claim under §9-1-33 does not fall within ERISA's savings clause. And even if it did, it would still be preempted because it conflicts with the exclusive remedial scheme provided in ERISA.[17]

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY

By Its Attorneys,

Mark A. Pogue (#3441)
Annemarie M. Carney (#6380)
EDWARDS & ANGELL, LLP
2800 Financial Plaza
Providence, RI 02903
(401) 274-9200
(401) 276-6611 (telecopy)

---

[16] ERISA's civil enforcement provisions allow an ERISA-plan participant to recover benefits, obtain a declaratory judgment, and to enjoin an improper refusal to pay benefits. 29 U.S.C. § 1132(a). Section 502(a) also allows an ERISA-plan participant to seek attorneys fees and costs. Id. Rhode Island's bad faith statute, on the other hand, allows insured's to recover punitive damages for bad faith conduct – a remedy nowhere found in ERISA.

[17] Even if ERISA did not preempt Plaintiff's State-law claims, Hartford does not concede that the law of Rhode Island would apply to this case. As Hartford stated in its motion to stay discovery in this case, if ERISA does not apply, then the substantive law of Washington, D.C. – where the DJRA is located, and where the Plan was negotiated and signed – does. If necessary, Hartford reserves the right to submit an additional motion at a later time on this choice-of-law issue.

**Certificate of Service**

I hereby certify that on this 2nd day of April, 2004 I served a copy of the within Reply To Plaintiff's Opposition To Hartford's Motion For Summary Judgment by first class mail, postage prepaid to:

Christopher M. Lefebvre
Law Offices of Claude Lefebvre & Sons
P.O. Box 479
Pawtucket, RI 02862

Jordan M. Lewis, Esq.
Siegel, Brill, Greupner, Duffy & Foster, P.A.
400 East Wisconsin Avenue
Suite 333, Floor 3A
Milwaukee, WI 53202

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| SHERYL SERREZE DESROSIERS, | : | |
| Plaintiff, | : | |
| v. | : | Civil Action No. 03-018-L |
| HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY, a Connecticut Corporation, | : | |
| Defendant. | : | |

**SUPPLEMENTAL AFFIDAVIT OF ARTHUR C. SMITH III**

I, Arthur Smith III, hereby declare and state as follows:

1. I am the president of the Department of Justice Recreation Association (the "DJRA"). I have personal knowledge of the facts set forth below.

2. The DJRA is the sponsor of a group long-term disability plan known as the Federal Employees Group Long-Term Disability Plan (the "Plan"). Hartford Life And Accident Insurance Company ("Hartford") issued a policy of insurance to the DJRA for the Plan. All participants of the Plan must be employees of the United States Department of Justice (the "DOJ").

3. The Plan became effective on March 1, 1995. Before that date, for the better part of a year, the DJRA was heavily involved in designing the structural components of the Plan and its subsidiary terms and conditions. Our involvement in this regard took occurred in two ways. First, the DJRA negotiated directly with Hartford over different issues relating to the design of the Plan. In addition, the DJRA reviewed numerous drafts of the Plan and marketing documents

associated with it. I personally participated in these negotiations and reviewed and edited these draft documents.

4. I remember several specific components of the Plan that were negotiated with Hartford before the Plan was acceptable to the DJRA. First, the DJRA wanted DOJ employees who were law enforcement officers to be eligible to participate in the Plan. Hartford initially resisted this concept, but the parties eventually agreed to make law enforcement officers eligible at a higher premium rate than for non-law enforcement employees. Second, the DJRA wanted employees of the Federal Bureau of Investigation (the "FBI") to be eligible for the Plan. After some negotiation, Hartford and the DJRA resolved this point by allowing FBI employees to participate so long as they were not counted toward the minimum number of participants necessary to activate the Plan. Third, the DJRA insisted that pregnancy be recognized as a disability within the meaning of the Plan. Hartford acceded to this point. Fourth, I recall that the DJRA wanted the definition of the term "elimination period" in the draft Plan I reviewed changed to clarify its provisions for our membership. Hartford accepted our changes to this definition.

5. The DJRA selected many of the other basic terms of the Plan from among a range of options presented to us by our insurance broker. For example, we specified that we wanted a definition of disability in the Plan that would include disabilities caused by mental health problems.

6. Since the Plan went into effect, the DJRA has continued to play an active role in establishing the Plan's terms, conditions, and basic structure. For example, in April 2000, the DJRA requested that the Plan's definition of "Cost Of Living Adjustment" be changed. In the

same month we also requested a specific definition of the term "Monthly Rate of Basic Earnings" be added to the Plan. Hartford agreed to make these requested changes.

7. In addition to plan design, the DJRA has also played a very active role in promoting the Plan to DOJ employees. During our initial negotiations in 1995, Hartford agreed that the DJRA would have the right to review, edit and approve all marketing materials developed for the Plan. I personally have reviewed and edited numerous such documents over the years. In addition, when the Plan first became effective, I distributed the memo attached hereto as Exhibit A to all DOJ employees. That memo describes the Plan as a "great" plan, and that description is consistent with the DJRA's strong efforts to encourage DOJ employees to enroll. Since the Plan became effective, the DJRA has given numerous briefings at which it has endorsed the Plan and encouraged DOJ employees to enroll.

8. One of the purposes for which the DJRA exists today is to deal with the DOJ on particular matters relating to the Plan. For example, from time to time a problem will arise in connection with a DOJ employee's participation in the Plan. On several of these occasions, I have dealt directly with management at the DOJ, explaining how the Plan works and is paid for, in order to straighten out the problem. In addition, the DJRA has been very active in making it easier for DOJ employees to pay for the Plan through payroll deductions. Two years ago, as a direct result of the efforts of the DJRA and others, the payroll deduction system used by the DOJ was changed from a system based on discretionary monthly allotments to one based on pay-period allotments. This has made it easier for DOJ employees to participate in the Plan. Apart from straightening out such problems and working on payroll deduction issues, however, the DJRA generally does not deal with the DOJ.

9. The DJRA receives 13 cents per enrollee per pay period as compensation for the services it provides in connection with the Plan. Although we do not maintain strict cost accounting, this income results in a small profit for the DJRA because we incur very few costs in connection with the services we provide for the Plan.

10. The DJRA has a board of directors and two officers. The Board members are elected from the membership. Over the years, DJRA members have participated in our Association in many different ways. DJRA members have formed and participated in activity groups focused on sports activities, photography and art. They have fielded sports teams and sponsored Little League teams, and have provided financial support to worthy groups such as day care centers.

11. Since the Plan became effective in 1995, one of the most important reasons why the DJRA has been organized and in existence is for the purpose of establishing and offering to DOJ employees a disability income protection plan. In fact, if the DJRA did not offer this important benefit to DOJ employees, we would not be adequately performing our mission, which is to sponsor programs and activities of benefit to justice employees.

12. Under the terms of the plan, the DJRA may terminate its participation in the Plan at any time.

Arthur C. Smith, III

Sworn to before me under the penalties of perjury this 19th day of March, 2004.

ROWENA G. DENNIS-BRIGHT
Notary Public of Commonwealth of Virginia
My Commission Expires November 30, 2007